2012-5130

# United States Court of Appeals
# for the Federal Circuit

KLAMATH CLAIMS COMMITTEE,

*Plaintiff-Appellant,*

*v.*

UNITED STATES,

*Defendant-Appellee.*

*Appeal from the United States District Court of Federal Claims in Case No. 09-CV-00075, Judge Francis M. Allegra.*

## BRIEF OF PLAINTIFF-APPELLANT

THOMAS W. FREDERICKS
MATTHEW J. KELLY
FREDERICKS PEEBLES & MORGAN LLP
1301 Connecticut Avenue, NW
Suite 450
Washington, DC 20036
(202) 450-4887

*Attorneys for Plaintiff-Appellant*

OCTOBER 15, 2012

COUNSEL PRESS, LLC          (202) 783-7288  *  (888) 277-3259                    244281

Form 9

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Klamath Claims Committee _____ v. United States of America

No. 12-5130

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Klamath Claims Committee certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Klamath Claims Committee

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Those persons whose names appeared on the Klamath final roll as published by the Secretary of the of the Interior in the Federal Register on November 21, 1957, their heirs and legatees (collectively referred to as the "1954 Members").

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Appellant is a private association that has no parent corporation, does not issue stock and is not owned in whole or in part by any corporation or publically held company.

4. ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Daniel H. Israel, Law Office of Daniel H. Israel, of Boulder, CO (deceased); Thomas W. Fredericks, Partner and Matthew J. Kelly, Partner, of Fredericks Peebles Morgan LLP.

09/14/12
_____
Date

/s/ Thomas W. Fredericks
_____
Signature of counsel

Thomas W. Fredericks
_____
Printed name of counsel

Please Note: All questions must be answered
cc: Director, Commercial Litigation Branch, Civ. Div., US DOJ

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ...................................................................iv

I.      Statement of Related Cases .......................................................xi

II.     Jurisdictional Statement.............................................................1

III.    Statement of the Issues ..............................................................2

IV.     Statement of the Case ................................................................4

V.      Statement of Facts......................................................................7

VI.     Summary of Argument .............................................................20

VII.    Standard of Review ..................................................................22

        1.      RCFC 19...........................................................................22

        2.      RCFC 15...........................................................................24

VIII.   Argument ..................................................................................26

        I.      THE COURT OF FEDERAL CLAIMS APPLIED THE
                WRONG TEST IN THIS CIRCUIT FOR DETERMINING AN
                "INTEREST" UNDER RCFC 19(a)......................................26

                A.      The "Interest" Analysis In The Federal Circuit Starts
                        With The Plaintiff's Complaint, Not The Absentee's
                        Claims ......................................................................26

        II.     THE COURT OF FEDERAL CLAIMS IMPROPERLY PUT
                THE CLAIMED INTEREST OF AN ABSENTEE AHEAD OF
                THE STATUTORY RIGHTS OF THE PLAINTIFF........................30

                A.      The Termination Act Established The Final Enrollees'
                        Right To Bring Tribal Claims After Termination....................34

                B.      The Distribution Act Affirms Final Enrollees' Right To
                        Bring Tribal Claims After Termination ...................................36

C.      The Restoration Act Preserved The Rights Of The Final
        Enrollees.................................................................................37

D.      Plaintiff's Proposed Claims Concern Personal Property
        Belonging To The Final Enrollees, Not Terminated Or
        Restored Tribal Property............................................................43

III.   COMPLETE RELIEF CAN BE ACCORDED THE PARTIES
       UNDER RCFC 19(a)(1)(A) ..................................................46

IV.    THE TRIBE IS NOT AN INDISPENSABLE PARTY UNDER
       RCFC 19(B) WITHOUT WHOM THE ACTION CANNOT
       PROCEED.........................................................................49

A.      The Court's RCFC 19(b) Decision ..........................................49

B.      The Restoration Act Limited The Restored Tribe's
        Sovereignty ..............................................................................50

V.     THE COURT OF FEDERAL CLAIMS ABUSED ITS
       DISCRETION IN DENYING PLAINTIFF'S MOTION TO
       AMEND THE COMPLAINT AS "MOOT" WITHOUT
       CONSIDERING THE PROPOSED AMENDED CLAIMS ..............54

A.      The Denial Is Contrary To The Spirit And Policy Of
        RCFC 15(a) ..............................................................................58

IX.   Conclusion and Relief Requested.................................................60

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

Acumed LLC v. Stryker Corp.,
  551 F.3d 1323 (Fed. Cir. 2008)...........................................................24

Am. Mar. Transp., Inc. v. United States,
  870 F.2d 1559 (Fed.Cir.1989).............................................................29

Caribbean Broadcasting System, Ltd. v. Cable  Wireless P.L.C.,
  148 F.3d 1080 (D.C. Cir. 1998)...........................................................25

Cathedral Candle Co. v. U.S. Int'l. Trade Commission,
  400 F.3d 1352 (Fed. Cir. 2005).............................................................39

Cherokee Nation of Oklahoma v. Babbitt,
  117 F.3d 1489 (D.C. Cir. 1997).............................................................52

Choctaw Nation v. United States,
  100 F.Supp. 318 (Ct. Cl. 1951),
   cert. denied, 343 U.S. 955, 72 S.Ct. 1050 (1952)...............................35

Cloverleaf Standardbred Owners Association, Inc. v. National Bank,
  699 F.2d 1274 (D.C.Cir.1983)..............................................................23

Crowe and Dunlevy, P.C. v. Stidham,
  640 F.3d 1140 (10th Cir. 2011)............................................................52

Davis v. U.S.,
  192 F.3d 951 (10th Cir. 1999) .......................................... 23, 24, 29, 50

Dussouy v. Gulf Coast Inv. Corp.,
  660 F.2d 594 (5th Cir. 1981) ................................................ 54, 55,  59

Extra Equipamentos E Exportacao Ltda. v. Case Corp.,
  361 F.3d 359 (7th Cir. 2004) ...............................................................23

Foman v. Davis,
  371 U.S. 178 (1962)...................................................................... 24, 54

iv

Goodyear Atomic Corp. v. Miller,
    486 U.S. 174, 108 S.Ct. 1704 (1988)...................................................38

Holland v. United States,
    62 Fed. Cl. 395 (2004) ........................................................... 54, 55

Innogenetics, N.V. v. Abbott Labs.,
    512 F.3d 1363 (Fed. Cir. 2008).....................................................24

Intel Corp. v. Commonwealth Scientific & Indus. Research Organization,
    455 F.3d 1364 (Fed. Cir. 2006)......................................................51

James Madison Ltd. v. Ludwig,
    82 F.3d 1085 (D.C. Cir. 1996) ......................................................25

Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,
    11 F.3d 399 (3rd Cir. 1993) ..........................................................24

Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services, Inc.,
    175 F.3d 848 (10th Cir. 1999) .......................................................25

Kalman v. Berlyn Corp.,
    914 F.2d 1473 (Fed. Cir. 1990)
    opinion clarified, 89-1371, 1991 WL 345039 (Fed. Cir. Mar. 4, 1991).............24

Keweenaw Bay Indian Cmty. v. Mich.,
    11 F.3d 1341 (6th Cir.1993) ..........................................................29

Kimball v. Callahan,
    493 F.2d 564 (9th Cir. 1974) ..................................................... 10, 27

Kimball v. Callahan,
    590 F.2d 768 (9th Cir. 1979) ........................................................10

Kiowa Tribe of Oklahoma v. Mfg. Technologies, Inc.,
    523 U.S. 751, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998)...................................51

Klamath and Modoc Tribes, et al., v. United States,
    13 Ind. Cl. Comm. 41 (1964).........................................................10

Klamath and Modoc Tribes v. United States,
    193 Ct. Cl. 670 (1971) ...............................................................10

Klamath and Modoc Tribes v. U.S.,
    436 F.2d 1008 (Ct. Cl. 1971) ...................................................... *passim*

Klamath Tribe Claims Committee v. U.S.,
    --- Fed. Cl. ---, 2012 WL 2878551 (2012)................................... *passim*

Klamath Tribe Claims Committee v. United States,
    --- Fed. Cl. ---, 2012 WL 2878551 (Jul. 16, 2012) .................................... *passim*

Klamath Tribe Claims Committee v. United States,
    97 Fed. Cl. 203 (2011).................................................................... *passim*

Klamath Tribes of Oregon, et al. v. Pacificorp,
    2005 WL 1661821 (D. Oreg. 2005) .................................................10

Klamath Tribes of Oregon, et al. v. Pacificorp,
    268 Fed. Appx. 575 (9th Cir. 2008)...............................................10

Koon v. United States,
    518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)................................ 23-24

Makah Indian Tribe v. Verity,
    910 F.2d 555 (9th Cir.1990) ...........................................................29

National Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of South Carolina, Inc.,
    210 F.3d 246 (4th Cir. 2000) ..........................................................23

Nez Perce, et al. v. Salazar, et al.,
    Case No. 06-cv-2239 (U.S.D.D.C.) ........................................ xi, 17, 57

Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel,
    657 F.3d 1159 (11th Cir. 2011),
    cert. denied, 132 S.Ct. 2379 (2012) ..............................................50

Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe,
    473 U.S. 753 (1985)...........................................................................10

Pacific Nat'l Cellular v. United States,
    41 Fed. Cl. 20 (1998) .......................................................................23

Pietsch v. McKissack & McKissack,
    677 F. Supp. 2d 325 (D.D.C. 2010).............................................25

<u>Ramah Navajo Sch. Bd., Inc. v. Babbitt</u>,
   87 F.3d 1338 (D.C.Cir.1996) ............................................................29

<u>Republic of Philippines v. Pimentel</u>,
   553 U.S. 851, 128 S. Ct. 2180, 171 L. Ed. 2d 131 (2008)...................... 23, 49, 51

<u>Santa Clara Pueblo v. Martinez</u>,
   436 U.S. 49, 98 S.Ct. 1670 (1978)....................................................52

<u>Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering</u>,
   476 U.S. 877 (1986).....................................................................51

<u>United Keetoowah Band of Cherokee Indians v. United States</u>,
   480 F.3d 1318 (Fed. Cir. 2007)................................................ *passim*

<u>U.S. v. Adair</u>,
    478 F. Supp. 336 (D. Oreg. 1979) ...................................................10

<u>U.S. v. Adair</u>,
    723 F.2d 1394 (9th Cir. 1983) ......................................................10

<u>United States v. Lara</u>,
   541 U.S. 193, 124 S. Ct. 1628, 158 L. Ed. 2d 420 (2004)..................................53

<u>Veridyne Corp. v. United States</u>,
   86 Fed. Cl. 668 (2009) ...............................................................24

<u>Walsh v. Centeio</u>,
   692 F.2d 1239 (9th Cir.1982) ........................................................23

<u>Watson ex rel. Watson v. Beckel</u>,
   242 F.3d 1237 (10th Cir. 2001) ......................................................25

<u>Wolfchild v. U.S.</u>,
   96 Fed. Cl. 302 (Fed. Cl. 2010) ............................................... 38, 39, 41

## Statutes

25 U.S.C. § 715c(b) ..........................................................................38

25 U.S.C. § 733(b) ............................................................................38

25 U.S.C. § 941b(c) ..........................................................................38

25 U.S.C. § 564 et seq.............................................................. 4, 7, 15

25 U.S.C. § 564a(d) ..................................................................... 8, 35

25 U.S.C. § 564b ........................................................................... 8, 34

25 U.S.C. § 564c ............................................................... 8, 34, 35 40

25 U.S.C. § 564d(a) ...........................................................................8

25 U.S.C. § 564e(b) ...................................................................... 9, 35

25 U.S.C. § 564e(c) .................................................................... passim

25 U.S.C. § 564g(a) ...........................................................................9

25 U.S.C. § 564h(b) ...................................................................... 8, 35

25 U.S.C. § 564*l*(c) ...........................................................................4

25 U.S.C. § 564q(a) ...................................................................... 9, 35

25 U.S.C. § 564r.................................................................... 7, 42, 44

25 U.S.C. § 564t...............................................................................36

25 U.S.C. § 565 et seq................................................................ passim

25 U.S.C. § 565a ........................................................................ 11, 36

25 U.S.C. § 565b ........................................................................ 11, 36

25 U.S.C. § 565c ............................................................. 11, 36, 37, 40

25 U.S.C. § 566 ...............................................................................45

25 U.S.C. § 566(a) ................................................................. 11, 12, 39

25 U.S.C. § 566(b) ........................................................................ 12, 39, 40

25 U.S.C. § 566(d) .................................................................... 12, 40, 58

25 U.S.C. § 566g ............................................................................. 12, 42

25 U.S.C. § 566g(2) ........................................................................ 12, 42

25 U.S.C. § 566g(5) ........................................................................ 12, 42

25 U.S.C. § 566g(6) ........................................................................ 12, 42

25 U.S.C. § 1300g-5 ....................................................................... 11, 38

25 U.S.C. § 1779, et seq. ......................................................................27

25 U.S.C. § 1779f. ...............................................................................28

28 U.S.C. § 1295(a)(3) ..........................................................................1

28 U.S.C. § 1491 ..................................................................................16

28 U.S.C. § 1505 ............................................................................. 1, 16

28 U.S.C. § 2501 ......................................................................... 5, 15, 16

## Rules and Regulations

22 Fed. Reg. 9,303 (Nov. 21, 1957)....................................................34

26 Fed. Reg. 7,362 (Aug. 12, 1961)....................................................35

Fed. R. App. P. 4(a)(1)(B) ....................................................................1

Fed. R. Civ. P. 19 .................................................................................23

Fed. R. Civ. P. 19(a)(1) ........................................................................27

RCFC 12(b)(1) ......................................................................................13

RCFC 12(b)(6) ......................................................................................13

RCFC 15(a) .................................................................................. 3, 54, 55

RCFC 19 .................................................................................................. 27, 28

RCFC 19(a) ..................................................................................... *passim*

RCFC 19(a)(1) ................................................................... 26, 27, 46

RCFC 19(a)(2) ..........................................................................................27

RCFC 19(b) ...................................................................................... passim

RCFC 24(a) .............................................................................. 17, 28, 29

## Other Authorities

H. Rpt. 99-630 (Jun. 11, 1986) ..............................................................40

H.R. 3554 .................................................................................................40

H.R. Rep. No. 94-1487, at 7 (1976),
     reprinted in 1976 U.S.C.C.A.N. 6604, 6605.......................................51

Joint Resolution of the Klamath Tribal Council and the Claims Committee,
Res. 2008-13 (Mar. 13, 2008) ..................................................................10

Klamath Tribal Executive Committee Resolution No. 83-2 (Jan. 18, 1983) ..........10

Klamath Tribes Executive Committee Resolution No. 94-27 (Jul. 28, 1993) ........10

Klamath Tribe Claims Committee Report to the General Council
(Jun. 1, 1996) ..........................................................................................10

Treaty between the United States and the Klamath and Moadoc Tribes and
Yahooskin Band of Snake Indians, October 14, 1864, 16 Stat. 707 ........................4

Wright & Miller, 7 Fed. Prac. & Proc. Civ. (3d ed.) § 1604 ...................................46

## <u>STATEMENT OF RELATED CASES</u>

There have been no previous appeals in this case. This Court's decision may affect the disposition of Plaintiff-Appellant's pending motions to intervene and for injunctive relief in <u>Nez Perce v. Salazar</u>, Case No. 06-CV-2239 (U.S.D.D.C.), a trust fund mismanagement suit by the Klamath Indian Tribes involving trust accounts that were the subject of Plaintiff-Appellant's proposed amended claims in this case below.

## **JURISDICTIONAL STATEMENT**

Jurisdiction in the Court of Federal Claims was invoked under 28 U.S.C. § 1505. Plaintiff is an identifiable group American Indians. Defendant is the United States of America. Plaintiff's claims arise under federal statutes.

Jurisdiction of the Court of Appeals for the Federal Circuit is invoked pursuant to 28 U.S.C. § 1295(a)(3). A final judgment was entered by the Court of Federal Claims in this action on July 17, 2012 after two opinions, one on February 11, 2011, 97 Fed. Cl. 203, and one on July 16, 2012, --- Fed. Cl. ---, 2012 WL 2878551. Appellant's notice of appeal was timely filed on August 13, 2012. <u>See</u> Fed. R. App. P. 4(a)(1)(B). This appeal is from a final judgment that disposed of all of Appellant's claims below.

## STATEMENT OF THE ISSUES

Plaintiff's action below involved claims to enforce the statutory rights of the 2,133 men, women and children listed by the Federal government as the final enrolled members of the terminated Klamath and Modoc Tribes and Yahooskin Band of Snake Indians in 1954. Those rights were established by the Klamath Termination Act of 1954, the Klamath Distribution Act of 1965, and the Klamath Restoration Act of 1986. The Termination Act transferred all rights in tribal property to the final enrollees, including the right to bring tribal claims against the United States after termination. The Distribution Act provided for the disbursal of awards so obtained, and for supplementing the litigation fund used to pay the costs of future claims. The Restoration Act of 1986 restored federal recognition to the Klamath Indians and preserved the pre-restoration property rights of the final enrollees.

The Court of Federal Claims found that the Klamath Indian Tribes, restored to federal recognition in 1986, was an indispensable party under RCFC 19(b) without whom Plaintiff's action should not proceed. The court dismissed Plaintiff's complaint and denied its pending request to amend the complaint as moot. The issues presented are:

1.     Whether the CFC applied the wrong analysis in this Circuit for determining when an absent party has a legally protectable interest in the statutory claims of a plaintiff under RCFC 19(a).

2.     Whether the CFC's determination that the restored Tribe was an indispensable party without whom Plaintiff's action could not proceed under RCFC 19(b) impermissibly limits Congress' plenary power over Indian affairs.

3.     Whether it was an abuse of discretion for the CFC to deny Plaintiff's motion to amend its complaint under RCFC 15(a) as "moot" in a nineteen-word footnote containing no further explanation and having no reference to or discussion of Plaintiff's proposed additional claims.

## STATEMENT OF THE CASE

Plaintiff commenced its action in the Court of Federal Claims ("CFC") on February 6, 2009. The complaint set forth claims for the taking of trust assets and the breach of fiduciary duties statutorily owed to the final enrollees of the terminated Klamath and Modoc Tribes and Yahooskin Band of Snake Indians under the Klamath Termination Act of 1954 ("Termination Act"),[1] the Klamath Restoration Act of 1986 ("Restoration Act"),[2] and the Klamath Treaty of 1864 ("1864 Treaty").[3] Plaintiff's statutory claims arose out of Defendant's failure to pay monies owing under Section 13 of the Termination Act (25 U.S.C. § 564*l*(c)) and for Defendant's August 2008 removal of the Chiloquin Dam, a part of the Klamath Indian Irrigation Project, causing the loss of treaty-based fishing and water rights in which the final enrollees held an interest. A52. Plaintiff amended its complaint once as of right. A52. On May 7, 2009, Defendant filed a motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim. A57. Oral argument on Defendant's motion to dismiss occurred on April 19, 2010. A322.

---

[1] Act of Aug. 13, 1954, 68 Stat. 718, codified at 25 U.S.C. § 564 et seq.

[2] Pub. L. 99-398 (Aug. 27, 1986), 100 Stat. 850, codified at 25 U.S.C. § 564 et seq.

[3] Treaty between the United States and the Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians, October 14, 1864, 16 Stat. 707.

On February 11, 2011, the CFC issued a published opinion dismissing

Plaintiff's claims relating to the non-disbursement of funds and to the transfer and

removal of the Chiloquin Dam for lack of jurisdiction under 28 U.S.C. § 2501.

Klamath Tribe Claims Committee v. United States, 97 Fed. Cl. 203 (2011)

("Klamath I"). The court found that it had jurisdiction over the remaining claims,

but determined sua sponte that the Klamath Indian Tribes, restored to federal

recognition in 1986 (the "Tribe"), was a required party under RCFC 19(a) that

could not be joined. A2. The court extended an invitation to the Tribe to intervene

in the action, which the Tribe declined. See A361. The court proceeded to

consider whether the restored Tribe was an indispensable party under RCFC

19(b). A2.

In July 2011, Plaintiff retained substitute counsel, who entered their

appearance. A369. The parties were ordered to respond to the Tribe's declination

of the court's invitation to intervene, and to brief the issue of the Tribe's

indispensability, A379, which the parties filed on September 26, 2011. A380,

A466. On October 7, 2011, the restored Tribe sought leave to participate as amicus

curiae. A491. The Tribe's motion was opposed by Plaintiff, supported by

Defendant, and granted by the court on November 1, 2011. A494, A569. On April

24, 2012, Plaintiff sought leave to amend its complaint to allege further statutory

claims arising under the Termination Act and the Klamath Distribution of

Judgment Fund Act of 1965 ("Distribution Act")[4] relating to the final enrollees'

litigation fund, A629, A630, which Defendant opposed. A765.

By order issued July 16, 2012, the CFC held that the restored Tribe was an

indispensable party under RCFC 19(b) and dismissed Plaintiff's complaint and

denied its motion to amend the complaint as moot. <u>Klamath Tribe Claims

Committee v. United States</u>, --- Fed. Cl. ---, 2012 WL 2878551 (Jul. 16, 2012)

("<u>Klamath II</u>"). Final judgment was entered on July 17, 2012. A13. The Committee

timely filed its notice of appeal on August 13, 2012. A892.

---

[4] Pub. L. 89-224 (Oct. 1, 1965), 79 Stat. 897, codified at 25 U.S.C. § 565 <u>et</u> <u>seq</u>.

## STATEMENT OF FACTS

This matter arises out of the history of Federal relations with the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians, recognized by treaty in 1864, terminated by Congress in 1954, and restored to recognition in 1986. At issue on appeal is whether the Court of Federal Claims erred as a matter of law in dismissing the complaint and denying the motion to amend by deciding that, for purposes of RCFC 19(a), the restored Tribe had a legally protectable interest in the statutory rights at issue in Plaintiff's existing and proposed amended claims. Congress defined those rights for the termination, post-termination and restoration eras in the three separate pieces of legislation: the Klamath Termination, Distribution, and Restoration Acts.

The Termination Act was enacted in 1954 to terminate federal supervision over the trust and restricted property of the tribe and its members and to terminate federal services provided to them because of their status as Indians. 25 U.S.C. § 564. The Act extinguished certain powers arising under tribal and federal laws. The Act acknowledged the ability of the final enrollees to act under the old tribal constitution after termination, provided such actions were not inconsistent with the Termination Act. 25 U.S.C. § 564r. Reciprocally, the Act "terminated" the powers of the Secretary or other officer of the United States to take, review, or approve any action under the tribe's constitution or bylaws. 25 U.S.C. § 564r.

7

The Termination Act permanently closed tribal membership as of August 13, 1954 (25 U.S.C. § 564b) and directed that all interests in tribal property be equally divided among the final enrollees. 25 U.S.C. § 564c. Upon publication of the final roll, the interest of each final enrollee in tribal property became heritable, personal property subject to state probate laws. 25 U.S.C. §§ 564c, 564h(b). The final roll was published in the Federal Register on November 21, 1957. 22 Fed. Reg. 9,303.

The Termination Act defined "tribal property" as "any real or personal property, including water rights, or any interest in real or personal property, that belongs to the tribe and either is held by the United States in trust for the tribe or is subject to a restriction against alienation imposed by the United States." 25 U.S.C. § 564a(d). It included the continuing right to bring tribal claims against the United States after termination. 25 U.S.C. § 564e(c).

Final enrollees were given two options for the distribution of tribal property by the Act. A final enrollee could participate in a plan for the future management of their share of tribal property by a private trustee, corporation, or other legal entity, or withdraw and have his or her interests in tribal property paid out in cash. 25 U.S.C. § 564d(a)(2), (5). The Act authorized the Secretary to sell tribal assets to provide the cash to pay withdrawing members. 25 U.S.C. § 564d(a). Of 2,133 final members, 1,660 withdrew. A4. The Act further provided that all final enrollees would share in the proceeds from future tribal claims against the United States

regardless whether they remained or withdrew. 25 U.S.C. § 564e(c); see also 25 U.S.C. § 565 et seq.

The Termination Act directed the Secretary to transfer unrestricted control of funds or personal property held in trust by the United States to the final enrollees by August 13, 1958. 25 U.S.C. § 564g(a). It was "the intention of Congress" that all actions related to the transfer of tribal property be completed no later than August 13, 1961. 25 U.S.C. § 564e(b). The Secretary was required to publish a proclamation of termination once the transfer was completed. 25 U.S.C. § 564q(a). The proclamation of termination was published on August 12, 1961. 61 Fed. Reg. 7,362.

Pursuant to the rights granted by the Termination Act, the final enrollees, acting pursuant to their old constitution, established the Plaintiff Claims Committee in order to pursue tribal claims against the United States after termination, A216-220; see also 25 U.S.C. § 565 et seq. Membership on the committee was to be divided equally between withdrawing and remaining members. A218. The Committee has gone by different names over the years, including the Executive Committee (Claims), the Klamath Executive Committee on Claims, the Klamath Tribes Executive Committee on Claims, and the Klamath

Claims Committee.[5]  Since 1961, Plaintiff has successfully pursued numerous

tribal claims against the United States on behalf of the final enrollees.[6]

In 1961 the final enrollees set aside $350,000 from tribal assets to pay the

cost of pursuing tribal claims. A771 (citing S. Rep. No. 89-160 (1965)). The

Secretary of the Interior ("Secretary") agreed to hold and maintain the litigation

fund, and has done so ever since. A771.

Congress in 1965 enacted the Klamath Distribution Act. 25 U.S.C. § 565 et

seq. The Distribution Act reaffirmed the statutory right of the final enrollees to

bring tribal claims against the United States. It established procedures for

distributing judgment funds from such claims to the final enrollees and to the heirs

---

[5] See A231-233  (Klamath Tribal Executive Committee Resolution No. 83-2 (Jan.
18, 1983)); A225-226  (Klamath Tribes Executive Committee Resolution No. 94-
27 (Jul. 28, 1993); A231-233 (Klamath Tribe Claims Committee Report to the
General Council (Jun. 1, 1996); A234-235 (Joint Resolution of the Klamath Tribal
Council and the Claims Committee, Res. 2008-13 (Mar. 13, 2008). See also
Klamath I at 206 (Committee given authority by terminated tribe's governing body
to pursue claims against the United States).

[6] See, e.g., Klamath and Modoc Tribes v. U.S., 436 F.2d 1008 (Ct. Cl. 1971);
Kimball v. Callahan, 493 F.2d 564 (9th Cir. 1974); Kimball v. Callahan, 590 F.2d
768 (9th Cir. 1979); Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe,
473 U.S. 753 (1985). Klamath and Modoc Tribes, et al., v. United States, 13 Ind.
Cl. Comm. 41 (1964); Klamath and Modoc Tribes v. United States, 193 Ct. Cl. 670
(1971); U.S. v. Adair, 478 F. Supp. 336 (D. Oreg. 1979); U.S. v. Adair, 723 F.2d
1394 (9th Cir. 1983); Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe,
473 U.S. 753 (1985); Klamath Tribes of Oregon, et al. v. Pacificorp, 2005 WL
1661821 (D. Oreg. 2005) (not reported); Klamath Tribes of Oregon, et al. v.
Pacificorp, 268 Fed. Appx. 575 (9th Cir. 2008).

and legatees of deceased final enrollees. See 25 U.S.C. §§ 565b (distribution

procedures); 565a (distribution of award from Indian Claims Commission docket

100); 565c (distribution of funds from other judgments). It provided for the

distribution to the final enrollees of any other funds held in the U.S. Treasury to the

credit of the Klamath Tribe. 25 U.S.C. § 565c. The Act authorized the Secretary to

withhold from distribution the funds "heretofore or hereafter set aside" to pay the

usual and necessary expenses of prosecuting further claims against the United

States. 25 U.S.C. § 565. See also 25 U.S.C. § 565c (same). The Bureau of Indian

Affairs relied on the Distribution Act in the mid-1990s to distribute approximately

$2.5 million of excess monies from the litigation fund to the final enrollees. A227-

228.

Thirty-two years after termination, Congress restored federal recognition to

the tribe and its members with the Klamath Restoration Act.  Unlike other

restoration legislation,[7] the Restoration Act did not completely repeal the

Termination Act.

The Act made applicable to the restored Tribe and its members "all laws and

regulations of the United States of general application to Indians or nations, tribes,

or bands of Indians" that were not "inconsistent with any specific provision" of the

Restoration Act, and "[e]xcept "as otherwise provided" by the Act. 25 U.S.C. §

7 See, e.g., Ysleta del Sur Pueblo Restoration Act, Pub. L. 100-89, Title I, § 106
(Aug.18, 1987), 101 Stat. 666, codified at 25 U.S.C. § 1300g-5.

566(a). The Act restored to the Tribe those rights and privileges arising under "any "Federal treaty, Executive order, agreement, or statute, or any other Federal authority" that had been "diminished or lost" under the Termination Act. 25 U.S.C. § 566(b). It rendered the provisions of the Termination Act inapplicable to the restored Tribe and its members after August 27, 1986 "to the extent that they are inconsistent" with the Restoration Act. 25 U.S.C. § 566(b). The Act provided that nothing within it "shall alter any property right or obligation, any contractual right or obligation, or any obligation for taxes already levied." 25 U.S.C. § 566(d) ("Certain rights not altered").

Like the Termination Act, the Restoration Act incorporates the Klamath Constitution by reference. 25 U.S.C. § 566g(2), (5), (6); see 25 U.S.C. § 564r.  The Act defines tribal "member" as persons eligible for enrollment under the Tribe's constitution and bylaws. 25 U.S.C. § 566g. Under Article III of the Klamath Constitution, final enrollees are "automatically" enrolled as members. A605. That is not the case for their descendants. Under the Klamath Constitution, persons born after the closing of the final roll on August 13, 1954 may enroll in the restored Tribe only if they satisfy eligibility requirements and are approved by an enrollment committee. A605. The enrollment of such persons is for "Tribal purposes" only and would not affect their eligibility to receive funds from disbursements related to the "Termination Act or claims litigation." A605.

12

On February 6, 2009, Plaintiff commenced this action to enforce the statutory rights of the final enrollees under the Termination Act and the 1864 Treaty. A38. The caption of the complaint incorrectly described Plaintiff as "Klamath Tribe Claims Committee," notwithstanding that the body of the complaint referred correctly to the "Klamath Claims Committee." A38, ¶ 2. Plaintiff amended the complaint and corrected the caption. A50. Plaintiff's complaint alleged harms to those interests from the taking of trust assets and the breach of fiduciary duties related the loss of fishing and storage water rights from the removal of the Chiloquin Dam. A52. Defendant filed a motion to dismiss under RCFC 12(b)(1) and 12(b)(6). After delays due to the illness of Plaintiff's counsel, A363, oral argument on the motion was conducted on April 19, 2010. A328.

The majority of the hearing was taken up with discussion of whether Plaintiff's suit was authorized by the restored Tribe. The court and the attorneys for both sides discussed whether the restored Tribe was the real party in interest (see, e.g., A896, 935, 940, 954, 985, 1046); whether it should consider evidence outside the record to determine that issue (see, e.g., A923, 926, 944-946, 1013); who held the rights at issue (see, e.g., A959); whether Plaintiff was an arm of the restored Tribal government or not (see, e.g., A926, 930, 932-933, 977-978, 981); whether in deciding such issues the court was wading into intertribal disputes (see, e.g., A932-933); whether Defendant would be exposed to dual liability if Plaintiff

and the restored Tribe each held the same claims (see, e.g., A1043-1044); and

whether Plaintiff had any authority to bring restored Tribal claims (see, e.g., A936,

938, 959, 982-983, 1012, 1044, 1042).

The Defendant took the position that Plaintiff lacked any authority to bring

claims on behalf of the restored Tribe (A936); that it could not allege injuries for

claims it didn't possess (A959); that only the restored Tribe could bring claims in

the post-restoration period (A1013); that what was really at issue was a dispute

over who represents the restored Tribe (A932-933); and that to proceed with the

claim, Plaintiff must provide a resolution from the restored Tribe's government

expressly authorizing it bring this action.

Plaintiff's attorney of record directed the court's attention to the complaint

itself, and to the terms of the Termination and Distribution Acts. A975, 1043. He

explained that the Committee is a division of the "terminated tribe" established by

the final enrollees (referred to in the complaint as the "54 members"). A977. He

stated that the final enrollees were preserved by the Restoration Act. A977. He said

that the status of the Committee was unchanged by the Restoration Act. A978. He

confirmed that the restored Tribe issued no particular grant of authority to the

Committee post-restoration. A982. He argued that Plaintiff had demonstrated that

its authority arises under statute. A1043.

14

The court adopted Defendant's concerns as its own and, at the close of the hearing, ordered Plaintiff to file an affidavit or resolution from an appropriate restored Tribal official directly addressing Plaintiff's authority to file its claims. A1048, 1052, 1056; see also A332-333.

Plaintiff ultimately submitted a copy of a letter sent by the restored Tribe's Chairman to the chairman of the Claims Committee declining to provide the requested affidavit "for lack of authority." A331. In addition, the Tribal Chairman's letter asserted: (1) that the Plaintiff Committee was established during termination before the tribe's recognition was restored; (2) that Plaintiff was not a committee under the Klamath Constitution; (3) that the final enrollees are different from the restored Tribe's membership (known as the Tribe's "General Council"); (4) that historically Plaintiff was not directly accountable to the restored Tribal government; and (5) that Plaintiff's action "may potentially affect Tribal rights" of the enrolled members. Id. The health of Plaintiff's counsel deteriorated thereafter and he passed away on February 6, 2011.  A363, A377.

On February 11, 2011, the court granted Defendant's motion to dismiss as to claims relating to the disbursement of funds under the Termination Act and the transfer of title to the Chiloquin Dam for being outside the statute of limitations set by 28 U.S.C. § 2501. Klamath I, 97 Fed. Cl. 203 (2011). The CFC determined it

had jurisdiction over the remaining treaty-based fishing and water rights claims under 28 U.S.C. §§ 1491, 1505, and 2501. Klamath I, 97 Fed. Cl. at 210.

The restored Tribe did not request leave to intervene for the limited purpose of asserting an interest in the action, and the Defendant never requested joinder of the restored Tribe as a required party. Nevertheless, the court determined, sua sponte,[8] that that the restored Tribe was a required party under RCFC 19(a)(1) because the court could not afford complete relief in the restored Tribe's absence and because the Tribe claimed an interest in the subject matter of the lawsuit. Klamath I, 97 Fed. Cl. at 212-13.

The court premised its conclusion on "uncontested" facts: (1) that the membership and interests of the final enrollees and the restored Tribe overlapped; (2) that the rights Plaintiff sought to vindicate were "those same rights and associated fiduciary obligations" held by the restored Tribe under the 1864 Treaty; and (3) that the Tribal Chairman claimed the action would affect Tribal rights. Id. at 212. None of these facts were alleged by Plaintiff in its original or amended complaints.

Because of its sovereign immunity, the court invited the restored Tribe to intervene after which, if declined, the court would consider whether the Tribe was indispensable under RCFC 19(b). Klamath I, 97 Fed. Cl. at 214. In September

---

[8] The court stated that Defendant's briefs had challenged Plaintiff's authority to sue without the restored Tribe. Klamath I, 97 Fed. Cl. at 212.

2011, after Plaintiff retained substitute counsel, the parties briefed the issue of the restored Tribe's indispensability. A380, A466. Thereafter the restored Tribe, having declined the court's invitation to intervene, A361, sought leave to file a brief as an amicus, A491, a request granted over Plaintiff's opposition. A494.

While the indispensability question was pending, Plaintiff sought leave to amend its complaint to assert takings and breach of trust claims arising out of Defendant's handling of the final enrollees' litigation fund. A630. The proposed amended complaint alleged that Plaintiff had recently denied Plaintiff access to the litigation fund for the purpose of paying the costs of Plaintiff's action. A757. In opposing the motion, Defendant admitted that it had long provided litigation fund account information to the restored Tribe (A773-774); asserted it held the fund for exclusive benefit of the Tribe (A770); and stated that the fund was the subject of the Tribe's pending trust mismanagement suit in the District Court for the District of Columbia in <u>Nez Perce, et al. v. Salazar, et al</u>., Case No. 06-cv-2239. A790. In light of this new information, Plaintiff on June 4, 2012 filed a motion pursuant to FRCP 24(a) to intervene in the District Court action seeking to determine whether any other statutory interests of the final enrollees were also the subject matter of that action, and to enjoin the United States to preserve and maintain any and all records and communications relating thereto. Plaintiff's motion is still pending.

On July 16, 2012 the CFC issued a second opinion in the case, dismissing Plaintiff's remaining claims and denying its motion to amend as moot on the basis that the restored Tribe was an indispensable party under RCFC 19(b) without whom the action should not go forward. <u>Klamath II</u>, --- Fed. Cl. ---, 2012 WL 2878551 (2012). Applying the RCFC 19(b) factors to Plaintiff's surviving claims, the CFC found that Plaintiff's inability to seek compensation in the event of dismissal of those claims was outweighed by the sovereign interests of the restored Tribe. <u>Klamath II</u> at *7. The court found that proceeding without the Tribe could practically impair the Tribe's ability to protect its sovereign interests. <u>Id</u>. at *8. Even without direct preclusive effect against the Tribe, the court held, a ruling "would be a negative precedent" confronting the Tribe in future litigation that could "ripen into binding adverse precedent" were the CFC's ruling affirmed by the Federal Circuit. <u>Id</u>. Adding weight to the CFC's decision was that disposition in the Tribe's absence could subject Defendant to multiple and conflicting claims with respect to Plaintiff's surviving claims to the extent the "different" memberships of the final enrollees and the Tribe "assert at least partially overlapping claims" to the same statutory rights. <u>Klamath II</u> at *9. The CFC noted that if the Tribe had intervened, determining how to allocate any resulting award would require the CFC "to wade into disputes" amongst all the parties. <u>Klamath II</u> at n. 19.

The CFC did not explain its application of the Rule 19 analysis to Plaintiff's proposed amended claims relating to the litigation fund. In the opinion's final footnote, the court simply stated that "[b]ecause of this ruling, the court will deny, as moot, a motion filed by plaintiff to amend its complaint." <u>Klamath II</u> at n. 22. That is the entirety of the court's analysis with respect to Plaintiff's proposed amended claims.

# SUMMARY OF ARGUMENT

The Termination Era is a period in American history when the Federal Government sought to assimilate tribes into mainstream society by eliminating their federal rights as Indians. The era wound to a close in the 1960s, after which Congress began the slow and uneven process of restoring recognition to some tribes.

This case is a legacy of the Termination Era. It concerns the scope of the statutory rights of the members of the terminated Klamath and Modoc Tribes and Yahooskin Band of Snake Indians after termination. The court below dismissed Plaintiff's existing and proposed amended claims on the basis that the restored Klamath Indian Tribes was an indispensable party under RCFC 19(b) without whom the action could not go forward. The dismissal was predicated on the CFC's earlier determination that the Tribe was a required party under RCFC 19(a) that would not intervene and that could not be joined because of tribal sovereign immunity.

1.     The CFC applied the wrong test for determining whether the Tribe had a legally protectable interest in Plaintiff's statutory claims. Under the law in this Circuit, that analysis should have begun with a consideration of the substance of Plaintiff's claims not, as the CFC did, on the bare claim of interest asserted by Defendant on behalf of the Tribe. Nor did it consider, as it should first have done,

20

the statutory interests at issue in Plaintiff's claims. Instead the CFC focused on the

Tribe's interests arising under treaty, on the overlapping memberships of Plaintiff

and the restored Tribe, and on the refusal of the Tribal Chairman to authorize

Plaintiff's suit. The CFC decision implies that the Restoration Act gives the

restored Tribe a retroactive interest in the statutory rights of the final enrollees.

Had the CFC applied the proper 19(a) analysis, it would have found that the

statutory rights Plaintiff sought to vindicate in its action were property interests

that Congress vested in the final enrollees at termination, and that those interests

included the right to bring tribal claims arising under treaty against the United

States. Congress elaborated and expanded those rights after termination, and

narrowed and preserved them after restoration. The fact that such rights are

exclusive to the final enrollees would have obviated the need to consider the

restored Tribe's interests at all.

2.     Assuming the restored Tribe had any legally protectable interest in

Plaintiff's claims – which it did not – the CFC failed to account for the fact that the

RCFC 19(b) analysis in this case required the court to balance the interests of two

differently weighted sovereignties: that of the restored Tribe claiming an interest in

Plaintiff's claims, and that of the United States Congress, which created and

preserved the statutory rights of final enrollees. Tribal immunity exists at the

sufferance of Congress, whose plenary power over Indian Affairs reflects the

hierarchy of their respective authorities. In weighing the equities and dismissing under RCFC 19(b) because proceeding without the restored Tribe would practically impair the Tribe's ability to protect its sovereign interests, the Court of Federal Claims turned this hierarchy on its head.

3.    The CFC's denial of Plaintiff's motion for leave to amend its complaint to assert claims arising from the handling of the litigation fund over the years, a trust property in which the final proposed held exclusive rights, was contained in a nineteen-word footnote that disposed of the motion as "moot." It contained no reference or description of Plaintiff's proposed amended claims. If the reason for the court's denial was that the restored Tribe claimed an interest in the litigation fund, then, under this Circuit's precedent, the court should have considered the nature of Plaintiff's proposed amended claims. Had the court done so, it would have found it impossible for the Tribe to possess  any legally protectable interest in the subject of the proposed amended claims absent Congressional authorization.

## STANDARD OF REVIEW

### 1.    RCFC 19

This Circuit has not decided whether RCFC 19 determinations by the Court of Federal Claims are reviewed de novo or for abuse of discretion. United Keetoowah Band of Cherokee Indians v. United States, 480 F.3d 1318, 1324 n.2

(Fed. Cir. 2007). Because RCFC is "virtually identical" to Fed.R.Civ.P. 19, this Circuit looks to cases interpreting FRCP 19 for its analysis. United Keetoowah Band of Cherokee Indians, 480 F.3d at 1324 n.2. See also Pacific Nat'l Cellular v. United States, 41 Fed. Cl. 20, 25 n.3 (1998). Other circuits review 19(a) determinations for abuse of discretion, but review any legal conclusions supporting such determinations de novo. See, e.g., Davis v. U.S., 192 F.3d 951, 957 n. 3 (10th Cir. 1999); Cloverleaf Standardbred Owners Association, Inc. v. National Bank, 699 F.2d 1274, 1276-77 (D.C.Cir.1983); Walsh v. Centeio, 692 F.2d 1239, 1241-43 (9th Cir.1982). Findings of fact underlying a Rule 19 determination must be reviewed for clear error. National Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of South Carolina, Inc., 210 F.3d 246, 250 n. 7 (4th Cir. 2000). While there is disagreement as to the appropriate standard to apply to Rule 19(b) determinations, see Id. (collecting different circuit standards applied to FRCP 19(b) determinations), most circuits review a determination of indispensability for abuse of discretion. Extra Equipamentos E Exportacao Ltda. v. Case Corp., 361 F.3d 359, 361 (7th Cir. 2004). See also Republic of Philippines v. Pimentel, 553 U.S. 851, 864, 128 S. Ct. 2180, 2189, 171 L. Ed. 2d 131 (2008) ("The case-specific inquiry of Rule 19(b) implies some degree of deference to the district court.") As with FRCP 19(a), findings of law implicit in a 19(b) determination are reviewed de novo. Pimentel, 553 U.S. at 864, citing Koon v. United States, 518 U.S. 81, 99-

23

100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (a court "by definition abuses its

discretion when it makes an error of law"). <u>See also Davis v. U.S.</u>, 192 F.3d 951,

957 (10th Cir. 1999); <u>Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.</u>, 11

F.3d 399, 404 (3rd Cir. 1993) (finding district court's conclusion under 19(b) that a

decision could become persuasive precedent against absent party was a conclusion

of law subject to plenary review).

## 2.    <u>RCFC 15</u>

The denial of a motion to amend the complaint is reviewed for abuse of

discretion. <u>Kalman v. Berlyn Corp.</u>, 914 F.2d 1473, 1480 (Fed. Cir. 1990) opinion

clarified, 89-1371, 1991 WL 345039 (Fed. Cir. Mar. 4, 1991) (review of denial of

motion to amend limited to whether court abused its discretion), citing <u>Foman v.</u>

<u>Davis</u>, 371 U.S. 178, 182 (1962). An abuse of discretion may be found upon a

showing that the court made a clear error of judgment in weighing relevant factors

or exercised its discretion based upon an error of law or clearly erroneous factual

findings. <u>Acumed LLC v. Stryker Corp.</u>, 551 F.3d 1323, 1327 (Fed. Cir. 2008),

citing <u>Innogenetics, N.V. v. Abbott Labs.</u>, 512 F.3d 1363, 1379 (Fed. Cir. 2008),

reh'g and reh'g en banc denied. The refusal to grant leave to amend without any

justifying reason appearing for the denial is an abuse of discretion and inconsistent

with the spirit of the Federal Rules. <u>Veridyne Corp. v. United States</u>, 86 Fed. Cl.

668, 677(2009), citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). <u>See also</u>

Caribbean Broadcasting System, Ltd. v. Cable  Wireless P.L.C., 148 F.3d 1080,

1083 (D.C. Cir. 1998) (failure to provide a sufficient reason for denial is abuse of

discretion). Denial of leave to amend based on futility is warranted if the proposed

claim would not survive a motion to dismiss.  James Madison Ltd. v. Ludwig, 82

F.3d 1085, 1099 (D.C. Cir. 1996); Pietsch v. McKissack & McKissack, 677 F.

Supp. 2d 325, 328 (D.D.C. 2010). Denial of a leave to amend for futility is

reviewed de novo. Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1239-40 (10th

Cir. 2001); Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services,

Inc., 175 F.3d 848, 859 (10th Cir. 1999).

## ARGUMENT

## I.  THE COURT OF FEDERAL CLAIMS APPLIED THE WRONG TEST IN THIS CIRCUIT FOR DETERMINING AN "INTEREST" UNDER RCFC 19(a).

The CFC's dismissal of Plaintiff's claims and its denial of Plaintiff's motion to amend relied on its determination that the restored Tribe has a legally protectable interest in the subject matter of Plaintiff's action, and that the court could not accord complete relief as to the existing parties. The CFC simply presumed, without examination, that the rights Plaintiff sought to enforce belonged to the restored Tribe. In doing so the CFC improperly conflated the distinct statutory rights of the final enrollees with the separate sovereign rights of the newly restored Tribe arising on August 27, 1986. Had the CFC considered the statutory bases of Plaintiff's claims, as it should have, it could not have held the Tribe to be a required party.

### A.  The "Interest" Analysis In The Federal Circuit Starts With The Plaintiff's Complaint, Not The Absentee's Claims.

Rule 19(a)(1) provides in relevant part that a required party shall be joined as a party to an action if:

(A)    in that person's absence, the court cannot accord complete relief among the existing parties; or

(B)    that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i)     as a practical matter impair or impede the person's ability to protect the interest; or

(ii)    leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

RCFC 19(a) (1) ("Required Party").[9]

The test in this Circuit for determining when an absent party has a legally protectable interest for purposes of RCFC 19(a) was set forth in <u>United Keetoowah Band of Cherokee Indians v. United States</u>, 480 F.3d 1318 (Fed. Cir. 2007).

<u>United Keetoowah Band</u> was an appeal from a dismissal of an action under RCFC 19(b) for the inability to join a tribe as a necessary party. As here, that case involved a claim arising under federal legislation. The relevant statute in that case settled different claims brought by three tribes against the Federal Government for the mismanagement of certain riverbed lands in Oklahoma (the "Settlement Act").[10] In addition to settling the tribes' claims, the Settlement Act extinguished

---

[9] RCFC 19(a) (1). <u>Cf</u>. Fed. R. Civ. Proc. 19(a)(1). <u>Kimball I</u> refers to RCFC 19(a)(1) and (a)(2) as the "first" and "second" joinder standards, respectively. <u>See</u>, e.g. <u>Kimball I</u>, 97 Fed. Cl. at 211. It refers to RCFC 19(a)(1) as titled "Joinder of Persons Needed for Just Adjudication." <u>Id</u>. at 210. RCFC 19(a)(1) is currently titled "Persons Required to Be Joined if Feasible," and 19(a)(2) is captioned "Joinder by Court Order." RCFC 19 was amended in 2008 to conform to the general restyling of the FRCP, resulting in a renumbering of the rule's provisions. Unless the context dictates otherwise, Plaintiff-Appellant assumes that <u>Klamath I</u>'s references are intended to be to RCFC 19(a)(1)(A) and 19(a)(1)(B), respectively.

[10] The Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub.L. No. 107-331, 116 Stat. 2845 (2002) (codified at 25 U.S.C. §§ 1779-1779g). <u>UKB</u>, 480 F.3d at 1319.

any related claims of any tribe that was not named in the Act if such claims were not filed within 180 days of its enactment, United Keetoowah Band, 480 F.3d at 1321-22, and set aside temporarily a portion of the settlement proceeds for use in paying any judgment that might result from such a timely-filed claim. United Keetoowah Band, citing 25 U.S.C. § 1779f.

The United Keetoowah Band of Cherokee Indians of Oklahoma ("UKB") was a non-settling tribe that filed an action in the Court of Federal Claims under the Act. United Keetoowah Band, Id. at 1322. In response, the Cherokee Nation of Oklahoma, a tribe named in the Act, filed a limited motion to intervene under RCFC 24(a) in order to file a motion to dismiss under RCFC 19. Id. The Cherokee Nation argued that it was a necessary and indispensable party since it was the sole titleholder to the riverbed lands identified in the Act and since UKB's action was essentially a claim against the Cherokee Nation. Id. The CFC agreed and dismissed UKB's claims. Id.

This Court reversed on appeal on the basis that the Cherokee Nation had no legally protectable interest under RCFC 19(a) in UKB's statutory claims. This Court began its analysis by noting that it had never directly defined the "interest" requirement of RCFC 19(a). United Keetoowah Band, 480 F.3d at 1324. It had, however, defined what it found to be an equivalent interest analysis under RCFC

24(a), RCFC 19(a)'s "counterpart," id. at n. 4, which it adopted as the standard for RCFC 19(a). Id.

This Court determined that a "legally protectable interest" under RCFC 19(a) must be one "which the substantive law recognizes as belonging to or being owned by the applicant." United Keetoowah Band, 480 F.3d at 1327, citing Am. Mar. Transp., Inc. v. United States, 870 F.2d 1559, 1562 (Fed.Cir.1989). Such an interest cannot be "indirect or contingent," but must be "of such a direct and immediate character" that the absentee will either "gain or lose by the direct legal operation and effect of the judgment." United Keetoowah Band, 480 F.3d at 1325 (internal quotations omitted), citing Davis v. United States, 192 F.3d 951, 959 (10th Cir.1999) ( interest claimed cannot be "fabricated" or "frivolous"); Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1351 (D.C.Cir.1996) (interest must be a "legally protected interest"); Keweenaw Bay Indian Cmty. v. Mich., 11 F.3d 1341, 1347 (6th Cir.1993) (interest must be a legally protected interest that would be impaired by a judgment in the case); Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir.1990) (interest must be "more than a financial stake" and "more than speculation about a future event").

The CFC's analysis in United Keetoowah had started by characterizing the interests claimed by the Cherokee Nation. United Keetoowah Band, 480 F.3d at 1326. Rejecting that approach, this Court held instead that the proper analysis

begins "by correctly characterizing the pending action between those <u>already</u> <u>parties</u> to the action," and not with the <u>absentee</u>'s interests. <u>Id</u>. (emphasis added). Turning to the claims of the petition, which concerned the Settlement Act's extinguishment of riverbed-related claims and for which UKB sought compensation, <u>id</u>. at 1326, this Court found that the subject of UKB's action was limited to statutory claims arising under the Settlement Act, in which the Cherokee Nation lacked a direct interest. <u>Id</u>. at 1327. The Court further determined that the interest claimed by the Cherokee Nation in retaining exclusive rights and title to the riverbed lands was indirect and contingent since the Nation would neither gain nor lose its title if UKB won money damages, the only type of relief available to UKB in the Court of Federal Claims. <u>Id</u>.

## II. THE COURT OF FEDERAL CLAIMS IMPROPERLY PUT THE CLAIMED INTEREST OF AN ABSENTEE AHEAD OF THE STATUTORY RIGHTS OF THE PLAINTIFF.

That <u>United Keetoowah</u> standard guides the review in this case. The Court of Federal Claims in <u>Klamath I</u> improperly began its RCFC 19(a) analysis by finding that the "interest" analysis "focuses more on the interests of those not before the court." <u>Klamath I</u>, 97 Fed. Cl. at 211. <u>See also</u> at n. 14 (among RCFC 19(a)'s concerns are "that the absentee's ability to protect its interests may be impaired or impeded by a ruling"). This is directly contrary to the teaching of <u>United Keetoowah</u>, and was precisely the same error reversed in that case.

The CFC here never looked to the statutory bases of Plaintiff's existing and proposed claims. Its finding that the restored Tribe claimed a legally protectable interest under RCFC 19(a)(1)(B) relied instead on what the court deemed "essentially uncontested" facts: that the memberships of the final enrollees and the restored Tribe overlapped;[11] that the "interests" of the final enrollees and the Tribe also overlapped, "particularly after the passage of the Restoration Act in 1986"; that the Tribe lacked control over Plaintiff or Plaintiff's claims, and that Plaintiff's claims could "potentially affect" rights of the Tribe's entire enrolled membership; and that the statutory rights Plaintiff sought to vindicate were the same treaty-based rights and associated fiduciary obligations now held by the restored Tribe. Klamath I, 97 Fed. Cl. at 212-213. These same findings informed the CFC's subsequent rulings that the restored Tribe was an indispensable party under RCFC 19(b), and that Plaintiff's proposed amended complaint was moot. See Klamath II, 2012 WL 2878551 (Jul. 16, 2012).

The restored Tribe never claimed any specific interest in the subject matter of Plaintiff's existing or proposed claims. The only assertion by the Tribe of an interest was contained in a letter from the Tribal Chairman to Plaintiff asserting that the action "may potentially affect Tribal rights" without specifying what they

---

[11] The trial court took the opposite position in its Order of July 16, 2012 dismissing the case. There it held that the memberships "are different." Klamath Tribe Claims Committee v. U.S., --- Fed. Cl. ---, 2012 WL 2878551, *9 (2012).

were. A331. As the hearing transcript from the argument on  Defendant's motion to dismiss shows, it was Defendant who repeatedly asserted that the rights Plaintiff sought to assert were rights belonging to the restored Tribe. (A929-930, 936, 938, 959).

The CFC presumed that the statutory rights Plaintiff sought to vindicate were rights that belonged to the Tribe. By doing so the CFC conflated entirely distinct and mutually exclusive rights while ignoring the significant differences in federal law between the rights of a recognized tribe and the rights of a tribe whose federal recognition has been terminated. Klamath II provides evidence of this presumption. There the CFC held that "the Klamath Claims Committee believed that it had broad authority to represent the Tribes and its members in tribal litigation." Klamath II at *3. The CFC pointed to resolutions adopted during the termination era to show the Committee's and the restored Tribe's overlapping interests.

During termination, the final enrollees gave the Committee broad authority to represent the final enrollees' interests which, after termination, included the right to bring tribal claims. See 25 U.S.C. §§ 564e(c); 565 et seq. The Committee did claim to act for the rights of the terminated tribe in this era. That is what Congress intended and that is what the Termination and Distribution Acts allowed. The CFC wrongly assumed, however, for purposes of enforcing federal rights, that

"tribe" had the same legal significance after 1961 as it did after 1986. Had that been the case, there would have been no need for restoration at all.

At the hearing on Defendant's motion to dismiss the complaint, the CFC and the Defendant presumed from the outset that the rights Plaintiff sought to vindicate in its action belonged to the restored Tribe. The court's extended questioning, which focused on whether the Committee was authorized to bring claims on the Tribe's behalf, makes clear that the CFC had already implicitly concluded that Plaintiff's claims involved exclusively rights of the restored Tribe. The court at length discussed with the attorneys for both sides whether the Tribe was the real party in interest (see, e.g., A896, 935, 940, 954, 985, 1046); whether Plaintiff was an arm of the restored Tribal government (see, e.g., A926, 930, 932-933, 977-978, 981); whether this was an intertribal dispute (see, e.g., A932-933);  and whether Plaintiff was authorized to bring Tribal claims (see, e.g., A936, 938, 959, 982-983, 1012, 1044, 1042). Relying on the assumption that Plaintiff sought to enforce the Tribe's rights, the CFC ultimately ordered Plaintiff to produce an affidavit from a Tribal official proving Plaintiff's authority to bring its suit. That simply presumed the very issue that the court is required to demonstrate under RCFC (a)(1). United Keetoowah Band of Cherokee Indians v. United States, 480 F.3d 1318 (Fed. Cir. 2007).

The hearing also made clear the reason for the court's error. The CFC, like Defendant, thought that a tribe is a tribe is a tribe, and that any "tribal" claims pursued by the Committee necessarily belonged to the restored Tribe. That is simply ignores the plain text of the Klamath Termination, Distribution, and Restoration Acts (discussion). Had the CFC looked where it should to the character of Plaintiff's actual and proposed claims, the court would have understood that Congress (1) granted a personal property right in the final enrollees to bring "tribal claims" after termination, (2) preserved that right after restoration, and (3) limited that right after restoration to the right to bring tribal claims for harms arising before August 27, 1986, when the Restoration Act took effect.

## A.    The Klamath Termination Act Established The Final Enrollees' Right To Bring Tribal Claims After Termination.

The statutory right of the final enrollees to bring tribal claims against the United States for harms occurring before August 27, 1986 was established by the Termination Act. The Termination Act directed that a final roll of the 2,133 men, women, and children comprising the terminated tribe's members as of midnight on August 13, 1954 each receive an equal share in tribal property. 25 U.S.C. § 564b. Upon publication of the final roll in 1957, all rights or beneficial interests of the final enrollees in tribal property became personal property.  25 U.S.C. §§ 564c; 22 Fed. Reg. 9,303 (Nov. 21, 1957) ("Members of Klamath Tribe of Indians Notice of Final Roll). The personal property interest of each final enrollee was heritable, and

subject to state probate laws at the same time. 25 U.S.C. §§ 564c, 564h(b). <u>See</u> <u>also</u> <u>Klamath and Modoc Tribe v. United States</u>, 436 F.2d 1008, 1011 (Ct. Cl. 1971) (publication of final roll rendered enrollees' rights in tribal property personal property that was descendible and devisable). Because it is settled that individual vested rights in tribal property are not created in Indians <u>until</u> promulgation of the final roll. <u>Klamath and Modoc Tribes</u>, 436 F.2d at 1027, citing <u>Choctaw Nation v.</u> <u>United States</u>, 100 F.Supp. 318, 320-22 (Ct. Cl. 1951), cert. denied, 343 U.S. 955, 72 S.Ct. 1050 (1952), it is therefore also clear that the rights of the final enrollees are vested.

The transfer of the terminated tribe's property to the final enrollees was a condition for completing termination. 25 U.S.C. § 564e(b) (expressing "the intention of Congress" that all actions related to the transfer of tribal property be completed by August 13, 1961). Only after that was done could the Secretary publish the final proclamation of the tribe's termination, 25 U.S.C. § 564q(a). <u>See</u> 26 Fed. Reg. 7,362 (Aug. 12, 1961) (proclamation of Klamath termination).

Under the Termination Act, "tribal property" consisted of "any real or personal property, including <u>water rights</u>, or any interest in real or personal property, that belonged to the tribe and either was held by the United States in trust for the tribe or was subject to a restriction against alienation imposed by the United States." 25 U.S.C. § 564a(d) (emphasis added). "Tribal property" included the

35

right to bring <u>tribal</u> claims against the United States after termination. <u>See</u> 25

U.S.C. §§ 564e(c) (preserving right of all final enrollees to share in proceeds of

"tribal claims" against United States); 564t (preserving tribal rights under Indian

Claims Commission Act). The inclusion of water rights in Act's provisions that

"tribal claims" included claims arising under the 1864 Klamath Treaty.

### B.   The Klamath Distribution Act Affirms Final Enrollees' Right To Bring Tribal Claims After Termination.

Congress enacted the Distribution Act in 1965 to better implement the final

enrollees' substantive right to bring tribal claims. 25 U.S.C. § 565 et seq. In

addition to providing for the distribution of judgment awards (25 U.S.C. §§ 565a-

c) and for withholding therefrom monies to be added to the litigation fund to

pursue future claims (25 U.S.C. §§ 565, 565c), the Distribution  Act authorized and

directed the Secretary of the Interior to distribute "all other funds heretofore or

hereafter deposited to the credit of the Klamath Tribe." 25 U.S.C. § 565.

Confirming the personal, heritable nature of the final enrollees' rights in

tribal property, the Distribution Act established specific procedures for distributing

judgment awards to the final enrollees as well as to the heirs and legatees of

deceased final enrollees. <u>See</u> 25 U.S.C. §§ 565a, 565b (procedures for distributions

of Dkt. 100 judgment to final enrollees and to heirs and legatees of deceased final

enrollees); 565c (distribution of funds from other judgments). Under the Act, the

Secretary alone shall have responsibility for effecting any distribution to the final

enrollees, their heirs or legatees. <u>See</u>, <u>e.g.</u>, 25 U.S.C. 565b (directing the Secretary to mail any notices of the distributions to all known heirs or legatees of deceased Final Enrollees).

More important, the Distribution Act made unequivocal that <u>any</u> monies held by the United States Treasury to the credit of the Klamath Tribes were held for the final enrollees, including, beyond judgment funds, "payments for rights-of-way, trespass damages, or other revenues, together with any interest accrued thereon." 25 U.S.C. § 565c. This confirms that the personal interests of the final enrollees in tribal property included all monies held or received to the credit of the Klamath Tribe <u>after</u> termination and <u>beyond</u> awards from tribal claims. Based on their personal property interest, it goes without saying only the final enrollees could have a vested, inalienable right to bring claims for any harms to such accounts. It also confirms that the litigation fund established in 1961 and the object of Plaintiff's proposed amended claims, was vested property held by the Federal Government for the benefit of final enrollees.

## C.    <u>The Klamath Restoration Act Preserved The Rights Of The Final Enrollees.</u>

Thirty-two years after termination, Congress restored federal recognition to the tribe and its members with the Klamath Restoration Act. Congress was aware in doing so that the Termination Act created interests in tribal property in the final enrollees, which included the right to bring tribal claims after termination.

Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85, 108 S.Ct. 1704, 1712 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts"). See 25 U.S.C. §§ 564e(c); 565 et seq. The language of the Restoration Act shows that Congress meant to preserve them.

The Restoration Act did not completely repeal the Termination Act, though Congress knew how to do so had it chosen to do so.[12] Congress instead intended the provisions of the Restoration Act to "co-exist" with the Termination Act in order to protect the existing property rights of the final enrollees. Wolfchild v. U.S., 96 Fed. Cl. 302, 314-15 (Fed. Cl. 2010).

The Restoration Act did three things with respect to the rights of the restored Tribe:

(1) It made applicable to the restored Tribe and its members "all laws and regulations of the United States of general application to Indians or nations, tribes,

---

[12] See, e.g., Ysleta del Sur Pueblo Restoration Act, Pub. L. 100-89, Title I § 106 (Aug. 18, 1987), codified at 25 U.S.C. § 1300g-5 ("The Tiwa Indians Act is hereby repealed"); Catawba Indian Tribe of South Carolina Restoration Act, Pub. L. No. 103-116, § 4(c) (Oct. 27, 1993), 107 Stat. 1118, codified at 25 U.S.C. § 941b(c) ("The [Catawba] Termination Act is repealed"). Other similar Acts includes the Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. 100-89, Title II, § 203 (Aug. 18, 1987), codified at 25 U.S.C. § 733(b) (restoring "all rights and privileges of the tribe and members" that "may have been diminished or lost under" the corresponding termination act); Coquille Indian Tribe of Oregon Restoration Act, Pub. L. 101-42, § 3 (Jun. 28, 1989), 103 Stat. 91, codified at 25 U.S.C. § 715c(b) (same).

or bands of Indians" that were not "inconsistent with any specific provision" of the Restoration Act, "[e]xcept as otherwise provided" by the Act. 25 U.S.C. § 566(a).

(2) It restored to the Tribe those rights and privileges arising under "any "Federal treaty, Executive order, agreement, or statute, or any other Federal authority" that had been "diminished or lost" under the Termination Act. 25 U.S.C. § 566(b).

(3) It rendered certain provisions of the Termination Act <u>inapplicable</u> to the restored Tribe and its members after August 27, 1986 "to the extent that they are inconsistent" with the Restoration Act. 25 U.S.C. § 566(b).

Reading the Termination and Restoration Acts together, as the court must, makes clear that Congress intended the rights-granting provisions of the Termination Act to survive restoration. <u>Wolfchild v. U.S.</u>, 96 Fed. Cl. 302, 315 (Fed. Cl. 2010) (where two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective) citing <u>Cathedral Candle Co. v. U.S. Int'l. Trade Commission</u>, 400 F.3d 1352, 1365 (Fed. Cir. 2005). Here, Congress made plain that it intended the provisions of the Termination Act that were not inconsistent with the Restoration Act to survive.

Congress wanted the personal property rights of the final enrollees that were created the by Termination Act to be preserved after restoration. This is evident in

section 566(d) of the Restoration Act, which provides that nothing in the Act's

provisions "shall alter any property right or obligation, any contractual right or

obligation, or any obligation for taxes already levied." 25 U.S.C. § 566(d)

("Certain rights not altered"). The House Committee on Interior and Insular

Affairs, in its report accompanying H.R. 3554, understood this language as not

altering "rights and obligations already incurred." H. Rpt. 99-630 (Jun. 11, 1986),

at 3.

Under the Termination Act, the right of the final enrollees to bring tribal

claims was a "personal property" right. See 25 U.S.C. § 564c. The rights preserved

by section 566(d) of the Restoration Act therefore included the right to bring tribal

claims against the United States. See 25 U.S.C. § 564e(c) (preserving interests of

all final enrollees in future tribal claims); § 565 (providing for continued

maintenance and use of litigation trust fund for final enrollees); § 565c (providing

for distributions from litigation and judgment trust funds to final enrollees whose

names appear on the final roll or their heirs and legatees).

The Restoration Act did, however, limit the scope of the final enrollees'

right to bring tribal claims under the Termination and Distribution Acts. By

restoring rights under the 1864 Treaty to the restored Tribe, 25 U.S.C. § 566(b), the

Restoration Act precludes the final enrollees' ability to bring claims after August

27, 1986, since doing so would be inconsistent with the terms of the Restoration

Act. 25 U.S.C. § 566(b).

It is therefore entirely consistent for the final enrollees to continue to bring

such claims for harms arising <u>before</u> the Tribe's federal rights, including its rights

under treaty, were restored. Indeed, it only makes sense. First, because there was

no tribal entity capable of possessing federal rights during the termination era, and

only the final enrollees could exercise the tribe's treaty rights in that time.

Second, to interpret the Restoration Act as bestowing a retroactive right the

restored Tribe to bring tribal claims for the period in which it was not federally

recognized would be inconsistent with the terms of the Restoration Act. Section

566(d) of the Act <u>preserved</u> the property interests of the final enrollees.

The only way for the surviving parts of the Termination Act to remain

effective alongside the Restoration Act, <u>Wolfchild v. U.S.</u>, 96 Fed. Cl. 302, 315

(Fed. Cl. 2010), is to preserve the right of the final enrollees to bring tribal claims

against the United States as to harms occurring <u>before</u> the Tribe's restoration of

federal recognition on August 27, 1986, and to terminate that right for harms

arising <u>after</u> that date, which remain the exclusive and sovereign prerogative of the

restored Tribe.

The fact that a final enrollee is or is not an enrolled member of the restored

Tribe is irrelevant for the analysis. <u>Klamath I</u>, 97 Fed. Cl. at 212 (finding that

record suggests overlapping membership). The fact that a final enrollee may enroll in the restored Tribe cannot, without more, confer upon the Tribe an interest in the final enrollee's personal property rights any more than membership in the Automobile Association of America gives AAA an interest in the title to one's car. The statutory rights of the final enrollees arise from Congressional enactments that are not within the Tribe's power to change.

Congress understood that it was preserving the property interests of persons who might or might not enroll as members in the restored Tribe. The restored Tribe wanted to make clear that it understood this, too. Congress incorporated the Klamath Constitution into the Restoration Act by reference. See 25 U.S.C. §§ 564r; 566g(2), (5), (6). The Act defines tribal "member" as those persons eligible for enrollment in the restored Tribe under its constitution and bylaws. 25 U.S.C. § 566g. Article III of the Klamath Constitution provides that final enrollees are "automatically" enrolled as members. A605. It also provides that persons born after the closing of the terminated tribe's final roll in 1954 can enroll in the restored Tribe when they meet certain eligibility requirements and are approved by an enrollment committee. A605. The Klamath Constitution shows that enrollment does not affect the rights of the final enrollees under the Termination and Distribution Acts. It states that the enrollment of persons born after August 13, 1954 would be for "Tribal purposes only" and would not "affect their eligibility for

42

funds from any types of disbursements related to the Klamath Termination Act or claims litigation." A605.

**D.    Plaintiff's Proposed Claims Concern Personal Property Belonging To The Final Enrollees, Not Terminated Or Restored Tribal Property.**

The CFC denied Plaintiff's request to amend its complaint to add claims relating to the litigation fund established by the final enrollees in 1961 and held by the Secretary of the Interior for their use ever since. The CFC offered no explanation for its denial, beyond stating the proposed claims were "moot." (See Section V below). The CFC's denial implicitly relied on a conclusion that the restored Tribe had a legally protectable interest in the litigation fund (which is certainly how Defendant sees it. See A773-774 (describing Department of the Interior's treatment of the litigation fund as a restored Tribal account). The CFC's conclusion is cannot be correct since would directly contradict the terms of the Termination Act.

The Termination Act had bilateral effects on the respective authorities of the tribe and the federal government. The Termination Act did anticipate the end of the terminated tribe's social or historical existence as an Indian community. It specifically preserved the tribe's right to take any action under its constitution or bylaws to the extent such action was consistent with the Termination Act. 25 U.S.C. § 564r. The final enrollees did so, establishing the Committee and

authorizing the Secretary to take the litigation funds in trust pursuant to their old constitution. See, e.g., A809-810. As a corollary, however, the Act also "terminated" the authority of the Secretary or other officer of the United States "to take, review, or approve any action under the constitution and bylaws of the tribe." 25 U.S.C. § 564r.

Two conclusions follow from section 564r's reciprocal provisions. If the final enrollees formed the Claims Committee and established the litigation fund pursuant to the old tribal constitution, and if the Secretary was barred from taking, reviewing, or approving any action under the tribal constitution, then the Secretary can only have accepted the litigation fund on behalf of the final enrollees. This only makes sense, since the litigation fund was established from tribal funds the interests in which had already transferred to the final enrollees with publication of the final roll in 1957. What the Secretary took on behalf of the final enrollees already belonged to the final enrollees. Any doubts should be resolved by the Distribution Act, which makes clear that any funds held in the U.S. Treasury to the credit of the Klamath Tribes were to be held for the benefit of the final enrollees or their heirs or legatees. 25 U.S.C. § 565. The fact that Defendant may have treated the litigation fund over the years as if it were a restored Tribal asset goes only to the question of Defendant's liability, not the final enrollees' beneficial interests in the fund.

44

Regardless whether the final enrollees believed themselves to be a tribe, under federal law the Secretary and other officers of the United States could only treat with them as final enrollees. and not as the tribe itself. 25 U.S.C. § 564r. If the Termination Act did not end the historical existence of the Klamath Indian community, it ended the ability of Federal officials from according them rights under federal law <u>as</u> an Indian community. Any other result would render the Termination Act ineffective, the Restoration Act unnecessary, and leave the rights conferred by the Distribution Act vague and unclear. Because the litigation fund was established by the final enrollees from tribal assets in which their personal interests had vested, and because the Secretary was barred from accepting the fund from a Klamath tribe, the Secretary must have done so on behalf of the final enrollees as the final enrollees. Since the Restoration Act preserved the final enrollees' property interests in the fund, 25 U.S.C. 566the restored Tribe can have no legal interest therein.

## III.    COMPLETE RELIEF CAN BE ACCORDED THE PARTIES UNDER RCFC 19(a)(1)(A).

RCFC 19(a)(1)(A) is the counterpart of Fed. R. Civ. Proc. ("FRCP")

19(a)(1)(A). FRCP 19(a)(1)(A) is designed to protect the interests of those who are

already parties to an action by requiring the presence of all persons who have an

interest in the litigation so that any relief that may be awarded will effectively and

completely adjudicate the dispute. Wright & Miller, 7 Fed. Prac. & Proc. Civ. (3d

ed.) § 1604. RCFC 19(a) provides that a party should be joined if, "in that person's

absence, the court cannot accord complete relief among existing parties." RCFC

19(a)(1)(A). The joinder under this provision is closely related to the factors listed

in the indispensability analysis under 19(b).  Wright & Miller, 7 Fed. Prac. & Proc.

Civ. (3d ed.) § 1604.

In its February 11, 2011 opinion, the Court of Federal Claims determined

that under RCFC 19(a)(1)(A),[13] complete relief could not be afforded the existing

parties in the absence of the restored Tribe. Klamath I, 97 Fed. Cl. at 212. The

CFC's decision relied on the same findings supporting its determination that the

Tribe had a legally protectable interest under RCFC 19(a)(1)(B): that membership

and interests of the restored Tribe and the final enrollees overlapped; that Plaintiff

sought to vindicate treaty rights belonging to the restored Tribe; and that the

restored Tribe had no control over Plaintiff's action.

---

[13] See supra n. 6

46

Based on this, the CFC concluded that in the absence of the restored Tribe, it would be unable to afford complete relief as between the Plaintiff and the Defendant. Klamath I, 97 Fed. Cl. at 212. That determination relies implicitly relies on a determination of the nature and scope of the final enrollees' statutory rights, a legal conclusion that this Court reviews de novo.

For the reasons set forth in Section II of the Argument above, no one other than the final enrollees can claim a legally protectable interest in the statutory rights Plaintiff here seeks to vindicate in its surviving and proposed claims. Those rights include the exclusive right to bring tribal claims for harms originating before August 27, 1986, but not claims for harms arising thereafter.

The existing and proposed statutory claims of the final enrollees are exclusive and necessarily distinct from the rights of the restored Tribe. As a result, there should be no reason that complete relief cannot be accorded as between Plaintiff and the Defendant. A judgment in this action would fully and finally determine the rights of the parties. It cannot expose the Defendant to multiple liability since no one other than the final enrollees can raise tribal claims for harms arising before August 27, 1986, or for harms to trust assets in which the final enrollees have an exclusive vested interest. The Restoration Act's restoration of rights of rights under the 1864 Treaty place a temporally defined limit on the scope of the final enrollees' and the Tribe's respective rights. As a result, though

47

Defendant could ultimately be found liable to the final enrollees and the restored Tribe, it could not be liable for the same claims, since the rights of each arise from different federal authority. Moreover, because the personal interests of the final enrollees in their property rights are inherently different from the sovereign interests of the restored Tribe, the scope of possible prejudice from a negative decision seems unlikely if not nonexistent. A judgment in the action could only be binding on Defendant as to the limited scope of the personal rights of the final enrollees, a limited scope that is, by operation of law, necessarily exclusive of the cognizable interests of the restored Tribal sovereign.

## IV.   THE TRIBE IS NOT AN INDISPENSABLE PARTY UNDER RCFC 19(B) WITHOUT WHOM THE ACTION CANNOT PROCEED.

### A.   The Court's RCFC 19(b) Decision

In Klamath II, the CFC began its analysis by correctly noting that Plaintiff, on behalf of the final enrollees, would have no adequate remedy if the complaint was dismissed. Klamath II, 2012 WL 2878551 at *7. Nevertheless it dismissed Plaintiff's existing and proposed amended claims after determining that a majority of the RCFC 19(b) factors weighed heavily in favor of that result.

The court relied on several countervailing considerations, foremost among which was the restored Tribe's "compelling claim of sovereign immunity." Klamath II, 2012 WL 2878551 at *8, citing Pimentel, 553 U.S. 851 at 869. Relying on its prior determination that the restored Tribe had asserted a legally protectable interest in Plaintiff's claims, the court found that such interest could be impaired by an adverse ruling. Even without direct preclusive effect, an adverse ruling would be negative precedent that would confront the Tribe in future litigation based on the 1864 Treaty and associated statutes. Klamath II, 2012 WL 2878551 at *8. That negative precedent could ripen into binding adverse precedent if it were later affirmed by the Federal Circuit. As a practical matter, the court concluded, proceeding without the restored Tribe would impair or impede the Tribe's ability to protect its sovereign interests. Id. at *8.

Also important in the court's analysis was its determination that any disposition of Plaintiff's claims in the absence of the restored Tribe could leave the Defendant subject to multiple and conflicting claims with respect to the rights at issue. Id. at *8-9. Because the United States would vigorously defend against such claims regardless who brought them, if Defendant prevailed here it would have "obvious implications" for the restored Tribe. Id. at *9. The court found no way to lessen or avoid prejudice in the event Plaintiff's suit proceeded. Id. at *9.

Because the restored Tribe can assert no legally protectable interest in Plaintiff's claims, disposing of Plaintiff's action in the Tribe's absence cannot, as a practical matter, impair or impede the Tribe's ability to protect whatever federal interests it may choose to prosecute in future. For the same reason, proceeding with the action cannot, as a logical matter, leave the Defendant at risk of incurring multiple or inconsistent obligations with respect to the Tribe's interests.

## B.    The Restoration Act Limited The Restored Tribe's Sovereignty.

Tribal sovereign immunity is a factor that must be weighed in the RCFC 19(b) analysis when present. In that event, tribal sovereign immunity should indeed be afforded "heightened protection" when a lawsuit poses a potential injury to a tribe's sovereign's interests. Klamath II, 2012 WL 2878551 at *7, citing Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1181 (11th Cir. 2011), cert. denied, 132 S.Ct. 2379 (2012). See also Davis v. United

States, 192 F.3d 951, 960 (10th Cir. 1999) (strong policy favors dismissal when tribe cannot be joined for sovereign immunity). The Court of Federal Claims cited at length from the U.S. Supreme Court's recent decision in Pimentel, which involved a dismissal under FRCP 19(b) for failure to join a foreign sovereign.

As the CFC correctly noted, Pimentel is distinguishable, not least because it involved the doctrine of foreign sovereign immunity and the comity and dignity interests arising thereunder. Klamath II, 2012 WL 2878551 at *8 and n.16. Though codified in federal law, the source of foreign sovereign immunity is international law. Intel Corp. v. Commonwealth Scientific & Indus. Research Organization, 455 F.3d 1364, 1370 (Fed. Cir. 2006) (citing  H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605 (Foreign Sovereign Immunities Act of 1976 codified existing international law); cf. Kiowa Tribe of Oklahoma v. Mfg. Technologies, Inc., 523 U.S. 751, 756, 118 S. Ct. 1700, 1703, 140 L. Ed. 2d 981 (1998) (foreign sovereign immunity began as judicial doctrine).

The doctrine of tribal sovereign immunity arose under federal law "almost by accident." Id. Because of the "peculiar" quasi-sovereign status of Indian tribes, tribal immunity is not congruent with that which the Federal Government or the States enjoy. Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877, 890 (1986).  Tribal immunity from suit is a matter of federal common law, not a constitutional guarantee, and its scope is subject to

control and modification by Congress in the exercise of its plenary authority over tribes. Crowe and Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1154 (10th Cir. 2011); see also Cherokee Nation of Oklahoma v. Babbitt, 117 F.3d 1489, 1498 (D.C. Cir. 1997) (Congress has plenary authority under federal Constitution to limit, modify, or eliminate tribal sovereignty) (citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1676–77).

If the restored Tribe has any legally protectable interest in Plaintiff's claims – which it does not – then the RCFC 19(b) analysis requires the court to balance the interests of two differently weighted sovereigns: the restored Tribe claiming an interest in Plaintiff's claims, and the United States Congress, which created and preserved the statutory rights of final enrollees.

Tribal immunity exists at the sufferance of Congress, whose plenary power over Indian Affairs reflects the hierarchy of their respective authorities. In dismissing Plaintiff's claims because of the restored Tribe's indispensability as a sovereign, the Court of Federal Claims turned this hierarchy on its head.

Congress has an interest in seeing its laws enforced, just as it has an interest in exercising its plenary authority over Indian affairs. In an exercise of this authority, Congress in 1961 terminated the Klamath Tribes and conferred statutory rights in its tribal property, including the right to bring tribal treaty claims against the United States, upon final enrollees. In a later exercise of that same authority,

52

Congress in 1986 restored federal rights to the Tribe as such and preserved the statutory rights earlier conferred upon the final enrollees. In doing so, Congress also placed limits on the sovereignty of the restored Tribe. The Restoration Act rendered applicable to the restored Tribe and its members any provisions of the Termination Act that were consistent with its terms. The Restoration Act preserved existing property rights of the final enrollees, including the right to bring claims for money damages against the United States on behalf of the terminated tribe. Plaintiff's action is such a claim seeking to enforce precisely these rights in a forum created to hear money damages claims against the United States.

Under these circumstances, by dismissing the Plaintiff's claims because of the Tribe's immunity, the Court of Federal Claims ignored the sovereign interests of Congress in seeing its laws enforced and in so doing allowed the limited sovereignty of the restored Tribe to outweigh the broader national sovereignty of Congress.

By not fully repealing the Termination Act and by preserving the statutory rights of the final enrollees after restoration, Congress restricted the sovereignty of the restored Tribe, limiting the period for which the Tribe could bring treaty claims in a manner consistent with the statutory rights it maintained in the final enrollees. United States v. Lara, 541 U.S. 193, 202, 124 S. Ct. 1628, 1634, 158 L. Ed. 2d 420 (2004) (federal Constitution's "plenary" grants of power authorize Congress to

enact legislation that both restricts and, in turn, relaxes restrictions on tribal

sovereign authority).

## V.    THE COURT OF FEDERAL CLAIMS ABUSED ITS DISCRETION IN DENYING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT AS "MOOT" WITHOUT CONSIDERING THE PROPOSED AMENDED CLAIMS.

A party may amend its pleading by leave of the court and the court "should

freely give leave when justice so requires." RCFC 15(a)(2). Where the underlying

facts or circumstances relied upon by a plaintiff in such a motion are a proper

subject of relief, the plaintiff "ought to be afforded an opportunity to test his claim

on the merits." Foman v. Davis, 371 U.S. 178, 182 (1962). RCFC 15(a)'s liberal

policy of granting amendments is based in part on the belief that decisions on the

merits should be made whenever possible. Holland v. United States, 62 Fed. Cl.

395, 406 (2004).

The decision to grant leave to amend a complaint is left to the discretion of

the trial court. Such discretion is limited by RCFC 15(a)'s direction that leave be

freely given, which "evinces a bias in favor of granting leave to amend." Dussouy

v. Gulf Coast Inv. Corp., 660 F.2d 594, 597 (5th Cir. 1981) (FRCP 15(a) severely

restricts judge's freedom to deny motion to amend). Unless there is a substantial

reason to deny leave to amend, the discretion of the district court is not broad

enough to permit denial. Id. at 598. Reasons warranting denial include "undue

delay, bad faith or dilatory motive on the part of the movant, repeated failures to

cure deficiencies by amendments previously allowed, futility of amendment, etc."

Holland v. United States, 62 Fed. Cl. 395, 406 (2004), citing Foman v. Davis, 371

U.S. 178, 182 (1962). While the absence of an explanation for the denial of a

motion for leave to amend a complaint need not always result in reversal, the

reasons for the denial must be readily apparent from the decision, particularly in

view of the liberal position of the federal rules on granting amendments. Dussouy

v. Gulf Coast Inv. Corp., 660 F.2d 594, 597 (5th Cir. 1981) (citations omitted).

The CFC's denial of Plaintiff's motion to amend was contained in a

nineteen-word footnote tacked to the end of its dismissal under RCFC 19(b). The

footnote simply read: "Because of this ruling, the court will deny, as moot, a

motion filed by plaintiff to amend its complaint." Klamath II, n. 22.

The denial was not based on Plaintiff's undue delay, bad faith or dilatory

motive, but because Plaintiff's motion was moot. The only reason for deeming

Plaintiff's motion "moot" was the court's dismissal of the action for want of an

indispensable party. In concluding that the Tribe was indispensable as to the

proposed claims, the court necessarily determined that the restored Tribe claimed a

legally protectable interest in the litigation fund. In doing so the court abused its

discretion inasmuch as that conclusion is based on errors of fact and of law.

Plaintiff amended its complaint as a matter of course on March 17, 2009.

A50. On April 24, 2012, Plaintiff moved under RCFC 15(a) to amend its complaint

to assert claims for takings and for trust fund mismanagement related to

Defendant's handling of the litigation fund. A630.

Plaintiff's proposed amended complaint included allegations that (1) in 1961

the final enrollees established a $350,000 fund for the purpose of paying the cost of

litigating post-termination claims against the United States; (2) the Secretary of the

Interior agreed to hold the litigation fund in trust for the benefit of the final

enrollees and had done so ever since; (3) in the ensuing years, the Secretary and

the Committee have worked together to distribute monies from the fund to final

enrollees or their heirs and legatees; (4) since the start of the action, federal

officials and the restored Tribe separately and affirmatively asserted that the

restored Tribe lacked an interest in the fund because it belonged to the final

enrollees exclusively; (5) as of January 2012, the Defendant reversed its position

and denied Plaintiff access to the fund to pay the costs of its litigation; (6) after

January 2012, Defendant for the first time asserted that the litigation fund was the

property of the Tribe in which the final enrollees lacked any interest; and (7) the

facts giving rise to the amended claims came to light since the start in 2009 of

Plaintiff's action.

In opposing Plaintiff's motion, Defendant claimed that the litigation fund

was property of the restored Tribe and formed the subject of the restored Tribe's

own trust mismanagement claims pending before the federal District Court for the

District of Columbia. See Nez Perce v. Salazar, Civ. No. 06-2239 (U.S.D.D.C.). A790.[14]

At no time in this action has the restored Tribe ever claimed an interest in the litigation fund, whether legally protectable or otherwise. In fact, Plaintiff included exhibits to its proposed amended complaints demonstrating that Tribal officials disclaimed any Tribal interest in the fund. See A728. As with Plaintiff's original claims, it was Defendant that asserted such a interest on the restored Tribe's behalf.  A781. ("The Litigation Expense Fund is a Tribal Asset"). But Defendant's assertion of a Tribal interest in the subject of Plaintiff's proposed amended claim cannot be sufficient for purposes of RCFC 19(a). At best it is simply a defense to Plaintiff's proposed claims, not a claim by the Tribe of a legally protectable interest in the fund. Had the Tribe wanted to claim an interest in the fund, it could have done so. The Tribe applied for and was granted amicus status the year before. For this reason alone, the CFC's denial of the motion to amend must be reversed.

As explained above, the litigation fund was established to pay the costs of pursuing tribal claims against the United States after termination. The final

---

[14] Presented with this information, Plaintiff on June 4, 2012 moved to intervene in the Nez Perce action to protect any interests of the final enrollees that might have be the subject of that action and to preserve all information and records related to the management and disposition thereof. That motion remains under consideration today.

enrollees' rights in the fund were unequivocally established in 1965 when

Congress enacted the Distribution Act. 25 U.S.C. § 565 et seq. That Act directs the

Secretary to manage the funds for the benefit of the final enrollees (and their heirs

and legatees), and to use it to pay for the costs of future claims. It established

procedures by which amounts could be distributed to final enrollees or to the heirs

and legatees of deceased final enrollees. As trust property of the final enrollees, its

status as property belonging to the final enrollees was preserved by the Restoration

Act. 25 U.S.C. § 566(d).

### A.    The Denial Is Contrary To The Spirit And Policy Of RCFC 15(a).

Plaintiff's proposed amended complaint, together with the materials

Defendant itself entered into the record in opposition thereto, raised a question of

material fact respecting the identity and ownership of the accounts in which

Defendant held the monies comprising the litigation fund.

The exhibits submitted with Defendant's opposing papers showed that there

was a question as to the identity of the relevant trust account(s) claimed by the

Tribe. At the very least, those exhibits demonstrated that the Secretary had, over

time, deposited the litigation fund into different trust accounts having different

account numbers (A808); and that the trust account numbers originally assigned to

the litigation fund accounts did not match the numbers of what Defendant asserted

was the current litigation fund account. A795.

By denying the motion to amend, the Court of Federal Claims thereby thwarted one of the primary federal policy goals in permitting liberal amendment under Rule 15, which is precisely to facilitate determination of claims on the merits.  Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 (5th Cir. 1981). Because it was necessarily based on a predicate determination that the restored Tribe claimed a legally protectable interest in the litigation fund, the subject of the proposed amended claims, the Court of Federal Claims' denial presumed the very fact that the parties' own exhibits had materially called into issue: the identity and ownership of the accounts holding the litigation funds. For this reason alone the court's denial should be reversed.

## **CONCLUSION**

For the reasons set forth above, the judgments of the Court of Federal

Claims should be reversed and the case remanded for further proceedings.

Respectfully submitted;

/s/ Thomas W. Fredericks
THOMAS W. FREDERICKS
MATTHEW J. KELLY
FREDERICKS PEEBLES & MORGAN LLP
1301 Connecticut Avenue, NW
Suite 450
Washington, DC 20036
(202) 450-4887

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

Judgment  entered July 17, 2012.............................................................................A1

Opinion and Order of February 11, 2011,
97 Fed. Cl. 203 (2012) ....................................................................... A2-12

Opinion and Order of July 16, 2012,
 --- Fed. Cl. ---, 2012 WL 2878551 (2012)..................................................... A13-22

# In the United States Court of Federal Claims

**No. 09-75 L**

**KLAMATH TRIBE CLAIMS COMMITTEE,**

                                                            **JUDGMENT**

    **v.**

**THE UNITED STATES**

Pursuant to the court's Opinion, filed July 16, 2012,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed. No costs.

                                   Hazel C. Keahey
                                   Clerk of Court

**July 17, 2012**           By:          s/Lisa L. Reyes

                                   Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $455.00.

97 Fed.Cl. 203
United States Court of Federal Claims.

KLAMATH TRIBE CLAIMS COMMITTEE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 09–75L. |    Feb. 11, 2011.

**Synopsis**

**Background:** Tribe claims committee brought action alleging that Interior Department failed to disburse funds owed to tribal members and to safeguard treaty-based water rights associated with dam. Department moved to dismiss.

**Holdings:** The Court of Federal Claims, Allegra, J., held that:

[1] tribes' claim arising from Interior Department's failure to reimburse them pursuant to Klamath Termination Act was untimely;

[2] tribes' claims relating to transfer of dam and its associated water storage were untimely; and

[3] tribes were necessary parties.

Motion granted in part.

West Headnotes (8)

[1]     **Federal Courts**  👈  Evidence and affidavits

Plaintiff must establish that Court of Federal Claims has subject matter jurisdiction over its claims.

10 Cases that cite this headnote

[2]     **Federal Courts**  👈  Accrual of claims;  continuing claims

Claim accrues under Tucker Act and Indian Tucker Act when all events have occurred to fix Government's alleged liability, entitling claimant to demand payment and sue here for its money. 28 U.S.C.A. §§ 1505, 2501.

[3]     **Federal Courts**  👈  Evidence and affidavits

Plaintiff asserting claims under Tucker Act or Indian Tucker Act bears burden of demonstrating that its claims were timely. 28 U.S.C.A. §§ 1505, 2501.

1 Cases that cite this headnote

[4]     **Federal Courts**  👈  Accrual of claims;  continuing claims

Tribes' claim arising from Interior Department's failure to reimburse them pursuant to Klamath Termination Act for costs they incurred in past construction, operation, and maintenance of irrigation project accrued on statutory deadline for completion of disbursement of funds. Klamath Termination Act, § 6(b), 25 U.S.C.A. § 564e(b); 28 U.S.C.A. § 2501.

**A2**

1 Cases that cite this headnote

**[5]**    **Federal Courts**    Accrual of claims; continuing claims

Tribes' claims against Interior Department relating to transfer of dam and its associated water storage accrued when Interior transferred dam from tribes to irrigation district. 28 U.S.C.A. § 2501.

**[6]**    **Federal Courts**    Parties; class actions and new parties

Even if defendant had not raised issue, court could consider absence of required person sua sponte. RCFC, Rule 19, 28 U.S.C.A.

**[7]**    **Federal Courts**    Parties; class actions and new parties

Klamath tribes were necessary parties in action brought by Klamath Tribe Claims Committee alleging that removal of dam effected taking of tribes' associated water and fishing rights and constituted breach of fiduciary duties established by tribes' treaty with United States and Klamath Termination Act, and thus tribes would be invited to intervene; tribes had claimed interest in remaining subject matter of lawsuit, and disposing of case in tribes' absence might, as practical matter, impede their ability to protect that interest or leave United States subject to inconsistent obligations. 25 U.S.C.A. § 564 et seq.; RCFC, Rule 19, 28 U.S.C.A.

**[8]**    **Indians**    Sovereign Immunity

Doctrine of tribal immunity, which recognizes sovereignty of Indian tribes and seeks to preserve their autonomy, protects tribes from suits in federal and state courts.

**Attorneys and Law Firms**

**\*204** Daniel H. Israel, Boulder, CO, for plaintiff.

Maureen E. Rudolph, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General Ignacia S. Moreno, for defendant.

**Opinion**

## OPINION

ALLEGRA, Judge:

The Klamath Tribe Claims Committee (Klamath Claims Committee or plaintiff) seeks damages owing to alleged takings and breaches of fiduciary duty by the Department of the Interior (Interior). It asserts that Interior has failed to disburse funds owed to tribal members and to safeguard treaty-based water rights associated with a dam. Defendant has moved to dismiss plaintiff's complaint, claiming, pursuant to RCFC 12(b)(1), that this court lacks jurisdiction, or, alternatively, pursuant to RCFC 12(b)(6), that the complaint fails to state a claim upon which relief can be granted. For the reasons that follow, the court, **GRANTS, IN PART,** this motion and dismisses two of plaintiff's counts for lack of jurisdiction. As to the remaining counts, this court concludes, under RCFC 19, that a necessary party must be joined.

## I. BACKGROUND

A brief recitation of the facts provides **\*205** necessary context. [1]

The United States and the Klamath Tribes (the Tribes) entered into a Treaty in 1864. *See* Treaty between the United States and the Klamath and Moadoc Tribes and Yahooskin Bank of Snake Indians, October 14, 1864, 16 Stat. 707 (the Treaty). Under this Treaty, the Tribes ceded their interest in approximately twelve million acres of land. The Tribes reserved to themselves a reservation of approximately 800,000 acres, along with "the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits." *Id.* In exchange, the federal government gave the Tribes cash and goods worth approximately $300,000. It also committed to provide various services to the Tribes and to hold tribal assets in trust for the benefit of the Tribes and its members. *Id.* From 1890 to 1920, the Bureau of Indian Affairs (BIA) surveyed the reservation for its irrigation potential and constructed irrigation facilities. One such facility was a diversion dam, the Chiloquin Dam (the Dam), which diverted portions of the Sprague River into canals that served lands on the Williamson River and Upper Klamath Lake.

In 1954, Congress passed the Klamath Termination Act (the 1954 Act), Pub.L. No. 83–587, 68 Stat. 718 (codified, as amended, at 25 U.S.C. §§ 564–564x), which ended federal supervision over the Tribes' trust assets and tribal properties, and terminated the federal services furnished to the Tribes. As described by the Court of Claims in an earlier case—

> [t]he basic scheme of that statute ... was to give each adult member whose name appeared on the final tribal roll an election between withdrawing from the tribe and having his interest in tribal property commuted to money to be paid to him, and, on the other hand, remaining in the tribe and participating in a nongovernmental tribal management plan.

*Klamath & Modoc Tribes v. United States,* 436 F.2d 1008, 1010–11 (Ct.Cl.1971). [2] Section 10 of the 1954 Act authorized the government to dispose of federally-owned property acquired for administration of the Tribes or to transfer this property to qualifying entities. 1954 Act § 10 (codified at 25 U.S.C. § 564 i ). Other provisions in this statute dealt with the federally-owned and operated irrigation facilities on the Klamath Reservation, which included the Dam. For example, section 13(a) of the 1954 Act authorized the Secretary to transfer the "care, operation and maintenance" of irrigation works to water users associations or irrigation districts. 1954 Act § 13(a) (codified at 25 U.S.C. § 564 l (a)).

Section 13(c) of the 1954 Act "authorized to be appropriated" $89,212 for "payment to the Klamath Tribe[s]" at four percent interest "per annum," calculated from the date of disbursement. 1954 Act § 13(c) (codified at 25 U.S.C. § 564 l (c)). The 1954 Act stated that these funds were "reimbursement for tribal funds used for irrigation construction operation and maintenance benefitting nontribal lands on the Klamath Reservation." *Id.* It further directed the Secretary to transfer all personal property or funds that the United States held in trust, free of encumbrance, to tribal members within four years. 1954 Act § 8 (codified at 25 U.S.C. § 564g). The Secretary was directed to arrange for the disposition of the Tribes' property within this same time period, with all tasks to be completed at the earliest practicable time, but not later than August 13, 1958. 1954 Act § 6(b) (codified at 25 U.S.C. § 564e(b)); *see also Klamath & Modoc Tribes,* 436 F.2d at 1011. Once all restrictions **\*206** on the Tribes' property were removed, the Secretary was to publish a proclamation in the Federal Register that the trust relationship between the Tribes and the United States was terminated. 1954 Act § 18 (codified at 25 U.S.C. § 564q). Finally, the 1954 Act expressly preserved the Tribes' water and fishing rights as granted under the 1864 Treaty. 1954 Act § 14 (codified at 25 U.S.C. § 564m).

Following the passage of this legislation, approximately seventy-eight percent of the Tribes' members (1,660 of 2,133) chose to withdraw, and defendant used its authority under Section 10 of the Act to sell off much of the Tribes' property to pay out these withdrawing members. *See Klamath & Modoc Tribes,* 436 F.2d at 1011. The Secretary transferred the remaining tribal property to a private trustee to be maintained for those members who chose to remain with the Tribes. In 1955, about a year after the passage of the 1954 Act, Congress appropriated funds to reimburse the Tribes for money used to construct, operate and maintain irrigation facilities benefiting non-tribal lands. *See* Dept. of Interior and Related Agencies Appropriations Act of 1956, Pub.L.

No. 84–78, ch. 147, 69 Stat. 141, 143 (June 16, 1955).[3] In 1961, the Secretary published a notice in the Federal Registrar stating that the federal government's relationship with the Tribe was officially terminated. 26 Fed.Reg. 7,362 (Aug. 12, 1961).

On August 21, 1961, the Tribes' governing body passed a resolution giving the Klamath Claims Committee authority to pursue certain claims against the United States. *See* Joint Resolution of Tribal Councils March 2008 (describing the earlier resolution). More specifically, the Klamath Claims Committee represents all 2,133 individuals who appeared on the rolls of the Tribes as of the date of their termination under the 1954 Act—both those who withdrew and those who chose to remain. In 1961, the Tribes and several individuals (both withdrawing and remaining members for themselves and as representatives for similarly-situated individuals) filed suit against the United States in the U.S. Court of Claims alleging that the United States effectuated a taking in implementing the Termination Act. *Klamath & Modoc Tribes,* 436 F.2d at 1012. In 1962, seventy-three withdrawn members filed a similar suit. *Id.* at 1013. The Court of Claims consolidated the two cases in 1964. *Id.* at 1010. It later dismissed some of the claims, allowed others to proceed, and remanded the case back to the trial commissioner for further proceedings. *Id.* at 1022. The takings claims were eventually settled for $23 million. *See Klamath & Modoc Tribes v. United States,* 199 Ct.Cl. 1024, 1972 WL 12758 (Ct.Cl. Sept. 18, 1972), Order at 2–3. The settlement was effectuated, in part, by legislation passed by Congress in 1965.[4]

Although the government-to-government relationship between the Tribes and the United States ceased in 1961, BIA took several years to conclude operations and transfer the Dam and other irrigation project facilities. In 1973, Interior transferred title to the Dam to the Modoc Point Irrigation District (MPID), a non-federal entity chartered under Oregon law, made up of landowners. MPID accepted the transfer in 1974. *See* Operation and Maintenance Charges, Deletion of Needless Regulations, 44 Fed.Reg. 12,192 (Mar. 6, 1979). In 1979, BIA published a notice deleting all the regulations pertaining to the irrigation system in light of the 1973 transfer of ownership to the MPID. *Id.* Nevertheless, several court decisions **\*207** at or around this time confirmed that the Tribes' rights to certain natural resources under the 1864 Treaty survived the passage of the Termination Act. *See Kimball v. Callahan,* 493 F.2d 564 (9th Cir.1974), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) (treaty-reserved hunting and fishing rights on former reservation lands survived termination); *United States v. Adair,* 723 F.2d 1394 (9th Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984) (same as to implied reserved water rights).

In 1986, Congress passed the Klamath Indian Tribe Restoration Act (the Restoration Act), Pub.L. No. 99–398, 100 Stat. 849 (Aug. 27, 1986) (codified at 25 U.S.C. § 566), reestablishing federal recognition of the Tribes. While the Restoration Act restored the Tribes' federal services, as well as the government-to-government relationship between the Tribe and the United States, it did not alter existing property rights. *See* 25 U.S.C. § 566(d). According to certain tribal documents, the United States' recognition of the Tribes did not change the responsibilities of the Klamath Claims Committee. *See* Klamath Tribe Executive Resolution, July 1993.

Throughout the post-termination and subsequent restoration period, the Klamath Claims Committee believed that it had broad authority to represent the Tribe and its members in tribal litigation. Several resolutions of the Committee reflect this. Among these is a 1983 resolution that states that the Tribes' August 21, 1961, grant of authority designated the Klamath Claims Committee as "the post-termination representative body of the Tribe" with respect to the "supervision and management of tribal claims against the United States for all dealings." Klamath Claims Committee Resolution, January 1983; *see also* Klamath Claims Committee Resolutions, June 1996; Klamath Claims Committee Resolution, May 1996. In 1993, the Tribes authorized plaintiff to work with BIA to disburse judgments from cases in which plaintiff, acting on behalf of the 1954 membership, was successful. *See* Klamath Tribe Executive Resolution, July 1993. More recently, the governing body of the Tribes reaffirmed the Klamath Claims Committee's role in tribal ligation when it authorized the Committee to use funds to "pursue claims, including but not limited to claims now being prosecuted against PacifiCorp." *See* Joint Resolution of Tribal Council, March 2008.[5] This resolution, however, did not give the Claims Committee exclusive authority to pursue the Pacificorp litigation, as it envisioned that the Tribes would also participate in that litigation. *Id.* The same resolution indicated that, to the extent that the Claims Committee pursued "other claims" outside of the Pacificorp case, it must act "within [its] authority as established by the General Counsel." *Id.*[6]

In the late 1980s, Interior determined that the Dam and its fish ladder were adversely affecting several fish species listed as "endangered" under the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 et seq. In 2001, Congress authorized a study to assess alternatives for improving fish passage at the Dam. *See* Farm Security and Rural Investment Act of 2002, Pub.L. No. 107–171, § 10905 116 Stat. 134, 537. After consulting with the MPID and the Tribes, Interior determined that removing the Dam was the best course of action. In 2006, BIA negotiated a cooperative agreement with MPID under which Interior would pay for removal of the Dam and construction of an alternative electric pump plant for irrigation. MPID landowners voted in favor of Dam removal, and signed a cooperative agreement  **\*208**  with the BIA. Removal was completed in August 2008.

Plaintiff filed its initial complaint with the court on February 6, 2009, and an amended complaint on March 17, 2009. The latter alleges four causes of action: (i) a taking of Indian trust assets based on the government's failure to reimburse the Tribes as authorized by section 13 of the Termination Act; (ii) a breach of fiduciary duty based on the failure to disburse the section 13 authorized funds; (iii) a taking based on the removal of the Chiloquin Dam and its associated water storage; [7] and (iv) a breach of fiduciary duty based on the removal of the Dam and its associated water storage. Plaintiff asserts that this court possesses jurisdiction over these claims under the Indian Tucker Act, 28 U.S.C. § 1505. On May 7, 2009, defendant filed a motion to dismiss under RCFC 12(b)(1) and (6). On June 21, 2009, plaintiff filed its response to defendant's motion to dismiss and a cross-motion for summary judgment. Briefing and oral argument on these motions have now been completed.

## II. DISCUSSION

[1]    Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.1997); *see also Bell Atl. Corp.,* 550 U.S. at 555, 127 S.Ct. 1955. The plaintiff must establish that the court has subject matter jurisdiction over its claims. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988); *Hansen v. United States,* 65 Fed.Cl. 76, 94 (2005). The court may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991). RCFC 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." But, this provision "does not apply to a motion under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter," under which the court undoubtedly may "address matters outside the pleadings." *Reed Island–MLC, Inc. v. United States,* 67 Fed.Cl. 27, 32 (2005) (citing *Toxgon Corp. v. BNFL, Inc.,* 312 F.3d 1379, 1383 (Fed.Cir.2002)); *see also Petro–Hunt, L.L.C. v. United States,* 90 Fed.Cl. 51, 58 (2009).

To survive a motion to dismiss for failure to state a claim under RCFC 12(b)(6), the complaint, in addition, must have sufficient "facial plausibility" to "allow [ ] the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *see also Colida v. Nokia, Inc.,* 347 Fed.Appx. 568, 569–70 (Fed.Cir.2009). The plaintiff's factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible." *Bell Atl. Corp.,* 550 U.S. at 555, 127 S.Ct. 1955; *see also Dobyns v. United States,* 91 Fed.Cl. 412, 422–28 (2010) (examining this pleading standard). Nevertheless, the Federal Circuit has recently reiterated that "[i]n ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States,* 558 F.3d 1331, 1335 (Fed.Cir.2009); *see also Bank of Guam v. United States,* 578 F.3d 1318, 1326 (Fed.Cir.2009), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 3468, 177 L.Ed.2d 1056 (2010); *Petro–Hunt, L.L.C. v. United States,* 90 Fed.Cl. 51, 68 (2009).

### A. Statute of Limitations

The Tucker Act gives this court jurisdiction to award damages upon proof of "any claim against the United States founded either upon the Constitution, or any Act of Congress," 28 U.S.C. § 1491(a). A companion statute, the Indian Tucker Act, confers a like waiver for Indian tribal claims that "otherwise  **\*209**  would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe." 28 U.S.C. § 1505; *see United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472–73, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *United States v. Navajo Nation,* 537 U.S. 488, 506, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003). This court has jurisdiction over this case under a combination of these provisions. *See Klamath and Modoc Tribes,* 436 F.2d at 1013.

[2]  [3]  A claimant must bring a claim under either of these provisions "within six years after such claim first accrues." 28 U.S.C. § 2501; *see also Samish Indian Nation v. United States,* 419 F.3d 1355, 1369 (Fed.Cir.2005). This is a jurisdictional limit that cannot be waived. *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 136, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for [its] money.' " *Martinez v. United States,* 333 F.3d 1295, 1303 (Fed.Cir.2003) (en banc), *cert. denied,* 540 U.S. 1177, 124 S.Ct. 1404, 158 L.Ed.2d 76 (2004) (quoting *Nager Elec. Co. v. United States,* 368 F.2d 847, 851 (Ct.Cl.1966)); *see also Samish,* 419 F.3d at 1369. Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely. *See Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998); *Entines v. United States,* 39 Fed.Cl. 673, 678 (1997), *cert. denied,* 526 U.S. 1117, 119 S.Ct. 1766, 143 L.Ed.2d 796 (1999); *see also John R. Sand & Gravel Co. v. United States,* 457 F.3d 1345, 1362 (Fed.Cir.2006) (Newman, J., dissenting); *Reynolds,* 846 F.2d at 748. [8]

[4]  Two of plaintiff's claims fall well outside the six-year window established by section 2501. The first of these involves its claim to disbursements required by section 13 of the 1954 Act—specifically, the $89,212, plus interest, plaintiff asserts it is still owed as reimbursement for the costs incurred by the Tribes in past construction, operation and maintenance of the Klamath Irrigation Project. Disbursement of these funds was originally to be completed not later than August 13, 1958. *See* 1954 Act, § 6(b), 68 Stat. 719 (1954), 25 U.S.C. § 564e(b); *see also Klamath & Modoc Tribes,* 436 F.2d at 1011. Congress later extended this deadline—first in 1957, to August 13, 1960, 71 Stat. 347 (1957), and then in 1958, to August 13, 1961, 72 Stat. 816 (1958). Any claims with respect to the disbursements thus accrued as of August 13, 1961, requiring that any lawsuit with respect thereto be brought within six years of that date. [9] Indeed, as discussed above, it appears that several such suits were brought in the Court of Claims in 1961 and 1962. This suit, however, was not filed until 2009, long after the statute of limitations on any disbursement claim had run.

[5]  Plaintiff's claims relating to the transfer of the Chiloquin Dam fare no better. In these claims, plaintiff seeks the replacement cost of the Dam, plus interest. But, Interior transferred the Dam to the MPID in 1973—more than twenty-six years before this lawsuit was filed. [10] Accordingly, any such claims also fall well outside the six-year statute of limitations established by 28 U.S.C. § 2501, and must be dismissed for lack of jurisdiction.

*210  **B. RCFC 19—Joinder of the Tribes**

The remainder of plaintiff's claims relate to the removal of the Dam in August of 2008. More specifically, plaintiff asserts that the removal of the Dam effectuated a taking of the Tribes' associated water and fishing rights and constituted a breach of the fiduciary duties established by the 1864 Treaty and the 1954 Act. It would appear that this court has jurisdiction over these claims under 28 U.S.C. §§ 1491 and 1505, and that they are timely under 28 U.S.C. § 2501. Defendant, nonetheless, challenges these counts, asserting that they fail to state a claim under RCFC 12(b)(6). Defendant's filings, however, beg another, more preliminary issue—whether, under RCFC 19, parties necessary to the resolution of this case must yet be joined herein.

"Compulsory joinder is an exception to the general practice of giving [a] plaintiff the right to decide who shall be the parties to a lawsuit." 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1602 (2001) (hereinafter "Federal Practice & Procedure"). Like its counterpart in the Federal Rules of Civil Procedure, RCFC 19(a)(1), entitled "Joinder of Persons Needed for Just Adjudication," instructs—

A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

*Cf.* Fed.R.Civ.P. 19(a); *see Republic of Philippines v. Pimentel,* 553 U.S. 851, 862, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008) (noting that Rule 19(a) "states the principles that determine whether persons or entities must be joined in a suit"); 7 Federal Practice & Procedure § 1604. Where joinder is not feasible, the court "must determine whether, in equity and good conscience, the action should proceed...." The latter inquiry turns on a set of nonexclusive considerations mapped in RCFC 19(b). [11]

The structure of this rule exhibits an analytical sequence in which the court must initially determine whether a person meets one of the criteria listed in RCFC 19(a)(1); if that is so, but joinder is not feasible, the court must determine whether, under RCFC 19(b), the case should proceed or be dismissed. The D.C. Circuit has distilled this analysis into three sequential questions: "Should the absentee be joined? If the absentee should be joined, can the absentee be joined? If the absentee cannot be joined should the lawsuit proceed without her nonetheless?" *W. Md. Ry. Co. v. Harbor Ins. Co.,* 910 F.2d 960, 961 (D.C.Cir.1990); *see also Glancy v. Taubman Ctrs., Inc.,* 373 F.3d 656, 666 (6th Cir.2004). [12] Through this process, **\*211** the rule "protect[s] the interests of absent persons as well as those already before the court from multiple litigation or inconsistent judicial determinations." 7 Federal Practice & Procedure at § 1602; *see also Shields v. Barrow,* 58 U.S. (17 How.) 130, 139, 15 L.Ed. 158 (1854) (describing similar protections); John W. Reed, "Compulsory Joinder of Parties in Civil Actions," 55 Mich. L.Rev. 327, 330 (1957).

The first joinder standard prescribed in RCFC 19(a)(1) protects existing parties by requiring the presence of all persons who have an interest in the litigation, so that any relief awarded will effectively and completed resolve the dispute. *See* Fed.R.Civ.P. 19 advisory committee's notes (1966); *Gen. Refractories Co. v. First State Ins. Co.,* 500 F.3d 306, 315 (3d Cir.2007). This standard promotes judicial economy by "avoiding repeated lawsuits on the same essential subject matter." Fed.R.Civ.P. 19 advisory committee's notes (1966); *see also Gen. Refractories Co.,* 500 F.3d at 315; 7 Federal Practice & Procedure  § 1604. A pertinent example of how this first alternative basis for compulsory joinder functions is *Keweenaw Bay Indian Community v. Michigan,* 11 F.3d 1341, 1346–47 (6th Cir.1993), which involved a dispute over fishing rights originating in a treaty. There, the court affirmed a lower court ruling which held that where one band of a tribe brought suit again the state and individual members of two other bands, the absent bands had to be joined so that any relief granted would not be partial. *Id.* at 1347. In this regard, the court noted that "the two absent bands are signatories to the very treaty at issue in the action," adding that "[t]he likelihood that they would seek legal recourse in the event that the judgment deprived them of fishing rights to which they believe they are entitled can hardly be characterized as speculative." *Id.*; *see also Makah Indian Tribe v. Verity,* 910 F.2d 555, 558–59 (9th Cir.1990) (absentee tribes that had treaty right in Columbia River salmon were necessary parties to action seeking higher ocean quota).

The second joinder standard prescribed in RCFC 19(a)(2) focuses more on the interests of those not before the court. It involves situations may which an absentee claims an interest in the subject matter of the action, and disposing of the case in that person's absence may prejudice either the parties before the court or the absentee. *See United Keetoowah Band of Cherokee Indians of Okla. v. United States,* 480 F.3d 1318, 1324 (Fed.Cir.2007). While the "interest" referenced under this requirement may not be "indirect or contingent," *id.* at 1325, this clause "does not require the absent party to actually possess an interest," but merely requires that the absentee claim such an interest. *Davis v. United States,* 192 F.3d 951, 958 (10th Cir.1999); *see also Shermoen v. United States,* 982 F.2d 1312, 1318 (9th Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 688 (1993) (holding that the rule covers such claimed interests unless "patently frivolous"). This clause "recognizes the importance of protecting the person whose joinder is in question against the practical prejudice to him which may arise through a disposition of the action in his absence." Fed.R.Civ.P. 19 advisory committee's note (1966); *see also Evergreen Park Nursing & Convalescent Home, Inc. v. Am. Equitable Assurance Co.,* 417 F.2d 1113, 1115 (7th Cir.1969); 7 Federal Practice & Procedure § 1604. It also recognizes "the need for considering whether a party may be left, after the adjudication, in a position where a person not joined can subject him to a double or otherwise inconsistent liability." Fed.R.Civ.P. 19 advisory committee's note (1966); *Willingham*

*v. Star Cutter Co.,* 555 F.2d 1340, 1346 (6th Cir.1977). A pertinent example of this second standard at work is *Davis,* 192 F.3d at 958–60. There, the Seminole Nation of Oklahoma claimed an interest in the subject matter of a suit brought by two bands of the Nation challenging their exclusion from a fund created by a judgment rendered by the Indian Claims Commission. *Id.* at 958–60. On the basis of this claimed  **\*212**  interest, the court held that the Nation's presence was required under Rule 19(a)(2). *Id.* at 961. [13]

[6]    In the court's view, now is the time, *i.e.,* before any merits claims are resolved, to determine whether the Tribes should be joined in this action under RCFC 19. [14] While, strictly speaking, defendant has not moved for such joinder, it has, in its briefs, repeatedly challenged plaintiff's ability to bring this suit without the participation of the Tribes, asserting that plaintiff lacks "standing" to proceed independently. [15]

The record, in fact, suggests that there is an overlap between the membership and interests of the Tribes and the Klamath Claims Committee, particularly after the passage of the Restoration Act in 1986, which restored the Tribes' status. Several cases hold that the Tribes currently possess fishing and water rights that derive from the 1868 Treaty. *See Kimball,* 493 F.2d at 569 (fishing rights); *Adair,* 723 F.2d at 1410–1411 (water rights). While the exact contours of those rights remain to be determined elsewhere, it is essentially those same rights and associated fiduciary obligations—deriving from the same 1868 Treaty—that plaintiff seeks to vindicate in this case. *Cf. Keweenaw Bay Indian Cmty.,* 11 F.3d at 1347 (invoking Rule 19(a) based on multiple parties claiming rights under the same treaty). Indeed, research reveals several other cases in which the Tribes and plaintiff were both involved because they claimed similar interests. *See, e.g., Klamath Tribes of Oregon v. Pacificorp,* 2005 WL 1661821 (D.Or. July 13, 2005). Finally, when, at the court's request, plaintiff contacted the Tribes to obtain confirmation that it had the authority to pursue this litigation, the Chairman of the Tribes tellingly declined to provide that confirmation. In a letter dated June 17, 2010, the Chairman explained that the "Claims Committee was established during the Termination era before the restoration of federal recognition of the Tribes by the United States." He further stated that "[t]he Tribal Council simply is not, and I am not in a position to lend support to litigation over which the Klamath Tribes have no control, particularly where the litigation may potentially affect Tribal rights of the entire General Council membership."

[7]    Based on these facts, which are essentially uncontested, the court finds that, in the absence of the Tribes, it cannot afford complete relief as between plaintiff and the United States. In addition, the court finds that the Tribes have claimed an interest in the remaining subject matter of this lawsuit  **\*213**  and that disposing of this case in the Tribes' absence may, as a practical matter, impede the Tribes' ability to protect that interest or leave the United States subject to inconsistent obligations. Accordingly, the court concludes that the Klamath Tribes are a party that should be joined to this action under RCFC 19(a). *See Washington v. Daley,* 173 F.3d 1158 (9th Cir.1999) (joinder of absent tribes required where State sued Secretary of Commerce challenging fishing regulations that impacted fishing treaty rights); *Keweenaw Bay Indian Cmty.,* 11 F.3d at 1347 (same, but with respect to disputed fishing rights); *Makah Indian Tribe,* 910 F.2d at 559 (same, but with respect to federal regulations allocating salmon quotas); *see also* Nicholas V. Merkley, "Compulsory Party Joinder and Tribal Sovereign Immunity: A Proposal to Modify Federal Courts' Application of Rule 19 to Cases Involving Absent Tribes as 'Necessary' Parties," 56 Okla. L.Rev. 931, 944 (2003) (hereinafter "Compulsory Party Joinder and Tribal Sovereign Immunity"). [16]

[8]    RCFC 19(a)(2) provides that "[i]f a person has not been joined as required, the court must order that the person be made a party," adding that "[a] person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff." Various cases, however, have held that the comparable provision in the Federal Rules of Civil Procedure (Fed.R.Civ.P. 19(a)(2)) is not triggered where, owing to sovereign immunity considerations, the entity required to be joined cannot be compelled to do so. That situation arises where an Indian tribe is the absent party. *See* 7 Federal Practice & Procedure § 1617 (citing cases involving the United States and noting that "the sovereign immunity guaranteed Indian tribes has produced parallel party-joinder issues in other litigation in which a tribe's rights are implicated."). [17] While most cases of this ilk involve situations in which sovereign immunity prevents the addition of a party as a defendant, others have recognized that a sovereign cannot be haled into court against its will, even as a plaintiff. [18]

Courts confronted with this problem have employed a two-step process: First, they extend an invitation to the absent party to intervene under Rule 24. If that invitation is accepted, the provisions of Rule 19(a) are satisfied and the case proceeds to the merits. *See, e.g., Narragansett Tribe of Indians v. S. R.I. Land Dev. Corp.,* 418 F.Supp. 798, 810–11 (D.R.I.1976). [19] If it is declined, the court **\*214** moves to the second step, namely, a determination as to whether the absent sovereign is "indispensable." If an absent sovereign proves "indispensable," the case is then dismissed under Rule 19(b). *See Davis,* 343 F.3d at 1289; "Compulsory Party Joinder and Tribal Sovereign Immunity," 56 Okla. L.Rev. at 963–64. In the court's view, it makes good sense to employ this process here, mindful of the sovereignty of the Tribes involved.

## III. CONCLUSION

Based on the foregoing, the court hereby **GRANTS, IN PART,** defendant's motion to dismiss under RCFC 12(b)(1), dismissing, for lack of jurisdiction, plaintiff's claims to the extent they seek compensation for the non-disbursement of funds relating to the 1954 Act and the transfer of the Dam in 1973. As to the remainder of plaintiff's claims, the court hereby extends an invitation to the Tribes to seek intervene in this lawsuit; any motion to intervene shall be filed on or before April 11, 2011. [20] Should the Tribes decline to participate in this lawsuit, the court will determine whether they are "indispensable" parties under RCFC 19(b). The Clerk is hereby ordered to effectuate service of this order on an appropriate official of the Klamath Tribes.

**IT IS SO ORDERED.**

Footnotes

1    These facts are largely drawn from plaintiff's complaint, and, for purposes of this motion, are assumed to be correct. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

2    The 1954 Act created a process in which a list of remaining and withdrawing members was prepared. *See* 1954 Act § 3 (codified at 25 U.S.C. § 564b). Upon publication of the final roll, the Act directed that "the rights or beneficial interests in tribal property of each person whose name appears on the roll shall constitute personal property." *See* 1954 Act § 4 (codified at 25 U.S.C. § 564c). The 1954 Act directed that $250 be distributed, per capita, to each individual listed on the final roll. 1954 Act § 7 (codified at 25 U.S.C. § 564f); *see Klamath & Modoc Tribes,* 436 F.2d at 1011.

3    One of the core issues in this case is whether defendant ever disbursed these funds. Defendant submitted a 1958 report from the BIA's Portland office that lists the repayment to the Tribe under section 13(c) as "completed." However, plaintiff submitted a 2008 request under the Freedom of Information Act, 5 U.S.C. § 552, to the BIA for an accounting regarding the distribution of section 13(c) funds, to which the BIA responded that "no responsive records could be located."

4    The Klamath Judgment Distribution Act of 1965, Pub.L. No. 89–224, 79 Stat. 897 (codified, as amended, at 25 U.S.C. §§ 565–565g), addressed various claims that the Tribes had pursued against the United States. The law authorized funds to be used in settling these claims. *Id.* As part of this Act, the BIA could retain funds for the benefit of the Tribes "or any of its constituent parts or groups" for the purpose of "paying unusual and accustomed expenses prosecuting claims against the United States." 25 U.S.C. § 565.

5    In their suit against Pacificorp, the Tribes sought damages for the disruption of salmon fish runs resulting from the construction and operation of government-authorized hydroelectric dams on the Klamath River. *See Klamath Tribes of Or. v. Pacificorp,* 2005 WL 1661821 (D.Or. July 13, 2005), *aff'd,* 268 Fed.Appx. 575 (9th Cir.), *cert. denied,* ––– U.S. ––––, 129 S.Ct. 109, 172 L.Ed.2d 34 (2008).

6    The United States and the Tribes jointly filed water rights claims as part of Oregon's adjudication of the Klamath River Basin. This adjudication will conclusively quantify, pursuant to the McCarran Amendment, the water rights recognized in *Adair* and held in trust by the United States for the Tribes. 43 U.S.C. § 666; *United States v. Oregon,* 44 F.3d 758 (9th Cir.1994), *cert. denied sub nom., Klamath Tribe v. Oregon,* 516 U.S. 943, 116 S.Ct. 378, 133 L.Ed.2d 302 (1995).

7    Plaintiff's briefs also assert that it is entitled to damages associated with the loss of fishing rights; those rights, however, are not referenced in the amended complaint. For purposes of this motion, the court will assume, *arguendo,* that these fishing rights were impacted by the loss of the water storage associated with the Dam. Should this case proceed to the merits, however, this matter will need to be clarified.

8    *See also Kingman Reef Atoll Invs., L.L.C. v. United States,* 541 F.3d 1189, 1197 (9th Cir.2008) ("Although ordinarily the defendant bears the burden of proving an affirmative statute of limitations defense, here the statute of limitations is jurisdictional, and, '[w]hen subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.' " (quoting *Tosco Corp. v. Comtys. for a Better Env't,* 236 F.3d 495, 499 (9th Cir.2001))).

9    Plaintiff asserts that there was no deadline for this disbursement. But, the Court of Claims concluded otherwise in *Klamath and Modoc Tribes*. There, the court stated that "the distribution of the proceeds" was "to be completed at the earliest practicable time but not later than August 13, 1958." 436 F.2d at 1011. The opinion in *Klamath and Modoc Tribes* then catalogued the legislative extensions of this deadline and the reasons therefor. *Id.* at 1011–13.

10   On brief, plaintiff claims that the actual transfer of the Dam did not occur until 2007. But, it has provided no support for this assertion.

11   In this regard, RCFC 19(b) states—

The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*See also Philippines,* 553 U.S. at 863, 128 S.Ct. 2180 (indicating that this determination is "case specific"); *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 118–19, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968) (discussing the interests relevant to joinder).

12   Although this terminology is no longer found in the rules, individuals whose joinder is obliged under RCFC 19(a) would have previously been called "necessary parties," while those whose absence would compel dismissal of the action under RCFC 19(b) would have been called "indispensable parties." The latter terminology was abandoned because it "had an unforgiving connotation that did not fit easily with a system that permits actions to proceed even when some persons who otherwise should be parties to the action cannot be joined." *Philippines,* 553 U.S. at 863, 128 S.Ct. 2180. Though the language has changed, Rule 19(b) still creates the " 'verbal anomaly' " of "[r]equired persons [who] may turn out not to be required for the action to proceed after all." *Philippines,* 553 U.S. at 863, 128 S.Ct. 2180 (quoting *Provident Tradesmens Bank,* 390 U.S. at 117 n. 12, 88 S.Ct. 733).

13   *See also Am. Greyhound Racing, Inc. v. Hull,* 305 F.3d 1015, 1024 (9th Cir.2002) (Indian tribes with existing compacts with state for operating gaming casinos had interest in action brought to enjoin Governor of Arizona from entering into new gaming compacts that would expand the scope of Indian gaming); *Shermoen,* 982 F.2d at 1318 (Hoopa Valley and Yurok Tribes had interest in outcome of action by individual Indians challenging the constitutionality of Hoopa–Yurok Settlement Act).

14   The rules do not address whether concerns arising under RCFC 19 should be resolved prior to deciding a motion to dismiss under RCFC 12(b)(6). To be sure, RCFC 12(b)(7) indicates that defendant may file a motion to dismiss based upon the "failure to join a party under Rule 19." But, nothing in this provision suggests that a motion under RCFC 12(b)(6) must be considered before one under RCFC 12(b)(7). Nor is any such ordering implied by RCFC 12(h)(2), which indicates that a "[f]ailure to state claim upon which relief can be granted [or] to join a person required by Rule 19(b)" may be filed in a pleading under RCFC 7(a), a motion for judgment on the pleadings under RCFC 12(c) or at trial. Logic suggests that the concerns raised under RCFC 19(a)—that the court might not be able to accord complete relief among existing parties or that the absentee's ability to protect its interests may be impaired or impeded by a ruling—ought to be resolved before the court resolves any issues on the merits. *See Keweenaw Bay Indian Comty.,* 11 F.3d at 1348; *Tankersley v. Albright,* 514 F.2d 956, 965–66 (7th Cir.1975) ("[The interests served by Rule 19] must be weighed and the necessity or indispensability of absent persons determined prior to any consideration of the merits of a case."). Notably, it is well-established that questions involving jurisdiction, including the statute of limitations questions addressed above, should be resolved before the court considers the application of RCFC 19. *See Rosales v. United States,* 89 Fed.Cl. 565, 584 n. 21 (2009).

15   Even if defendant had not raised this issue, the court could consider the absence of a required person *sua sponte. See Philippines,* 553 U.S. at 860, 128 S.Ct. 2180; *Minnesota v. Northern Secs. Co.,* 184 U.S. 199, 235, 22 S.Ct. 308, 46 L.Ed. 499 (1902); *see also Provident Tradesmens Bank,* 390 U.S. at 111, 88 S.Ct. 733.

16   In some cases, courts have held that absent tribes are not "necessary" parties under Rule 19 because the federal government may adequately represent the tribes' interest. These cases, however, hold this is true "only so long as 'no conflict exists between the United States and the nonparty beneficiaries.' " *Citizen Potawatomi Nation v. Norton,* 248 F.3d 993, 999 (10th Cir.2001) (quoting *Davis,* 192 F.3d at 958). Here, it does not appear that the United States can adequately represent the interests of the absent Tribes, at least insofar as plaintiff claims that defendant's actions impaired the Tribes' water rights.

17   As noted by the D.C. Circuit, "[t]he doctrine of tribal immunity, which recognizes the sovereignty of Indian tribes and seeks to preserve their autonomy, protects tribes from suits in federal and state courts." *Wichita & Affiliated Tribes of Okla. v. Hodel,* 788 F.2d 765, 771 (D.C.Cir.1986); *see also Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *United States v. U.S. Fid. & Guar. Co.,* 309 U.S. 506, 512–13, 60 S.Ct. 653, 84 L.Ed. 894 (1940); "Compulsory Party Joinder and Tribal Sovereign Immunity," 56 Okla. L.Rev. at 940–42.

18    *See Clinton v. Babbitt,* 180 F.3d 1081, 1090 (9th Cir.1998) ( "because the Hopi Tribe enjoys sovereign immunity ... it cannot be joined as a party without its consent"); *Kescoli v. Babbitt,* 101 F.3d 1304, 1310 (9th Cir.1996); *Wichita & Affiliated Tribes of Okla.,* 788 F.2d at 771 ("tribal immunity quickly surfaces as a crucial issue in such a suit since if the tribe is indispensable party, and cannot be joined due to its immunity, the claim may not proceed"); 7 Federal Practice & Procedure § 1617; *see also* "Compulsory Party Joinder and Tribal Sovereign Immunity," 56 Okla. L.Rev. at 948 ("Courts labeling absent tribes as necessary parties have recognized that tribal sovereign immunity prevents them from joining the tribes as parties to the lawsuit."). It, of course, makes no sense to issue an order under RCFC 19(a)(2) that is unenforceable. *Garpeg, Ltd. v. United States,* 583 F.Supp. 789, 799 (S.D.N.Y.1984); Fed. Practice & Procedure § 2945 (courts will avoid "futile gesture" of issuing unenforceable order).

19    Under RCFC 24(a), an absentee has a right to intervene when a statute confers the right or when it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." As the Federal Circuit has observed, this standard is essentially identical to that in RCFC 19(a)(1)(B)(i). *See United Keetoowah Band,* 480 F.3d at 1324–25; *see also Klamath Irr. Dist. v. United States,* 64 Fed.Cl. 328, 329–30 (2005) ("By way of further analogy to the Federal Rules, the findings required by RCFC 24(a)(2) are identical to those required by RCFC 19(a)(2), dealing with joinder of person needed for just adjudications, revealing an obvious symmetry between these two gatekeeper provisions.").

20    In lieu of such a motion, the Tribes may make such other filing (*e.g.,* a memorandum setting forth their position on the joinder issue) as they deem appropriate.

End of Document                                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2878551
Only the Westlaw citation is currently available.
United States Court of Federal Claims.

KLAMATH TRIBE CLAIMS COMMITTEE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 09–75L.  |  July 16, 2012.

**Synopsis**

**Background:** Tribe claims committee brought action alleging that Interior Department failed to disburse funds owed to tribal members and to safeguard treaty-based water rights associated with dam.

**[Holding:]** The Court of Federal Claims, Allegra, J., held that tribes were indispensable parties.

Dismissed.

West Headnotes (4)

**[1]    Indians    ⟜ Sovereign Immunity**

Indian tribes possess common-law immunity from suit traditionally enjoyed by sovereign powers.

**[2]    Indians    ⟜ Sovereign Immunity**

Indian tribe cannot be haled into court against its will, even as plaintiff.

**[3]    Federal Courts    ⟜ Parties;  Class Actions and New Parties**

Klamath tribes were indispensable parties in action brought by Klamath Tribe Claims Committee alleging that removal of dam effected taking of tribes' associated water and fishing rights and constituted breach of fiduciary duties established by tribes' treaty with United States and Klamath Termination Act, and thus dismissal of Committee's action was warranted after Tribes elected not to intervene, even though it was likely Committee would be left without any ability to recoup compensation for its claimed injuries, where Tribes asserted nonfrivolous interest in subject matter of suit that might be impaired by adverse ruling, and disposition of dispute in Tribes' absence threatened to leave United States subject to multiple and conflicting claims with respect to fishing and water rights conferred by treaty. RCFC, Rule 19(b), 28 U.S.C.A.

**[4]    Federal Courts    ⟜ Parties;  Class Actions and New Parties**

Where sovereign party should be joined in action, but cannot be owing to sovereign immunity, entire case must be dismissed if there is potential for sovereign's interests to be injured, even when no alternative forum exists in which plaintiff can press its case. RCFC, Rule 19(b), 28 U.S.C.A.

**Attorneys and Law Firms**

Thomas W. Fredericks, Louisville, CO, for plaintiff.

Maureen E. Rudolph, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General Ignacia S. Moreno, for defendant.

**Opinion**

**OPINION**

ALLEGRA, Judge:

**\*1**  The Klamath Tribe Claims Committee (Klamath Claims Committee or plaintiff) seeks damages for alleged takings and breaches of fiduciary duty committed by the Department of the Interior (Interior). It asserts that Interior has failed to disburse funds owed to tribal members and to safeguard treaty-based water rights associated with a dam. On February 11, 2011, the court granted, in part, a motion filed by defendant, and dismissed two of plaintiff's counts for lack of jurisdiction. As to the remaining counts, this court concluded, under RCFC 19, that a necessary party, the Klamath Tribes (the Tribes)[1] must be joined. Subsequently, the Tribes declined to participate in this lawsuit. Accordingly, the court must now determine whether the Tribes is an indispensable party under RCFC 19(b). For the reasons that follow, the court concludes that the Tribes, indeed, is an indispensable party and that the inability to join it in this lawsuit requires that the complaint be dismissed.

## I. BACKGROUND

A brief recitation of the facts provides necessary context.

The United States and the Tribes entered into a Treaty in 1864. *See* Treaty between the United States and the Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians, October 14, 1864, 16 Stat. 707 (the Treaty). Under this Treaty, the Tribes ceded their interest in approximately twelve million acres of land, reserving unto themselves approximately 800,000 acres, along with "the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits." *Id.* In exchange, the federal government gave the Tribes cash and goods worth approximately $300,000. It also committed to provide various services to the Tribes and to hold tribal assets in trust for the benefit of the Tribes and its members. *Id.* From 1890 to 1920, the Bureau of Indian Affairs (BIA) surveyed the reservation for its irrigation potential and constructed irrigation facilities. One such facility was a diversion dam, the Chiloquin Dam (the Dam), that diverted portions of the Sprague River into canals which served lands on the Williamson River and Upper Klamath Lake.

In 1954, Congress passed the Klamath Termination Act (the 1954 Act), Pub.L. No. 83–587, 68 Stat. 718 (codified, as amended, at 25 U.S.C. §§ 564–564x), which ended federal supervision over the Tribes' trust assets and tribal properties, and terminated the federal services furnished to the Tribes. As described by the Court of Claims in an earlier case—

> [t]he basic scheme of that statute ... was to give each adult member whose name appeared on the final tribal roll an election between withdrawing from the tribe and having his interest in tribal property commuted to money to be paid to him, and, on the other hand, remaining in the tribe and participating in a nongovernmental tribal management plan.

*Klamath & Modoc Tribes v. United States,* 193 Ct.Cl. 670, 436 F.2d 1008, 1010–11 (Ct.Cl.1971).[2] Section 10 of the 1954 Act authorized the government to dispose of federally-owned property acquired for administration of the Tribes or to transfer this property to qualifying entities. 1954 Act § 10 (codified at 25 U.S.C. § 564i). Other provisions in this statute dealt with the federally-owned and operated irrigation facilities on the Klamath Reservation, including the Dam. For example, section 13(a)

of the 1954 Act authorized the Secretary to transfer the "care, operation and maintenance" of irrigation works to water users associations or irrigation districts. 1954 Act § 13(a) (codified at 25 U.S.C. § 5641(a)).

**\*2** Section 13(c) of the 1954 Act "authorized to be appropriated" $89,212 for "payment to the Klamath Tribe[s]" at four percent interest "per annum," calculated from the date of disbursement. 1954 Act § 13(c) (codified at 25 U.S.C. § 5641 (c)). The 1954 Act stated that these funds were "reimbursement for tribal funds used for irrigation, construction, operation and maintenance benefitting nontribal lands on the Klamath Reservation." *Id.* It further directed the Secretary to transfer all personal property or funds that the United States held in trust, free of encumbrance, to tribal members within four years. 1954 Act § 8 (codified at 25 U.S.C. § 564g). The Secretary was directed to arrange for the disposition of the Tribes' property at the earliest practicable time, but not later than August 13, 1958. 1954 Act § 6(b) (codified at 25 U.S.C. § 564e(b)); *see also Klamath & Modoc Tribes,* 436 F.2d at 1011. Once the restrictions on the Tribes' property were removed, the Secretary was to publish a proclamation in the Federal Register that the trust relationship between the Tribes and the United States was terminated. 1954 Act § 18 (codified at 25 U.S.C. § 564q). Finally, the 1954 Act expressly preserved the Tribes' water and fishing rights as granted under the 1864 Treaty. 1954 Act § 14 (codified at 25 U.S.C. § 564m).

Following the passage of this legislation, approximately seventy-eight percent of the Tribes' members (1,660 of 2,133) chose to withdraw, and defendant used its authority under Section 10 of the Act to sell off much of the Tribes' property to pay these withdrawing members. *See Klamath & Modoc Tribes,* 436 F.2d at 1011. The Secretary transferred the remaining tribal property to a private trustee to be maintained for those members who chose to remain with the Tribes. In 1955, about a year after the passage of the 1954 Act, Congress appropriated funds to reimburse the Tribes for money expended to construct, operate and maintain irrigation facilities benefiting non-tribal lands. *See* Dept. of Interior and Related Agencies Appropriations Act of 1956, Pub.L. No. 84–78, ch. 147, 69 Stat. 141, 143 (June 16, 1955). In 1961, the Secretary published a notice in the Federal Registrar stating that the federal government's relationship with the Tribe was officially terminated. 26 Fed.Reg. 7,362 (Aug. 12, 1961).

On August 21, 1961, the Tribes' governing body passed a resolution giving the Klamath Claims Committee authority to pursue certain claims against the United States. *See* Joint Resolution of Tribal Councils, March 2008 (describing the earlier resolution). The Klamath Claims Committee represents all 2,133 individuals who appeared on the rolls of the Tribes as of the date of their termination under the 1954 Act. In 1961, the Tribes and several individuals (both withdrawing and remaining members for themselves and as representatives for similarly-situated individuals) filed suit against the United States in the U.S. Court of Claims alleging that the United States effectuated a takings in implementing the 1954 Act. *Klamath & Modoc Tribes,* 436 F.2d at 1012. In 1962, seventy-three withdrawn members filed a similar suit. *Id.* at 1013. The Court of Claims consolidated the two cases in 1964. *Id .* at 1010. The takings claims were eventually settled for approximately $23.5 million. *See Klamath & Modoc Tribes v. United States,* 199 Ct.Cl. 1024 (Ct.Cl. Sept. 18, 1972). The settlement was effectuated, in part, via legislation passed by Congress in 1965 . [3]

**\*3** Although the government-to-government relationship between the Tribes and the United States ceased in 1961, BIA took several years to conclude operations and transfer its irrigation project facilities. In 1973, Interior transferred title to the Dam to the Modoc Point Irrigation District (MPID), a non-federal entity chartered under Oregon law, made up of landowners. MPID accepted the transfer in 1974. *See* Operation and Maintenance Charges, Deletion of Needless Regulations, 44 Fed.Reg. 12,192 (Mar. 6, 1979). In 1979, BIA published a notice deleting all the regulations pertaining to the irrigation system in light of the 1973 transfer of ownership to the MPID. *Id.* Nevertheless, several court decisions at or around this time confirmed that the Tribes' rights to certain natural resources under the 1864 Treaty survived the passage of the Termination Act. *See Kimball v. Callahan,* 493 F.2d 564 (9th Cir.), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) (treaty-reserved hunting and fishing rights on former reservation lands survived termination); *United States v. Adair,* 723 F.2d 1394 (9th Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984) (same as to implied reserved water rights).

In 1986, Congress passed the Klamath Indian Tribe Restoration Act (the Restoration Act), Pub.L. No. 99–398, 100 Stat. 849 (Aug. 27, 1986) (codified at 25 U.S.C. § 566), reestablishing federal recognition of the Tribes. While the Restoration Act restored the Tribes' federal services, as well as the government-to-government relationship between the Tribe and the United States, it did not alter existing property rights. *See* 25 U.S.C. § 566(d).

Throughout the post-termination and subsequent restoration period, the Klamath Claims Committee believed that it had broad authority to represent the Tribes and its members in tribal litigation. Several resolutions of the Committee reflect this. For example, a 1983 resolution that states that the Tribes' August 21, 1961, grant of authority designated the Klamath Claims Committee as "the post-termination representative body of the Tribe" with respect to the "supervision and management of tribal claims against the United States for all dealings." Klamath Claims Committee Resolution, January 1983; *see also* Klamath Claims Committee Resolutions, June 1996; Klamath Claims Committee Resolution, May 1996. In 1993, the Tribes authorized plaintiff to work with BIA to disburse judgments from cases in which plaintiff, acting on behalf of the 1954 membership, was successful. *See* Klamath Tribe Executive Resolution, July 1993. More recently, the governing body of the Tribes authorized the Klamath Claims Committee to use funds to "pursue claims, including but not limited to claims now being prosecuted against PacifiCorp." *See* Joint Resolution of Tribal Council, March 2008. [4] This resolution, however, did not give the Committee exclusive authority to pursue the Pacificorp litigation, as it envisioned that the Tribes would also participate in that litigation. *Id.* The same resolution indicated that, to the extent that the Klamath Claims Committee pursued "other claims" outside of the Pacificorp case, it must act "within [its] authority as established by the General Counsel." *Id.* [5]

**\*4** In the late 1980s, Interior determined that the Dam and its fish ladder were adversely affecting several fish species listed as "endangered" under the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 *et seq.* In 2001, Congress authorized a study to assess alternatives for improving fish passage at the Dam. *See* Farm Security and Rural Investment Act of 2002, Pub.L. No. 107–171, § 10905, 116 Stat. 134, 537. After consulting with the MPID and the Tribes, Interior determined that the best course of action was removing the Dam. In 2006, BIA negotiated a cooperative agreement with MPID under which Interior would pay to remove the Dam and construct an alternative electric pump plant for irrigation. MPID landowners voted in favor of Dam removal, and signed a cooperative agreement with the BIA. The Dam was removed in August 2008.

Plaintiff filed its initial complaint in this court on February 6, 2009, and an amended complaint on March 17, 2009. The latter advances four causes of action: (i) a takings of Indian trust assets based on the government's failure to reimburse the Tribes as authorized by section 13 of the 1954 Act; (ii) a breach of fiduciary duty based on the failure to disburse the section 13 authorized funds; (iii) a takings based on the removal of the Chiloquin Dam and its associated water storage; and (iv) a breach of fiduciary duty based on the removal of the Dam and its associated water storage. Plaintiff asserted that this court possesses jurisdiction over these claims under the Indian Tucker Act, 28 U.S.C. § 1505. On May 7, 2009, defendant filed a motion to dismiss under RCFC 12(b)(1) and (6).

On February 11, 2011, the court granted, in part, defendant's motion. It held that plaintiff's claims involving the disbursements required by section 13 of the 1954 Act and relating to the transfer of the Chiloquin Dam fell far outside the six-year statute of limitations established by 28 U.S.C. § 2501, and thus must be dismissed for lack of jurisdiction. *See Klamath Tribe Claims Comm. v. United States,* 97 Fed.Cl. 203, 209 (2011) (*Klamath Tribe Claims Comm. I* ). The court, however, held that it had jurisdiction over the remainder of plaintiff's claims relating to the removal of the Dam in August of 2008. *Id.* at 210. As to those claims, the court concluded that the Tribes "are a party that should be joined to this action under RCFC 19(a)." *Id.* at 213. In this regard, the court noted that "there is an overlap between the membership and interests of the Tribes and the Klamath Claims Committee, particularly after the passage of the Restoration Act in 1986." *Id.* at 212. Observing that "the Tribes currently possess fishing and water rights that derive from the 1864 Treaty," the court noted that it is "essentially those same rights and associated fiduciary obligations—deriving from the same 1864 Treaty—that plaintiff seeks to vindicate in this case." *Id.* Despite this, it found that in communications with plaintiff's counsel, the Chairman of the Tribes had indicated that he was " 'not in a position to lend support to litigation over which the Klamath Tribes have no control, particularly where the litigation may potentially affect Tribal rights of the entire General Council membership.' " *Id.* (quoting a letter from the Chairman of the Tribes).

**\*5** "Based on these facts," the court concluded that "in the absence of the Tribes, it cannot afford complete relief as between plaintiff and the United States." *Id.* It further found "that the Tribes has claimed an interest in the remaining subject matter of this lawsuit and that disposing of this case in the Tribes' absence may, as a practical matter, impede the Tribes' ability to protect that interest or leave the United States subject to inconsistent obligations." *Id.* at 212–13. Because the Tribes is a sovereign, the court determined that the appropriate process was to extend an invitation to the Tribes to intervene in this case under RCFC 24.

*Id.* at 214. The court stated that if the Tribes declined that invitation, it would determine whether the Tribes was "indispensable," further observing that if this was so, the case would then be dismissed under RCFC 19(b). *Id.*

On April 20, 2011, the Klamath Tribes responded to this court's invitation, declining to intervene in this matter. This response, nonetheless, asserted that the Tribes "have an interest in the remaining subject matter of this lawsuit" and that "disposing of this case in the Tribes' absence may, as a practical matter, impede the Tribes' ability to protect that interest." Lastly it indicated that "the Plaintiff Claims Committee has no authority to speak for or represent the Tribes." [6] On August 11, 2011, following the death and replacement of plaintiff's counsel, this court ordered the parties to file simultaneous briefs addressing whether the Tribes were indispensable under RCFC 19(b). In an *amicus* filing, the Tribes "expressly reserve[d] its sovereign immunity from suit in this action," declaring the rights at issue to be ones "that belong to the Tribes." This *amicus* brief further claimed that plaintiff is "in fact acting hostilely to the Tribes, asserting control over tribal rights, and inviting this Court to de-legitimize the Tribes."

The parties' briefing on the RCFC 19(b) issue is now completed. Argument is deemed unnecessary.

## II. DISCUSSION

[1]    [2]    Indian tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *see also Kiowa Tribe v. Mfg. Techs., Inc.,* 523 U.S. 751, 753–54, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). Like all sovereigns, they are free to assert or to waive their immunity, as they see fit. *Okla. Tax Comm'n v. Citizen Band Potowatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). One aspect of this immunity is that a tribe "cannot be haled into court against its will, even as a plaintiff." *Klamath Claims Comm. I,* 97 Fed.Cl. at 213. [7] In this case, the Tribes has refused an invitation to intervene in this action under RCFC 24. In that situation, the court must determine whether dismissal here is warranted under RCFC 19(b). *See Klamath Claims Comm. I,* 97 Fed.Cl. at 213–14; *see also Narragansett Tribe of Indians v. S.R.I. Land Dev. Corp.,* 418 F.Supp. 798, 810–11 (D.R.I.1976).

**\*6** Under RCFC 19(b), "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Specifically, the rule indicates that, in making this determination, factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate, and

(4) whether the person would have an adequate remedy if the action were dismissed for nonjoinder.

RCFC 19(b). [8] This decision "is to be made in the light of pragmatic considerations." Fed.R.Civ.P., Advisory Comm. notes (1966); *see also Roos v. Texas Co.,* 23 F.2d 171 (2d Cir.1927), *cert. denied,* 277 U.S. 587, 48 S.Ct. 434, 72 L.Ed. 1001 (1928); *H.H. Robertson Co. v. Lumbermen's Mut. Cas. Co.,* 94 F.R.D. 578, 579 (W.D.Pa.1982), *aff'd,* 696 F.2d 982 (3d Cir.1982). [9] "It must be based on factors varying with the different cases," the Supreme Court has observed, "some procedural, some compelling by themselves, and some subject to balancing against opposing interests." *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 119, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); *see also Pimentel,* 553 U.S. at 863 ("multiple factors must bear on the decision whether to proceed without a required person"); *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt,* 43 F.3d 1491, 1495 (D.C.Cir.1995).

In *Provident,* Mr. Justice Harlan, speaking for a unanimous Court, parsed the factors in Rule 19. First, he noted, how the factors reflect the interests of the parties before the Court—

> First, the plaintiff has an interest in having a forum. Before the trial, the strength of this interest obviously depends upon whether a satisfactory alternative forum exists.... Second, the defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another.

*Id.* at 109–10. Also manifest in the factors, Justice Harlan wrote, "is the interest of the outsider whom it would have been desirable to join." *Id.* at 110. On this point, the *Provident* Court expounded—

Of course, since the outsider is not before the court, he cannot be bound by the judgment rendered. This means, however, only that a judgment is not *res judicata* as to, or legally enforceable against, a nonparty. It obviously does not mean either (a) that a court may never issue a judgment that, in practice, affects a nonparty or (b) that (to the contrary) a court may always proceed without considering the potential effect on nonparties simply because they are not 'bound' in the technical sense. Instead, as Rule 19(a) expresses it, the court must consider the extent to which the judgment may 'as a practical matter impair or impede his ability to protect' his interest in the subject matter.

**\*7** *Id.* at 110–11. Finally, "there remains the interest of the courts and the public in complete, consistent, and efficient settlement of controversies," which implicates the "public's stake in settling disputes by wholes, whenever possible, for clearly the plaintiff, who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtainable against them." *Id.* at 111. [10]

That plaintiff lacks an adequate remedy if this suit is dismissed weighs against dismissal. This court has exclusive jurisdiction over the takings and breach of fiduciary duty claims that remain at issue in this case. *See United States v. Tohono O'Odham Nation,* ––– U.S. ––––, –––– – ––––, 131 S.Ct. 1723, 1729–31, 179 L.Ed.2d 723 (2011); *Trusted Integration v. United States,* 659 F.3d 1159, 1162 (Fed.Cir.2011); *Morris v. United States,* 392 F.3d 1372, 1375 (Fed.Cir.2004). Conversely, a U.S. district court would lack jurisdiction to provide any relief to plaintiff under the Administrative Procedure Act, 5 U.S.C. §§ 702 and 704. [11] Accordingly, if this suit is dismissed, plaintiff likely will be left without any ability to recoup compensation for the injuries it claims. In such an instance, the decisional law indicates that this court should be " 'extra cautious' before dismissing an action." *Kescoli,* 101 F.3d at 1310 (quoting *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990)) . [12]

 **[3]**    But, there are countervailing considerations here. Courts generally afford sovereigns "heightened protection" if a lawsuit poses "a potential of injury to the sovereign's interest." *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel,* 657 F.3d 1159, 1181 (11th Cir.2011), *cert. denied,* ––– U.S. ––––, 132 S.Ct. 2379, 182 L.Ed.2d 1051 (2012). This consideration has often led courts to dismiss in cases where the United States is the absent party. *See Mine Safety Appliances Co. v. Forrestal,* 326 U.S. 371, 375, 66 S.Ct. 219, 90 L.Ed. 140 (1945); *State of Minnesota v. United States,* 305 U.S. 382, 388–89, 59 S.Ct. 292, 83 L.Ed. 235 (1939). And there likewise is a "strong policy that has favored dismissal when a court cannot join a tribe because of sovereign immunity." *Davis v. United States,* 192 F.3d 951, 960 (10th Cir.1999), *cert. denied,* 542 U.S. 937, 124 S.Ct. 2907, 159 L.Ed.2d 812 (2004). [13] Indeed, "[w]hen ... a necessary party ... is immune from suit, there is very little room for balancing of other factors set out in Rule 19(b), because immunity may be viewed as one of those interests compelling by themselves." *Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel,* 883 F.2d 890, 894 (10th Cir.1989) (quoting *Wichita & Affiliated Tribes,* 788 F.2d at 777 (quoting 3A Moore's Federal Practice ¶ 19.15, at 19–266 n. 6 (1984)). [14] While "this does not mean that balancing can be completely avoided simply because an absent person is immune from suit," it does mean that "the plaintiff's inability to obtain relief in an alternative forum is not as weighty a factor when the source of that inability is a public policy that immunizes the absent party from suit." *Davis ex rel. Davis v. United States,* 343 F.3d 1282, 1293–94 (10th Cir.2003), *cert. denied,* 542 U.S. 937, 124 S.Ct. 2907, 159 L.Ed.2d 812 (2004); *see also N. Arapaho Tribe v. Harnsberger,* 660 F.Supp.2d 1264, 1283 (D.Wyo.2009).

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.    6

**\*8** Recently, in *Pimentel,* 553 U.S. 851, 128 S.Ct. 2180, 171 L.Ed.2d 131, the Supreme Court elaborated on the importance of sovereign immunity plays in the balancing analysis required by Rule 19(b). In that case, various parties claimed assets in a Merrill Lynch brokerage account that included funds which allegedly had been illicitly obtained by former Philippines President Marcos. *Id.* at 857. Originally, the Republic of the Philippines and a sovereign Filipino Commission were included as defendants in the action, via interpleader, but were later dismissed after they successfully invoked the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1604, 1609. *Id.* at 859. After this dismissal, the district court awarded the funds to another party. *Id.* at 860. The Ninth Circuit affirmed this ruling, holding that while the Republic and the Commission were necessary parties under Rule 19(a) and entitled to be dismissed based on sovereign immunity, their claim to the disputed assets was unlikely to succeed on the merits. [15] The Supreme Court reversed, holding that the lower courts erred in their analysis of Rule 19(b) because they had "not accord[ed] proper weight to the compelling claim of sovereign immunity." *Pimentel,* 553 U.S. at 869. Framing the rationale of the Court, Justice Kennedy stated that cases "involving the intersection of joinder and the governmental immunity of the United States ... instruct us that where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* at 867. Recognizing that "[d]ismissal under Rule 19(b) will mean, in some instances, that plaintiff will be left without a forum for definitive resolution of their claims," the Court, nonetheless, concluded that this "result is contemplated under the doctrine of foreign sovereign immunity." *Id.* at 872.

[4]    While *Pimentel* is, in some regards, distinguishable, [16] it, nevertheless, illustrates that sovereign immunity often will be compelling itself in swaying the Rule 19(b) analysis. *Pimentel* stands for the proposition that where a sovereign party should be joined in an action, but cannot be owing to sovereign immunity, the entire case must be dismissed if there is the potential for the interests of the sovereign to be injured. And this result obtains even when no alternative forum exists in which the plaintiff can press its case. As subsequent cases confirm, this rationale applies to domestic sovereigns, *i.e.,* States and Indian nations, as much as it does to foreign sovereigns, *e.g.,* the Philippines. *See Vann v. Salazar,* 2011 WL 4953030, at * 3–4 (D.D.C.2011); *N. Arapaho Tribe,* 660 F.Supp.2d at 1287; *see also A123 Sys., Inc. v. Hydro–Quebec,* 626 F.3d 1213, 1221 (Fed.Cir.2010). [17]

This rationale weighs heavily in favor of dismissing this case owing to the absence of the Tribes. Although the Tribes has decided not to intervene, it has asserted a nonfrivolous interest in the subject matter of this suit that might be impaired by an adverse ruling in this case. Even without a direct preclusive effect, [18] such a ruling would be a negative precedent that the Tribes would have to confront in future litigation involving the 1864 Treaty and the associated statutes. *See Acton Co., Inc. of Mass. v. Bachman Foods, Inc.,* 668 F.2d 76, 78–79 (1st Cir.1982) ("Even if Acton would not be legally bound, an adverse ruling would be persuasive precedent in a subsequent proceeding, and would weaken Acton's bargaining position for settlement purposes."); *Doty v. St. Mary Parish Land Co.,* 598 F.2d 885, 887 (5th Cir.1979) (dismissing case under Rule 19(b) because "an unfavorable judgment in the present case would constitute precedent adverse to the [absent party's] claims"); *Johnson & Johnson,* 720 F.Supp. at 1123–25 (same). And that negative precedent could ripen into binding adverse precedent were this court's ruling affirmed by the Federal Circuit. Thus, it would appear that to proceed without the Tribes might "as a practical matter impair or impede" the Tribe's ability to protect its sovereign interests. *See RCFC 19(a); Provident,* 390 U.S. at 110 (stating that when considering the "interest of the outsider whom it would have been desirable to join," the court should consider the "practical" impact of a judgment on that interest); *Picciotto v. Continental Cas. Co.,* 512 F.3d 9, 16–17 (1st Cir.2008).

**\*9** Adding weight to that conclusion is the fact that any disposition here in the Tribes' absence threatens to leave defendant subject to multiple and conflicting claims with respect to the same fishing and water rights conferred by the 1864 Treaty. Plaintiff and the Tribes, whose memberships are different, [19] assert at least partially overlapping claims to those rights. To the extent, moreover, that the Tribes' claims hinge on the removal of the Chiloquin Dam, the statute of limitations under 28 U.S.C. § 2501 is still open and will remain so until August of 2014. *See Klamath Tribes Claims Comm. I,* 97 Fed.Cl. at 210. Accordingly, if this suit proceeds, the United States could find itself subject to competing claims for the same compensation. For this and other reasons, this is not a case in which the interests of the Tribes may be adequately represented by the United States. *Id.* at 213 n. 16. [20] *Per contra.* Indeed, in numerous recent cases, the United States has urged this court to construe narrowly the trust and treaty responsibilities it owes to various Tribes, both for jurisdictional and merits purposes. *See, e.g.,*

*Jicarilla Apache Nation v. United States,* 100 Fed.Cl. 726 (2011). There is no reason to believe that defendant will be any less zealous in pressings its claims in this case, with obvious implications for the Tribes if the United States were to prevail on these points. *See Provident,* 390 U.S. at 110. [21] Nor does this court see any way that, under RCFC 19(b)(2), "any prejudice could be lessened or avoided" if this suit were allowed to proceed.

Accordingly, a majority of the factors in RCFC 19(b) weigh heavily in favor of holding the Tribes an indispensable party. As such, the court finds that the Tribes is not only a necessary party, but also an indispensable one, compelling dismissal. [22]

## III. CONCLUSION

The court will not gild the lily. For the foregoing reasons, the court hereby orders the Clerk to **DISMISS** plaintiff's complaint. No costs.

## IT IS SO ORDERED.

Footnotes

1  The present-day Klamath Tribes is a single, federally-recognized tribal government that uses the plural "Tribes" to reflect the fact that it is composed of the Klamath and Modoc Tribes, and the Yahooskin Band of Snake Indians. The court adopts the Tribes' convention of referring to itself in the singular.

2  The 1954 Act created a process in which a list of remaining and withdrawing members was prepared. *See* 1954 Act § 3 (codified at 25 U.S.C. § 564b). Upon publication of the final roll, the Act directed that "the rights or beneficial interests in tribal property of each person whose name appears on the roll shall constitute personal property." *See* 1954 Act § 4 (codified at 25 U.S.C. § 564c). The 1954 Act directed that $250 be distributed, per capita, to each individual listed on the final roll. 1954 Act § 7 (codified at 25 U.S.C. § 564f); *see Klamath & Modoc Tribes,* 436 F.2d at 1011.

3  The Klamath Judgment Distribution Act of 1965, Pub.L. No. 89–224, 79 Stat. 897 (codified, as amended, at 25 U.S.C. §§ 565–565g), addressed various claims that the Tribes had pursued against the United States. The law authorized funds to be used in settling these claims. *Id.* As part of this Act, the BIA could retain funds for the benefit of the Tribes "or any of its constituent parts or groups" for the purpose of "paying the usual and accustomed expenses of prosecuting claims against the United States." 25 U.S.C. § 565.

4  In their suit against Pacificorp, the Tribes sought damages for the disruption of salmon fish runs resulting from the construction and operation of government-authorized hydroelectric dams on the Klamath River. *See Klamath Tribes of Or. v. Pacificorp,* 2005 WL 1661821 (D.Or. July 13, 2005), *aff'd,* 268 Fed.Appx. 575 (9th Cir.), *cert. denied,* 555 U.S. 821, 129 S.Ct. 109, 172 L.Ed.2d 34 (2008).

5  The United States and the Tribes jointly filed water rights claims as part of Oregon's adjudication of the Klamath River Basin. This adjudication will conclusively quantify, pursuant to the McCarran Amendment, the water rights recognized in *Adair* and held in trust by the United States for the Tribes. 43 U.S.C. § 666; *United States v. Oregon,* 44 F.3d 758 (9th Cir.1994), *cert. denied sub nom., Klamath Tribe v. Oregon,* 516 U.S. 943, 116 S.Ct. 378, 133 L.Ed.2d 302 (1995).

6  On February 19, 2011, the Tribes' General Council passed Klamath Tribes General Council Resolution # 2011–011, entitled "General Council Resolution Rescinding General Council Resolution # 2004–002 and Reaffirming General Council Authority Over Claims of the Klamath Tribe." This resolution rescinded a prior resolution on which plaintiff had relied in asserting that it could litigate the subject case. The February resolution further stated that "the General Council reaffirms that the Claims Committee does not speak for or represent the Klamath Tribes, nor has it ever done so."

7  *See also Clinton v. Babbitt,* 180 F.3d 1081, 1090 (9th Cir.1998) ("because the Hopi Tribe enjoys sovereign immunity ... it cannot be joined as a party without its consent"); *Kescoli v. Babbitt,* 101 F.3d 1304, 1310 (9th Cir.1996); *Wichita & Affiliated Tribes of Okla. v. Hodel,* 788 F.2d 765, 771 (D.C.Cir.1986) ("tribal immunity quickly surfaces as a crucial issue in such a suit since if the tribe is an indispensable party, and cannot be joined due to its immunity, the claim may not proceed").

8  Rule 19 formerly spoke in terms of "necessary" and "indispensable" parties. It was altered in 2007 for "stylistic" reasons but the "substance and operation of the rule ... are unchanged." *Rep. of Philippines v. Pimentel,* 553 U.S. 851, 855–56, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008). The same can be said of the 2008 modification of the language of this court's rule. For a discussion regarding the evolution of this rule, *see* Katherine Florey, *Making Sovereign Indispensable, Pimentel and the Evolution of Rule 19," 58 UCLA L.Rev. 667, 673–76 (2011)* (hereinafter "Florey").

9  "In general, the rules of [Court of Federal Claims] are patterned on the Federal Rules of Civil Procedure," making "precedent under the Federal Rules of Civil Procedure ... relevant to interpret rules of [Court of Federal Claims]." *Pac. Nat'l Cellular v. United States,* 41 Fed.Cl. 20, 25 n. 3 (1998). As to Rule 19, the Federal Circuit has recently noted that "RCFC 19 is virtually identical to Fed.R.Civ.P.

19" and "[b]ecause our case law on RCFC 19 is limited, we rely on cases interpreting Fed.R.Civ.P. 19 in our analysis of what is a 'necessary' party under RCFC 19." *United Keetoowah Band of Cherokee Indians v. United States,* 480 F.3d 1318, 1324 n. 2 (Fed.Cir.2007).

10     As the Fifth Circuit indicated shortly after *Provident* was decided, the essence of Rule 19 is to balance the rights of all those whose interests are implicated by the action:

> The plaintiff has the right to "control" his own litigation and to choose his own forum. This "right" is, however, like all other rights, "defined" by the rights of others. Thus the defendant has the right to be safe from needless multiple litigation and from incurring avoidable inconsistent obligations. Likewise the interests of the outsider who cannot be joined must be considered. Finally there is the public interest and the interest the court has in seeing that insofar as possible the litigation will be both effective and expeditious.

> *Schutten v. Shell Oil Co.,* 421 F.2d 869, 873 (5th Cir.1970); *see also Universal Reinsurance Co., Ltd. v. St. Paul Fire and Marine Ins. Co.,* 312 F.3d 82, 88 (2d Cir.2002); *Nichols v. Rysavy,* 809 F.2d 1317, 1332 (8th Cir.), *cert. denied,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987); *Tick v. Cohen,* 787 F.2d 1490, 1495 (11th Cir.1986); Matthew L.M. Fletcher, "The Comparative Rights of Indispensable Sovereigns," 40 Gonz. L.Rev. 1, 8–9 (2004) (hereinafter "Fletcher"); 7 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, Fed. Prac. & Proc. Civ. § 1602 (2012).

11     In *Pueblo of Laguna v. United States,* 60 Fed.Cl. 133 (2004), this court discussed why it believed that district courts lack jurisdiction over matters such as these, stating:

> [T]he Federal Circuit, in *Consolidated Edison Co. v. United States,* 247 F.3d 1378 (Fed.Cir.2001) (en banc), instructed that "[a] party may not circumvent the [Court of Federal Claim's] exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." *Id.* at 1385 (quoting *Rogers v. Ink,* 766 F.2d 430, 434 (10th Cir.1985)); *cf. Cobell v. Norton,* 240 F.3d 1081, 1094–95 (D.C.Cir.2001). Moreover, the Administrative Procedure Act waives sovereign immunity for district court suits only if "there is no other adequate remedy." 5 U.S.C. § 704 (2000). Yet, to the extent that these other actions seek an accounting, that remedy is available here as a prelude to the award of monetary damages. *See, e.g., Minnesota Chippewa Tribe Red Lake Band v. United States,* 768 F.2d 338, 342 (Fed.Cir.1985); *Klamath and Modoc Tribes v. United States,* 174 Ct.Cl. 483, 486–91 (1966) (construing 28 U.S.C. § 1505); *see also United States v. Mitchell,* 463 U.S. 206, 219–22, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

> More recently, the Federal Circuit has made clear that a compensation award in this court provides most plaintiffs with an "adequate remedy," thereby precluding a district court from exercising jurisdiction over a related claim under 5 U.S.C. § 704. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.,* 480 F.3d 1116, 1126–27 (Fed.Cir.2007); *Consol. Edison Co.,* 247 F.3d at 1384–85.

12     *See also Sac and Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1260 (10th Cir.2001), *cert. denied,* 534 U.S. 1078, 122 S.Ct. 807, 151 L.Ed.2d 693 (2002); *Bassett v. Mashantucket Pequot Tribe,* 204 F.3d 343, 358 (2d Cir.2000); *Pasco Int'l (London) Ltd. v. Stenograph Corp.,* 637 F.2d 496, 501 n. 9 (7th Cir.1980) (indicating that "the absence of an alternative forum would weigh heavily, if not conclusively against dismissal").

13     *See also Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 553 (4th Cir.2006); *American Greyhound Racing, Inc. v. Hull,* 305 F.3d 1015, 1025 (9th Cir.2002) ("we have regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs"); *Keweenaw Bay Indian Cmty. v. State,* 11 F.3d 1341, 1347–48 (6th Cir.1993) (in case involving fishing rights under treaty, equity required case to be dismissed where two absent bands were indispensable where adequate remedy was available); Florey, *supra* at 684–85 ("cases from the tribal context continue to form the bulk of cases in which courts contemplate dismissal because an immune Rule 19 party cannot be joined"); Fletcher, *supra,* at 14 ("For the most part, courts dismiss a case when an absent tribe has a significant stake in the outcome of the litigation."); Nicholas V. Merkely, "Compulsory Party Joinder and Tribal Sovereign Immunity: A Proposal to Modify Federal Courts' Application of Rule 19 to Cases Involving Absent Tribes as 'Necessary' Parties," 56 Okl. L.Rev. 931, 939 (2003) ("When applying Rule 19 to cases involving Indian tribes, courts generally dismiss suits because the tribes' sovereign immunity renders joinder infeasible.").

14     Other courts have employed similar reasoning. *See also Seneca Nation of Indians v. New York,* 383 F.3d 45, 48 (2d Cir.2004), *cert. denied,* 547 U.S. 1178, 126 S.Ct. 2351, 165 L.Ed.2d 278 (2006); *Kickapoo Tribe,* 43 F.3d at 1496; Florey, *supra* at 686.

15     *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. ENC Corp.,* 464 F.3d 885 (9th Cir.2006); *In re Republic of Philippines,* 309 F.3d 1143, 1149–52 (9th Cir.2002).

16     Among other things, the Court there cited deference to the comity and dignity interests of the Republic and the Commission "in determining if, and how, the assets should be used to compensate those persons who suffered grievous injury under Marcos" and the desirability of avoiding the "specific affront that could result to the Republic and the Commission if the property they claimed is seized by the decree of a foreign court." *Pimentel,* 553 U.S. at 866.

17    For nearly two centuries, the Supreme Court has described Indian tribes as "domestic dependent nations." *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L.Ed. 25 (1831) (Marshall, C.J.); *see also United States v. Lara,* 541 U.S. 193, 204–05, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004).

18    As several courts have noted, it is difficult to determine the preclusive effect of a ruling in later lawsuit. That is particularly true here given the debates regarding the legal relationship between plaintiff and the Tribes. *See Huber v. Taylor,* 532 F.3d 237, 250 (3d Cir.2008) ( "[i]t would be premature for this Court to endeavor to decide whether [the absent party is] in privity in bringing the instant action, for purposes of determining the preclusive effect of this action on a later lawsuit, where the potential later lawsuit is yet to be brought, and where the instant action has not even run its course yet") (quoting *Johnson & Johnson v. Coopervision, Inc.,* 720 F.Supp. 1116, 1124 (D.Del.1989)).

19    While plaintiff and the Tribes dispute the precise contours of the other's membership, they both agree that an award to the other would provide a windfall to unentitled individuals while denying certain entitled individuals a share. Given this, it is apparent that if the Tribes had intervened in this action, the court would have been forced to determine how to allocate any resulting judgment, requiring it to wade into disputes not only between the claimants and the United States, but also among the claimants themselves. *See Makah Indian Tribe,* 910 F.2d at 559–61 (holding absent tribe was indispensable where case involved "potential intertribal conflict").

20    *See also SW. Ctr. for Biological Diversity v. Babbitt,* 150 F.3d 1152, 1154 (9th Cir.1998); *Ramah Navajo School Bd., Inc. v. Babbitt,* 87 F.3d 1338, 1351–52 (D.C.Cir.1996); *Citizens Against Casino Gambling in Erie County v. Kempthor ne,* 471 F.Supp.2d 295, 315 (W.D.N.Y.2007).

21    To be sure, the court is discomforted by the prospect of dismissing a suit in which the Tribes has claimed that its interests may be impaired, but, nonetheless, has elected not to intervene. But, at least in tribal cases, the weight of authority takes the view that an essential aspect of sovereignty is to decide when **not** to assert an interest in the suit. *See Kickapoo Tribe,* 43 F.3d at 1498 ("[f]ailure to intervene is not a component of the prejudice analysis where intervention would require the absent party to waive sovereign immunity"); *Pueblo of Sandia v. Babbitt,* 47 F.Supp. 49, 54 (D.D.C.1999); *cf. School Dist. of City of Pontiac v. Sec'y of U.S. Dept. of Educ.,* 584 F.3d 253, 281 (6th Cir.2009), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 3385, 177 L.Ed.2d 302 (2010) ( "When States stick their heads in the sand for nearly five years of litigation about a high-profile lawsuit, it is difficult to say that proceeding without them will impair their interests—which so far seem focused above all on **not** being forced to take a public stand on the issues presented."); *see also* Florey, *supra* at 686–87 ("When considering the extent of Rule 19(b) prejudice to a party, some courts have cautioned against attaching any weight to an immune party's failure to intervene."); One can imagine a number of reasons why politically, legally, tactically or practically, the Tribes may wish not to assert their rights in a given suit. *See* Fletcher, *supra,* at 121–123; *see generally,* Angela Riley, "Good (Native) Governance," 107 Colum. L.Rev. 1049, 1111–13 (2007) (discussing situations in which tribes have and have not waived their sovereign immunity).

22    Because of this ruling, the court will deny, as moot, a motion filed by plaintiff to amend its complaint.

---

**End of Document**                                        © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# STATUTORY ADDENDUM

## <u>STATUTORY ADDENDUM TABLE OF CONTENTS</u>

25 U.S.C. § 5645 <u>et</u> <u>seq</u>............................................................Statutory Addednum 1

25 U.S.C. § 565 <u>et</u> <u>seq</u>.............................................................Statutory Addednum 10

25 U.S.C. § 566 <u>et</u> <u>seq</u>.............................................................Statutory Addednum 11



equipment, industrial equipment, trucks, live-
stock, feed, food, seed, tools, machinery, imple-
ments, household goods, bedding, clothing, and
any other equipment or supplies necessary to
enable the Indians to fit themselves for or to en-
gage in the farming, livestock industry, or such
other industrial or agricultural pursuits or avo-
cations as will enable them to become self-sup-
porting; (2) the educational advancement of such
Indians; (3) financial assistance in cases of ill-
ness, death, or other emergency; (4) the repay-
ment of reimbursable debts previously con-
tracted; or (5) security for or the repayment of
loans made to such Indians from any Klamath
revolving loan fund now existent or which shall
hereafter be created.

(June 1, 1938, ch. 310, § 3, 52 Stat. 605.)

REFERENCES IN TEXT

Herein, referred to in text, means act June 1, 1938,
which comprises this subchapter. For complete classi-
fication of this Act to the Code, see Tables.

### § 554. Disposition of payment on death of Indian

In the event of the death of any such Indian
entitled to receive a payment in lieu of allot-
ment after June 1, 1938, any unexpended balance
of said $1,500 still due the decedent shall first be
applied to the repayment of any loans received
by such Indian from the United States or from
the Klamath Tribal funds, and the balance
thereafter shall be distributed as personal prop-
erty.

(June 1, 1938, ch. 310, § 4, 52 Stat. 606.)

### § 555. Repealed. Aug. 13, 1954, ch. 732, § 9(c), 68 Stat. 721

Section, act June 1, 1938, ch. 310, § 5, 52 Stat. 606, re-
lated to devise of restricted or trust property and is
now covered by section 564h of this title.

### § 556. Reversion of interest in property on death without heirs or devisees

If any enrolled member of the Klamath Tribe
dies without lawful heirs or devisees,[1] all interest
which such member has in any restricted or
trust property within the Klamath Reservation
shall revert to and become part of the common
tribal property.

(June 1, 1938, ch. 310, § 6, 52 Stat. 606.)

SUBCHAPTER XII—KLAMATH TRIBE: FEES
AND CHARGES

### §§ 561, 562. Omitted

CODIFICATION

Sections, which related to fees for general services
and medical services, were from the Interior Depart-
ment Appropriation Act, 1946, July 3, 1945, ch. 262, § 1,
59 Stat. 334, and were not repeated in the Interior De-
partment Appropriation Act of 1947, July 1, 1946, ch.
529, 60 Stat. 348.

### § 563. Salaries and expenses for Klamath Tribe Officials

The Secretary of the Interior, or such official
as may be designated by him, is authorized,

[1] So in original. Probably should be "devisees,".

until otherwise directed by Congress, to advance
to the tribe or to pay out of any unobligated
tribal funds of the Klamath Indians in the
Treasury of the United States salaries and ex-
penses of tribal officials or representatives (ex-
cept the Klamath Loan Fund Board) at rates
and/or limitations designated in advance by the
Klamath General Council, or any governing
body to which it may delegate such authority,
and approved by the Secretary of the Interior:
*Provided,* That the length of stay of representa-
tives serving the tribe at the seat of government
shall be determined by the Secretary of the In-
terior.

(May 29, 1953, ch. 86, § 1, 67 Stat. 40.)

PRIOR PROVISIONS

A prior section 563, acts June 25, 1938, ch. 710, 52 Stat.
1207; Aug. 7, 1939, ch. 519, 53 Stat. 1244; May 15, 1945, ch.
123, 59 Stat. 167, provided for payment of salaries and
expenses of Klamath Tribe officials out of tribal funds
but limited the amount of such expenditures to $15,000
per annum, prior to repeal by act May 29, 1953, § 2, 67
Stat. 40.

SUBCHAPTER XIII—KLAMATH TRIBE:
TERMINATION OF FEDERAL SUPERVISION

### § 564. Purpose

The purpose of this subchapter is to provide
for the termination of Federal supervision over
the trust and restricted property of the Klamath
Tribe of Indians consisting of the Klamath and
Modoc Tribes and the Yahooskin Band of Snake
Indians, and of the individual members thereof,
for the disposition of federally owned property
acquired or withdrawn for the administration of
the affairs of said Indians, and for a termination
of Federal services furnished such Indians be-
cause of their status as Indians.

(Aug. 13, 1954, ch. 732, § 1, 68 Stat. 718.)

REVOLVING FUND: INTEREST-FREE LOANS TO KLAMATH
INDIANS; REFINANCING LENDING AGENCY LOANS

Pub. L. 86–40, June 11, 1959, 73 Stat. 70, provided:
"That the Secretary of the Interior is authorized to
make loans, without interest, from the revolving fund
authorized by the Acts of June 18, 1934 (48 Stat. 986; 25
U.S.C. 470), and June 26, 1936 (49 Stat. 1968; 25 U.S.C.
506), as amended and supplemented, to members of the
Klamath Tribe of Indians who elected to withdraw from
the tribe pursuant to the Act of August 13, 1954 (68 Stat.
718; 25 U.S.C. 564), as amended, regardless of the degree
of Indian blood of the borrower, and to collect such
loans by setoff against funds payable to the borrower
pursuant to said Act of August 13, 1954, as amended
[this subchapter]. The Secretary is also authorized to
refinance from such revolving fund any loan made by a
lending agency to a withdrawing Klamath Indian that
is secured by encumbrance of his beneficial interest in
tribal property with the approval of the Secretary as
required by section 4 of said 1954 Act [section 564c of
this title], and to include therein a nonreimbursable
grant equal to the interest charges incurred by the bor-
rower prior to such refinancing. In the event adequate
funds are not available from the revolving fund to refi-
nance a loan by such lending agency, the Secretary is
authorized to pay from the revolving fund, without re-
imbursement, the interest charged on such loan."

INDIAN REVOLVING LOAN FUND

Certain funds to be administered as a single Indian
Revolving Loan Fund after Apr. 12, 1974, see section
1461 of this title.

REPEALS; RECOUPMENT OF FUNDS EXPENDED FOR
KLAMATH COUNTY SCHOOL BOARD

Section 24 of act Aug. 13, 1954, as amended by Pub. L. 85–72, June 29, 1957, 71 Stat. 243, provided that: "All Acts or parts of Acts inconsistent with this Act [this subchapter] are hereby repealed insofar as they affect the tribe or its members. Effective on July 1, 1957, section 2 of the Act of August 19, 1949 (63 Stat. 621, ch. 488) shall become inapplicable to the unrecouped balance of funds expended in cooperation with the school board of Klamath County, Oregon, pursuant to said Act."

SEPARABILITY

Section 25 of act Aug. 13, 1954, provided that: "If any provision of this Act [this subchapter], or the application thereof to any person or circumstance, is held invalid, the remainder of the Act and the application of such provision to other persons or circumstances shall not be affected thereby."

## § 564a. Definitions

For the purposes of this subchapter:

(a) "Tribe" means the Klamath Tribe of Indians consisting of the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians.

(b) "Secretary" means the Secretary of the Interior.

(c) "Lands" means real property, interests therein, or improvements thereon, and include water rights.

(d) "Tribal property" means any real or personal property, including water rights, or any interest in real or personal property, that belongs to the tribe and either is held by the United States in trust for the tribe or is subject to a restriction against alienation imposed by the United States.

(e) "Adult" means a person who is an adult according to the law of the place of his residence.

(Aug. 13, 1954, ch. 732, § 2, 68 Stat. 718; Pub. L. 85–132, § 1(f), Aug. 14, 1957, 71 Stat. 348.)

AMENDMENTS

1957—Subsec. (e). Pub. L. 85–132 substituted provision defining adult as a person who is an adult according to the law of the place of his residence, for provision defining adult as a member of the tribe who has attained the age of twenty-one years.

## § 564b. Membership roll; closure; preparation and initial publication; appeal from inclusion or omission from roll; finality of determination; final publication

At midnight of August 13, 1954, the roll of the tribe shall be closed and no child born thereafter shall be eligible for enrollment: *Provided*, That the tribe shall have a period of six months from August 13, 1954, in which to prepare and submit to the Secretary a proposed roll of the members of the tribe living on August 13, 1954, which shall be published in the Federal Register. If the tribe fails to submit such roll within the time specified in this section, the Secretary shall prepare a proposed roll for the tribe, which shall be published in the Federal Register. Any person claiming membership rights in the tribe or an interest in its assets, or a representative of the Secretary on behalf of any such person, may, within ninety days from the date of publication of the proposed roll, file an appeal with the Secretary contesting the inclusion or omission of the name of any person on or from such roll. The

Secretary shall review such appeals and his decisions thereon shall be final and conclusive. After disposition of all such appeals, the roll of the tribe shall be published in the Federal Register, and such roll shall be final for the purposes of this subchapter.

(Aug. 13, 1954, ch. 732, § 3, 68 Stat. 718.)

## § 564c. Personal property rights; restrictions; tax exemption

Upon publication in the Federal Register of the final roll as provided in section 564b of this title, the rights or beneficial interests in tribal property of each person whose name appears on the roll shall constitute personal property which may be inherited or bequeathed, but shall not otherwise be subject to alienation or encumbrance before the transfer of title to such tribal property as provided in section 564e of this title without the approval of the Secretary. Any contract made in violation of this section shall be null and void. Property which this section makes subject to inheritance or bequest and which is inherited or bequeathed after August 13, 1954, and prior to the transfer of title to tribal property as provided in section 564e of this title shall not be subject to State or Federal inheritance, estate, legacy, or succession taxes.

(Aug. 13, 1954, ch. 732, § 4, 68 Stat. 718; Pub. L. 85–731, § 2, Aug. 23, 1958, 72 Stat. 818.)

AMENDMENTS

1958—Pub. L. 85–731 inserted provision that property which is inherited or bequeathed after Aug. 13, 1954, and prior to transfer of title to tribal property should not be subject to taxes.

REVOLVING FUND: INTEREST-FREE LOANS TO KLAMATH
INDIANS; REFINANCING LENDING AGENCY LOANS

Use of Revolving Loan Fund for Indians to assist Klamath Indians during period for terminating Federal supervision, see note set out under section 564 of this title.

## § 564d. Management specialists

### (a) Employment; duties

The Secretary is authorized and directed to select and retain by contract, at the earliest practicable time after August 13, 1954 and after consultation with the tribe at a general meeting called for that purpose, the services of qualified management specialists who shall—

(1) cause an appraisal to be made, within not more than twelve months after their employment, or as soon thereafter as practicable, of all tribal property showing its fair market value by practicable logging or other appropriate economic units;

(2) immediately after the appraisal of the tribal property and approval of the appraisal by the Secretary, give to each member whose name appears on the final roll of the tribe an opportunity to elect to withdraw from the tribe and have his interest in tribal property converted into money and paid to him, or to remain in the tribe and participate in the tribal management plan to be prepared pursuant to paragraph (5) of this subsection; in the case of members who are minors, persons declared incompetent by judicial proceedings, or de-

ceased, the opportunity to make such election on their behalf shall be given to the person designated by the Secretary as the person best able to represent the interests of such member: *Provided, however,* That any member, or any heir or any devisee of any deceased member, for whom the Secretary has so designated a representative may (on his own behalf, through his natural guardian, or next friend) within one hundred and twenty days after receipt of written notice of such secretarial designation, contest the secretarial designation in any naturalization court for the area in which such member resides, by filing of a petition therein requesting designation of a named person other than the secretarial designee, and the burden shall thereupon devolve upon the Secretary to show cause why the member-designated representative should not represent the interests of such member, and the decision of such court shall be final and conclusive;

(3) determine and select the portion of the tribal property which if sold at the appraised value would provide sufficient funds to pay the members who elect to have their interests converted into money, arrange for the sale of such property, and distribute the proceeds of sale among the members entitled thereto: *Provided,* That any person whose name appears on the final roll of the tribe, or a guardian on behalf of any such person who is a minor or an incompetent, shall have the right to purchase, for his or its own account but not as an agent for others, any of such property in lots as offered for sale for not less than the highest offer received by competitive bid; any individual Indian purchaser who has elected to withdraw from the tribe may apply toward the purchase price up to 100 per centum of the amount estimated by the Secretary to be due him from the sale or taking of forest and marsh land pursuant to subsection (b), (d), and (f) of section 564w–1 of this title, and up to 75 per centum of the amount estimated by the Secretary to be due him from the conversion of his interest in other tribal property; and if more than one right is exercised to purchase the same property pursuant to this proviso the property shall be sold to one of such persons on the basis of competitive bids: *Provided further,* That when determining and selecting the portion of the tribal property to be sold, due consideration shall be given to the use of such property for grazing purposes by the members of both groups of the tribe;

(4) cause such studies and reports to be made as may be deemed necessary or desirable by the tribe or by the Secretary in connection with the termination of Federal supervision as provided for in this subchapter; and

(5) cause a plan to be prepared in form and content satisfactory to the members who elect to remain in the tribe and to the Secretary for the management of tribal property through a trustee, corporation, or other legal entity. If no plan that is satisfactory both to the members who elect to remain in the tribe and to the Secretary has been prepared six months before the time limit provided in section 564e(b) of this title the Secretary shall adopt a plan for managing the tribal property, subject to the provisions of section 564n of this title.

## (b) Availability of funds for expenditures; reimbursement of tribal funds

Such amounts of Klamath tribal funds as may be required for the purposes of this section shall be available for expenditure by the Secretary. In order to reimburse the tribe, in part, for expenditure of such tribal funds as the Secretary deems necessary for the purposes of carrying out the requirements of this section, there is authorized to be appropriated out of any money in the Treasury not otherwise appropriated, an amount equal to one-half of such expenditures from tribal funds, or the sum of $550,000, whichever is the lesser amount.

(Aug. 13, 1954, ch. 732, § 5, 68 Stat. 718; Pub. L. 85–132, § 1(b), (d), (e), (g), Aug. 14, 1957, 71 Stat. 347, 348; Pub. L. 85–731, §§ 6–8, Aug. 23, 1958, 72 Stat. 819.)

### AMENDMENTS

1958—Subsec. (a)(3). Pub. L. 85–731, §§ 6, 7, struck out first proviso requiring that funds payable to the withdrawing members be distributed as each $200,000 accumulates, and substituted "who has elected to withdraw from the tribe may apply toward the purchase price up to 100 per centum of the amount estimated by the Secretary to be due him from the sale or taking of forest and marsh lands pursuant to subsections (b), (d), and (f) of section 564w–1 of this title, and up to 75 per centum of the amount estimated by the Secretary to be due him from the conversion of his interest in other tribal property" for "may apply toward the purchase price all or any part of the sum due him from the conversion of his interest in tribal property" in second proviso.

Subsec. (a)(5). Pub. L. 85–731, § 8, inserted sentence to provide that if no plan is satisfactory both to the members who elect to remain in the tribe and to the Secretary, the Secretary shall adopt a management plan.

1957—Subsec. (a)(2). Pub. L. 85–132, § 1(d), provided that the time of election to withdraw be given after the appraisal is approved by the Secretary, and provided for election on behalf of minors, incompetents, or deceased persons by designee of Secretary.

Subsec. (a)(3). Pub. L. 85–132, § 1(e), in second proviso provided that any person whose name appears on the final roll of the tribe, may purchase for his own account, but not as an agent for others, any such property in lots as offered for sale, and provided that if more than one right is exercised to purchase the same property, it be sold on the basis of competitive bids.

Subsec. (a)(5). Pub. L. 85–132, § 1(g), substituted "members who elect to remain in the tribe" for "tribe".

Subsec. (b). Pub. L. 85–132, § 1(b), provided for partial reimbursement of the tribe for expenditures of tribal funds under this section, authorization of appropriation of the lesser amount equal to one-half of such expenditures, or $550,000, in lieu of former provisions which charged expenses incident to par. (3) to members who withdraw from tribe, charged expenses under pars. (4) and (5) to members who remain in tribe, and charged all other expenses under this section to interests of both groups of members.

### COMPENSATION FOR SERVICES PERTAINING TO ENACTMENT PROHIBITED

Section 3 of Pub. L. 85–731 provided that: "No funds distributed pursuant to section 5 of the Act of August 13, 1954, as amended [this section], to members who withdraw from the tribe shall be paid to any person as compensation for services pertaining to the enactment of said Act or amendments thereto [this subchapter] and any person making or receiving such payments shall be guilty of a misdemeanor and shall be imprisoned for not more than six months and fined not more than $500."

TERMINATION OF CONTRACT WITH MANAGEMENT
SPECIALISTS BY SECRETARY OF THE INTERIOR

Section 4 of Pub. L. 85–731 provided that: "The Secretary of the Interior is directed to terminate the contract between him and the management specialists by giving immediately the sixty-day notice required by paragraph 18 of such contract. When the contract is terminated, all of the functions of the management specialists under section 5 of the Act of August 13, 1954, as amended [this section], shall be performed by the Secretary."

PROVISIONS REQUIRING ELECTION TO WITHDRAW OR RE-
MAIN IN TRIBE FOLLOWING APPRAISAL AS UNAF-
FECTED

Section 5 of Pub. L. 85–731 provided that: "Nothing in this Act shall in any way modify or repeal the provisions of subsection 5(a) of the Act of August 13, 1954, 68 Stat. 718), as amended [subsec. (a) of this section], providing for and requiring members of the Klamath Tribe to elect to withdraw from or remain in the tribe, following the appraisal of the tribal property."

CEMETERIES WITHIN RESERVATION

Section 9 of Pub. L. 85–731 provided that: "Except as provided below the provisions of the Act of August 13, 1954 (68 Stat. 718), as amended [this subchapter], shall not apply to cemeteries within the reservation. The Secretary is hereby authorized and directed to transfer title to such properties to any organization authorized by the tribe and approved by him. In the event such an organization is not formed by the tribe within eighteen months following enactment of this Act [August 23, 1958], the Secretary is directed to perfect the organization of a nonprofit entity empowered to accept title and maintain said cemeteries, any costs involved to be subject to the provisions of section 5(b) of said Act of August 13, 1954, as amended [subsec. (b) of this section]."

DEFERRAL OF TIME FOR SALES OF TRIBAL PROPERTY

Sales of tribal property made pursuant to subsec. (a)(3) of this section or section 564e of this title as deferred until the adjournment of the second session of the Eighty-fifth Congress, see note set out under section 564e of this title.

## § 564e. Sale of tribal property

### (a) Transfer procedure

The Secretary is authorized and directed to execute any conveyancing instrument that is necessary or appropriate to convey title to tribal property to be sold in accordance with the provisions of paragraph (3) of subsection (a) of section 564d of this title, and to transfer title to all other tribal property to a trustee, corporation, or other legal entity in accordance with the plan prepared pursuant to paragraph (5) of subsection (a) of section 564d of this title.

### (b) Time limitation

It is the intention of the Congress that all of the actions required by section 564d of this title and this section shall be completed at the earliest practicable time and in no event later than seven years from August 13, 1954.

### (c) Effect on tribal members selling interests

Members of the tribe who receive the money value of their interests in tribal property shall thereupon cease to be members of the tribe: *Provided*, That nothing shall prevent them from sharing in the proceeds of tribal claims against the United States.

(Aug. 13, 1954, ch. 732, § 6, 68 Stat. 719; Pub. L. 85–132, § 1(c), Aug. 14, 1957, 71 Stat. 347; Pub. L. 85–731, § 10, Aug. 23, 1958, 72 Stat. 819.)

AMENDMENTS

1958—Subsec. (b). Pub. L. 85–731 substituted "seven years" for "six years".

1957—Subsec. (b). Pub. L. 85–132 substituted "six years" for "four years".

DEFERRAL OF TIME FOR SALES OF TRIBAL PROPERTY

Section 27 of act Aug. 13, 1954, ch. 732, as added by Pub. L. 85–132, § 1(a), provided that: "Notwithstanding any other provisions of this Act [this subchapter], no sales of tribal property shall be made pursuant to paragraph (3) of subsection (a) of section 5, or section 6 of this Act [section 564d(a)(3) of this title or this section] prior to the adjournment of the second session of the Eighty-fifth Congress."

## § 564f. Per capita payments to tribal members

The Secretary is authorized and directed, as soon as practicable after the passage of this subchapter, to pay from such funds as are deposited to the credit of the tribe in the Treasury of the United States, $250 to each member of the tribe on the rolls of the tribe on August 13, 1954. Any other person whose application for enrollment on the rolls of the tribe is subsequently approved, pursuant to the terms of section 564b of this title, shall, after enrollment, be paid a like sum of $250: *Provided*, That such payments shall be made first from the capital reserve fund created by section 530 of this title.

(Aug. 13, 1954, ch. 732, § 7, 68 Stat. 720.)

## § 564g. Individual property

### (a) Transfer of unrestricted control

The Secretary is authorized and directed to transfer within four years from August 13, 1954, to each member of the tribe unrestricted control of funds or other personal property held in trust for such member by the United States.

### (b) Removal of restrictions on sales or encumbrances; fee simple title

All restrictions on the sale or encumbrance of trust or restricted interests in land, wherever located, owned by members of the tribe (including allottees, purchasers, heirs, and devisees, either adult or minor), and on trust or restricted interests in land within the Klamath Indian Reservation, regardless of ownership, are removed four years after August 13, 1954, and the patents or deeds under which titles are then held shall pass the titles in fee simple, subject to any valid encumbrances. The titles to all interests in trust or restricted land acquired by members of the tribe by devise or inheritance four years or more after August 13, 1954, shall vest in such members in fee simple, subject to any valid encumbrance.

### (c) Multiple land ownership; partition; sale; election to purchase; unlocated owners

Prior to the time provided in subsection (b) of this section for the removal of restrictions on land owned by one or by more than one member of a tribe, the Secretary may—

(1) upon request of any of the owners, partition the land and issue to each owner a patent or deed for his individual share that shall become unrestricted four years from August 13, 1954;

(2) upon request of any of the owners, and a finding by the Secretary that partition of all

or any part of the land is not practicable, cause all or any part of the land to be sold at not less than the appraised value thereof and distribute the proceeds of sale to the owners: *Provided,* That any one or more of the owners may elect before a sale to purchase the other interests in the land at not less than the appraised value thereof, and the purchaser shall receive an unrestricted patent or deed to the land; and

(3) if the whereabouts of none of the owners can be ascertained, cause such lands to be sold and deposit the proceeds of sale in the Treasury of the United States for safekeeping.

**(d) Approval of exchanges or sales by Secretary**

The Secretary is authorized to approve—

(1) the exchange of trust or restricted land between the tribe and any of its members;

(2) the sale by the tribe of tribal property to individual members of the tribe; and

(3) the exchange of tribal property for real property in fee status. Title to all real property included in any sale or exchange as provided in this subsection shall be conveyed in fee simple.

(Aug. 13, 1954, ch. 732, §8, 68 Stat. 720; Pub. L. 85–132, §1(h), (i), Aug. 14, 1957, 71 Stat. 348; Pub. L. 85–731, §11, Aug. 23, 1958, 72 Stat. 819.)

AMENDMENTS

1958—Subsec. (b). Pub. L. 85–731 struck out provision making subsection inapplicable to subsurface rights and directing Secretary to transfer subsurface rights to trustees for management for a period not less than ten years.

1957—Subsec. (b). Pub. L. 85–132, §1(i), substituted "interests in land, wherever located" for "land", and inserted "purchasers" and "and on trust or restricted interests in land within the Klamath Reservation regardless of ownership" preceding proviso.

Subsec. (c). Pub. L. 85–132, §1(h), inserted "one or by" after "on land owned by".

**§ 564h. Property of deceased members**

**(a) Federal laws inapplicable to probate**

The Act of June 25, 1910 (36 Stat. 855), the Act of February 14, 1913 (37 Stat. 678), and other Acts amendatory thereto shall not apply to the probate of the trust and restricted property of the members of the tribe who die six months or more after August 13, 1954.

**(b) State, etc., laws applicable to probate**

The laws of the several States, Territories, possessions, and the District of Columbia with respect to the probate of wills, the determination of heirs, and the administration of decedents' estates shall apply to the individual property of members of the tribe who die six months or more after August 13, 1954.

(Aug. 13, 1954, ch. 732, §9(a), (b), 68 Stat. 720, 721.)

REFERENCES IN TEXT

Act of June 25, 1910, referred to in subsec. (a), is act June 25, 1910, ch. 431, 36 Stat. 855, which enacted sections 47, 93, 151, 202, 337, 344a, 351, 352, 353, 372, 403, 406, 407, and 408 of this title, section 6a–1 of former Title 41, Public Lands, and section 148 of Title 43, Public Lands, and amended sections 191, 312, 331, 333, and 336 of this title and sections 104 and 107 of former Title 18, Criminal Code and Criminal Procedure. Sections 104 and 107 of former Title 18 were repealed and restated as sections 1853 and 1856 of Title 18, Crimes and Criminal Procedure, by act June 25, 1948, ch. 645, 62 Stat. 683. Section 6a–1 of former Title 41 was repealed and restated as section 6102(e) of Title 41, Public Contracts, by Pub. L. 111–350, §§3, 7(b), Jan. 4, 2011, 124 Stat. 3677, 3855. For complete classification of this Act to the Code, see Tables.

Act of February 14, 1913, referred to in subsec. (a), is act Feb. 14, 1913, ch. 55, 37 Stat. 678, which amended section 373 of this title. For complete classification of this Act to the Code, see Tables.

CODIFICATION

Section is comprised of subsecs. (a) and (b) of section 9 of act Aug. 13, 1954. Subsection (c) of section 9 repealed section 555 of this title.

**§ 564i. Transfer of federally owned property**

The Secretary is authorized, in his discretion, to transfer to the tribe or any member or group of members thereof any federally owned property acquired, withdrawn, or used for the administration of the affairs of the tribe which he deems necessary for Indian use, or to transfer to a public or nonprofit body any such property which he deems necessary for public use and from which members of the tribe will derive benefit.

(Aug. 13, 1954, ch. 732, §10, 68 Stat. 721.)

**§ 564j. Taxes; initial exemption; taxes following distribution; valuation for capital gains or losses**

No property distributed under the provisions of this subchapter shall at the time of distribution be subject to Federal or State income tax. Following any distribution of property made under the provisions of this subchapter, such property and any income derived therefrom by the individual, corporation, or other legal entity shall be subject to the same taxes, State and Federal, as in the case of non-Indians: *Provided,* That, for the purpose of capital gains or losses the base value of the property shall be the value of the property when distributed to the individual, corporation or other legal entity.

(Aug. 13, 1954, ch. 732, §11, 68 Stat. 721.)

ALL AMOUNTS REALIZED FROM CONDEMNATION OF CERTAIN FOREST LANDS HELD IN TRUST

Pub. L. 94–81, §1, Aug. 9, 1975, 89 Stat. 417, as amended by Pub. L. 96–596, §5(a), Dec. 24, 1980, 94 Stat. 3476; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095, provided: "That, for purposes of the Internal Revenue Code of 1986 [formerly I.R.C. 1954, Title 26, Internal Revenue Code], all amounts realized by the trust from the condemnation, pursuant to Public Law 93–102 [section 564w–2 of this title], of the Klamath Indian forest lands held by the trustee for the Klamath Indian Tribe—

"(1) shall be excluded from the gross income of the trust, and

"(2) on the distribution from the trust of the proceeds of such condemnation, shall be excluded from the gross income of each person receiving such distribution."

Section 5(b) of Pub. L. 96–596 provided that: "The amendment made by subsection (a) [amending section 1 of Pub. L. 94–81, set out above] shall apply to all amounts whether received before, on, or after the date of the enactment of this Act [Dec. 24, 1980]."

**§ 564k. Loan transfers; collection by tribe**

All loans made from the reimbursable loan fund established by section 531 of this title, and

all other loans made from Klamath tribal funds, including loans of livestock made by the tribe repayable in kind, shall be transferred to the tribe for collection in accordance with the terms thereof.

(Aug. 13, 1954, ch. 732, § 12, 68 Stat. 721.)

REFERENCES IN TEXT

Section 531 of this title, referred to in text, was repealed by act Aug. 13, 1954, ch. 732, § 12, 68 Stat. 721.

CODIFICATION

Section is composed of second sentence of section 12 of act Aug. 13, 1954. The first sentence of said section 12 repealed sections 531 to 535 and 542(a) of this title.

### § 564l. Klamath irrigation works

#### (a) Transfer of operation and maintenance

That part of section 499 of title 43, which relates to the transfer of the care, operation, and maintenance of reclamation works to water users associations or irrigation districts shall be applicable to the irrigation works on the Klamath Reservation.

#### (b) Termination of construction costs deferment; recordation of lien

Effective on the first day of the calendar year beginning after the date of the proclamation provided for in section 564q of this title, the deferment of the assessment and collection of construction costs provided for in the first proviso of section 386a of this title, shall terminate with respect to any lands within irrigation projects on the Klamath Reservation. The Secretary shall cause the first lien against such lands created by section 387[1] of this title, to be filed of record in the appropriate county office.

#### (c) Appropriation authorization

There is authorized to be appropriated out of any funds in the Treasury not otherwise appropriated the sum of $89,212 for payment to the Klamath Tribe with interest at 4 per centum annually as reimbursement for tribal funds used for irrigation construction operation and maintenance benefiting nontribal lands on the Klamath Reservation, such interest being computed from the dates of disbursement of such funds from the United States Treasury.

#### (d) Adjustment of reimbursable irrigation costs

The Secretary is authorized to adjust, eliminate, or cancel all or any part of reimbursable irrigation operation and maintenance costs and reimbursable irrigation construction costs chargeable against Indian owned lands that are subject to the provisions of this subchapter, and all or any part of assessments heretofore or hereafter imposed on account of such costs, when he determines that the collection thereof would be inequitable or would result in undue hardship on the Indian owner of the land, or that the administrative costs of collection would probably equal or exceed the amount collected.

#### (e) Applicable irrigation laws

Nothing contained in any other section of this subchapter shall affect in any way the laws applicable to irrigation projects on the Klamath Reservation.

(Aug. 13, 1954, ch. 732, § 13, 68 Stat. 721.)

REFERENCES IN TEXT

Section 387 of this title, referred to in subsec. (b), was omitted after not being repealed in the Interior Department Appropriation Act of 1947, July 1, 1946, ch. 529, 60 Stat. 348.

### § 564m. Water and fishing rights

#### (a) Water rights; laws applicable to abandonment

Nothing in this subchapter shall abrogate any water rights of the tribe and its members, and the laws of the State of Oregon with respect to the abandonment of water rights by nonuse shall not apply to the tribe and its members until fifteen years after the date of the proclamation issued pursuant to section 564q of this title.

#### (b) Fishing rights or privileges

Nothing in this subchapter shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty.

(Aug. 13, 1954, ch. 732, § 14, 68 Stat. 722.)

### § 564n. Protection of minors, persons non compos mentis, and other members needing assistance; guardians; other adequate means; trusts; annuities; assistance factors; contests

Prior to the transfer of title to, or the removal of restrictions from, property in accordance with the provisions of this subchapter, the Secretary shall protect the rights of members of the tribe who are minors, non compos mentis, or in the opinion of the Secretary in need of assistance in conducting their affairs, by causing the appointment of guardians for such members in courts of competent jurisdiction, or by such other means as he may deem adequate, without application from the member, including but not limited to the creation of a trust of such member's property with a trustee selected by the Secretary, or the purchase by the Secretary of an annuity for such member: *Provided, however*, That no member shall be declared to be in need of assistance in conducting his affairs unless the Secretary determines that such member does not have sufficient ability, knowledge, experience, and judgment to enable him to manage his business affairs, including the administration, use, investment, and disposition of any property turned over to such member and the income and proceeds therefrom, with such reasonable degree of prudence and wisdom as will be apt to prevent him from losing such property or the benefits thereof: *Provided further*, That any member determined by the Secretary to be in need of assistance in conducting his affairs may, within one hundred and twenty days after receipt of written notice of such secretarial determination, contest the secretarial determination in any naturalization court for the area in which said member resides by filing therein a petition having that purpose; the burden shall thereupon devolve upon the Secretary to show cause why such member should not conduct his own affairs, and the decision of such court shall be final and conclusive with respect to the affected member's conduct of his affairs.

---

[1] See References in Text note below.

(Aug. 13, 1954, ch. 732, § 15, 68 Stat. 722; Pub. L. 85–132, § 1(j), Aug. 14, 1957, 71 Stat. 348.)

AMENDMENTS

1957—Pub. L. 85–132 inserted provisions allowing Secretary to act without application from member to create a trust or purchase an annuity for such member, by setting out factors for determination by Secretary before he declares a member to be in need of assistance, and by providing for contest of such secretarial determination by member.

## § 564*o*. Advances or expenditures from tribal funds

Pending the completion of the property dispositions provided for in this subchapter, the funds now on deposit, or hereafter deposited, in the United States Treasury to the credit of the tribe shall be available for advance to the tribe, or for expenditure, for such purposes as may be designated by the governing body of the tribe and approved by the Secretary.

(Aug. 13, 1954, ch. 732, § 16, 68 Stat. 722.)

## § 564p. Execution by Secretary of patents, deeds, etc.

The Secretary shall have authority to execute such patents, deeds, assignments, releases, certificates, contracts, and other instruments as may be necessary or appropriate to carry out the provisions of this subchapter, or to establish a marketable and recordable title to any property disposed of pursuant to this subchapter.

(Aug. 13, 1954, ch. 732, § 17, 68 Stat. 722.)

## § 564q. Termination of Federal trust

### (a) Publication; termination of Federal services; application of Federal and State laws

Upon removal of Federal restrictions on the property of the tribe and individual members thereof, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians and, except as otherwise provided in this subchapter, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

### (b) Citizenship status unaffected

Nothing in this subchapter shall affect the status of the members of the tribe as citizens of the United States.

(Aug. 13, 1954, ch. 732, § 18, 68 Stat. 722.)

## § 564r. Termination of Federal powers over tribe

Effective on the date of the proclamation provided for in section 564q of this title, all powers of the Secretary or other officer of the United States to take, review, or approve any action under the constitution and bylaws of the tribe are terminated. Any powers conferred upon the tribe by such constitution which are inconsistent with the provisions of this subchapter are terminated. Such termination shall not affect the power of the tribe to take any action under its constitution and bylaws that is consistent with this subchapter without the participation of the Secretary or other officer of the United States.

(Aug. 13, 1954, ch. 732, § 19, 68 Stat. 722.)

## § 564s. Set off of individual indebtedness; credit

The Secretary is authorized to set off against any indebtedness payable to the tribe or to the United States by an individual member of the tribe or payable to the United States by the tribe, any funds payable to such individual or tribe under this subchapter and to deposit the amounts set off to the credit of the tribe or the United States as the case may be.

(Aug. 13, 1954, ch. 732, § 20, 68 Stat. 723.)

## § 564t. Indian claims unaffected

Nothing contained in this subchapter shall deprive the tribe or its constituent parts of any right, privilege, or benefit granted by the Act of August 13, 1946 (60 Stat. 1049) [25 U.S.C. 70 et seq.].

(Aug. 13, 1954, ch. 732, § 21, 68 Stat. 723.)

REFERENCES IN TEXT

Act of August 13, 1946, referred to in text, is act Aug. 13, 1946, ch. 959, 60 Stat. 1049, as amended, known as the Indian Claims Commission Act of 1946, which was classified generally to chapter 2A (§ 70 et seq.) of this title and was omitted in view of the termination of the Indian Claims Commission on Sept. 30, 1978. See Codification note set out under former section 70 et seq. of this title.

## § 564u. Valid leases, permits, liens, etc., unaffected

Nothing in this subchapter shall abrogate any valid lease, permit, license, right-of-way, lien, or other contract heretofore approved. Whenever any such instrument places in or reserves to the Secretary any powers, duties, or other functions with respect to the property subject thereto, the Secretary may transfer such functions, in whole or in part, to any Federal agency with the consent of such agency and may transfer such functions, in whole or in part to a State agency with the consent of such agency and the other party or parties to such instrument.

(Aug. 13, 1954, ch. 732, § 22, 68 Stat. 723.)

## § 564v. Rules and regulations; tribal referenda

The Secretary is authorized to issue rules or regulations necessary to effectuate the purposes of this subchapter, and may in his discretion provide for tribal referenda on matters pertaining to management or disposition of tribal assets.

(Aug. 13, 1954, ch. 732, § 23, 68 Stat. 723.)

## § 564w. Education and training program; purposes; subjects; transportation; subsistence; contracts; other education programs

Prior to the issuance of a proclamation in accordance with the provisions of section 564q of

this title, the Secretary is authorized to undertake, within the limits of available appropriations, a special program of education and training designed to help the members of the tribe to earn a livelihood, to conduct their own affairs, and to assume their responsibilities as citizens without special services because of their status as Indians. Such program may include language training, orientation in non-Indian community customs and living standards, vocational training and related subjects, transportation to the place of training or instruction, and subsistence during the course of training or instruction. For the purposes of such program the Secretary is authorized to enter into contracts or agreements with any Federal, State, or local governmental agency, corporation, association, or person. Nothing in this section shall preclude any Federal agency from undertaking any other program for the education and training of Indians with funds appropriated to it.

(Aug. 13, 1954, ch. 732, § 26, 68 Stat. 723.)

## § 564w–1. Klamath Indian Forest and Klamath Marsh

Notwithstanding the provisions of sections 564d and 564e of this title, and all Acts amendatory thereof—

### (a) Designation of boundaries

The tribal lands that comprise the Klamath Indian Forest, and the tribal lands that comprise the Klamath Marsh, shall be designated by the Secretary of the Interior and the Secretary of Agriculture, jointly.

### (b) Sales; terms and conditions

The portion of the Klamath Indian Forest that is selected for sale pursuant to section 564d(a)(3) of this title to pay members who withdraw from the tribe shall be offered for sale by the Secretary of the Interior in appropriate units, on the basis of competitive bids, to any purchaser or purchasers who agree to manage the forest lands as far as practicable according to sustained yield procedures so as to furnish a continuous supply of timber according to plans to be prepared and submitted by them for approval and inclusion in the conveyancing instruments in accordance with specifications and requirements referred to in the invitations for bids: *Provided,* That no sale shall be for a price that is less than the realization value of the units involved determined as provided in subsection (c) of this section. The terms and conditions of the sales shall be prescribed by the Secretary. The specifications and minimum requirements to be included in the invitations for bids, and the determination of appropriate units for sale, shall be developed and made jointly by the Secretary of the Interior and the Secretary of Agriculture. Such plans when prepared by the purchaser shall include provisions for the conservation of soil and water resources as well as for the management of the timber resources as hereinbefore set forth in this section. Such plans shall be satisfactory to and have the approval of the Secretary of Agriculture as complying with the minimum standards included in said specifications and requirements before

the prospective purchaser shall be entitled to have his bid considered by the Secretary of the Interior and the failure on the part of the purchaser to prepare and submit a satisfactory plan to the Secretary of Agriculture shall constitute grounds for rejection of such bid. Such plans shall be incorporated as conditions in the conveyancing instruments executed by the Secretary and shall be binding on the grantee and all successors in interest. The conveyancing instruments shall provide for a forfeiture and a reversion of title to the lands to the United States, not in trust for or subject to Indian use, in the event of a breach of such conditions. The purchase price paid by the grantee shall be deemed to represent the full appraised fair market value of the lands, undiminished by the right of reversion retained by the United States in a nontrust status, and the retention of such right of reversion shall not be the basis for any claim against the United States. The Secretary of Agriculture shall be responsible for enforcing such conditions. Upon any reversion of title pursuant to this subsection, the lands shall become national forest lands subject to the laws that are applicable to lands acquired pursuant to the Act of March 1, 1911 (36 Stat. 961), as amended.

### (c) Appraisals; notice to Congressional committees; appropriation; realization value; report to Congressional committees

Within sixty days after August 23, 1958 the Secretary of the Interior shall contract by negotiation with three qualified appraisers or three qualified appraisal organizations for a review of the appraisal approved by the Secretary pursuant to section 564d(a)(2) of this title. In such review full consideration shall be given to all reasonably ascertainable elements of land, forest, and mineral values. Not less than thirty days before executing such contracts the Secretary shall notify the chairman of the House Committee on Interior and Insular Affairs and the chairman of the Senate Committee on Interior and Insular Affairs of the names and addresses of the appraisers selected. The cost of the appraisal review shall be paid from tribal funds which are made available for such purpose, subject to full reimbursement by the United States, and the appropriation of funds for that purpose is authorized. Upon the basis of a review of the appraisal heretofore made of the forest units and marsh lands involved and such other materials as may be readily available, including additional market data since the date of the prior appraisal, but without making any new and independent appraisal, each appraiser shall estimate the fair market value of such forest units and marsh lands as if they had been offered for sale on a competitive market without limitation on use during the interval between the adjournment of the Eighty-fifth Congress and the termination date specified in section 564e(b) of this title. This value shall be known as the realization value. If the three appraisers are not able to agree on the realization value of such forest units and marsh lands, then such realization values shall be determined by averaging the values estimated by

each appraiser. The Secretary shall report such realization values to the chairman of the House Committee on Interior and Insular Affairs and to the chairman of the Senate Committee on Interior and Insular Affairs not later than January 15, 1959. No sale of forest units that comprise the Klamath Indian Forest designated pursuant to subsection (a) of this section shall be made under the provisions of this subchapter prior to April 1, 1959.

**(d) Unsold forest units and marsh lands; title after publication in Federal Register; aggregate realization value; appropriation**

If all of the forest units offered for sale in accordance with subsection (b) of this section are not sold before April 1, 1961, the Secretary of Agriculture shall publish in the Federal Register a proclamation taking title in the name of the United States to as many of the unsold units or parts thereof as have, together with the Klamath Marsh lands acquired pursuant to subsection (f) the section, an aggregate realization value of not to exceed $90,000,000, which shall be the maximum amount payable for lands acquired by the United States pursuant to this subchapter. Compensation for the forest lands so taken shall be the realization value of the lands determined as provided in subsection (c) of this section, unless a different amount is provided by law enacted prior to the proclamation of the Secretary of Agriculture. Appropriation of funds for that purpose is authorized. Payment shall be made as soon as possible after the proclamation of the Secretary of Agriculture. Such lands shall become national forest lands subject to the laws that are applicable to lands acquired pursuant to the Act of March 1, 1911 (36 Stat. 961), as amended. Any of the forest units that are offered for sale and that are not sold or taken pursuant to subsection (b) or (d) of this section shall be subject to sale without limitation on use in accordance with the provisions of section 564d of this title.

**(e) Sale of retained lands to Secretary of Agriculture**

If at any time any of the tribal lands that comprise the Klamath Indian Forest and that are retained by the tribe are offered for sale other than to members of the tribe, such lands shall first be offered for sale to the Secretary of Agriculture, who shall be given a period of twelve months after the date of each such offer within which to purchase such lands. No such lands shall be sold at a price below the price at which they have been offered for sale to the Secretary of Agriculture, and if such lands are reoffered for sale they shall first be reoffered to the Secretary of Agriculture. The Secretary of Agriculture is authorized to purchase such lands subject to such terms and conditions as to the use thereof as he may deem appropriate, and any lands so acquired shall thereupon become national forest lands subject to the laws that are applicable to lands acquired pursuant to the Act of March 1, 1911 (36 Stat. 961), as amended.

**(f) Klamath Marsh National Wildlife Refuge; appropriation**

The lands that comprise the Klamath Marsh shall be a part of the property selected for sale pursuant to section 564d(a)(3) of this title to pay members who withdraw from the tribe. Title to such lands is taken in the name of the United States, effective the earliest date after September 30, 1959, when the Secretary of the Interior determines that funds for the payment of the purchase price are available from the sale of stamps under the Migratory Bird Hunting Stamp Act of March 16, 1934, as amended [16 U.S.C. 718 et seq.]. Such lands are designated as the Klamath Marsh National Wildlife Refuge, which shall be administered in accordance with the law applicable to areas acquired pursuant to section 4 of the Act of March 16, 1934 (48 Stat. 451), as amended or supplemented [16 U.S.C. 718d]. Compensation for said taking shall be the realization value of the lands determined in accordance with subsection (c) of this section, and shall be paid out of funds in the Treasury of the United States, which are authorized to be appropriated for that purpose.

**(g) Homesites**

Any person whose name appears on the final roll of the tribe, and who has since December 31, 1956, continuously resided on any lands taken by the United States by subsections (d) and (f) of this section, shall be entitled to occupy and use as a homesite for his lifetime a reasonable acreage of such lands, as determined by the Secretary of Agriculture, subject to such regulations as the Secretary of Agriculture may issue to safeguard the administration of the national forest and as the Secretary of the Interior may issue to safeguard the administration of the Klamath Marsh National Wildlife Refuge.

**(h) Administration of outstanding timber sales contracts**

If title to any of the lands comprising the Klamath Indian Forest is taken by the United States, the administration of any outstanding timber sales contracts thereon entered into by the Secretary of the Interior as trustee for the Klamath Indians shall be administered by the Secretary of Agriculture.

**(i) Right of United States to use roads**

All sales of tribal lands pursuant to subsection (b) of this section or pursuant to section 564d of this title on which roads are located shall be made subject to the right of the United States and its assigns to maintain and use such roads.

(Aug. 13, 1954, ch. 732, § 28, as added Pub. L. 85–731, § 1, Aug. 23, 1958, 72 Stat. 816; amended Pub. L. 86–247, Sept. 9, 1959, 73 Stat. 477; Pub. L. 105–312, title II, § 205, Oct. 30, 1998, 112 Stat. 2957; Pub. L. 105–321, § 4(e), Oct. 30, 1998, 112 Stat. 3025.)

REFERENCES IN TEXT

Act of March 1, 1911, referred to in subsecs. (b), (d), and (e), is act Mar. 1, 1911, ch. 186, 36 Stat. 961, as amended, popularly known as the Weeks Law, which is classified to sections 480, 500, 513 to 519, 521, 552, and 563 of Title 16, Conservation. For complete classification of



this Act to the Code, see Short Title note set out under section 552 of Title 16 and Tables.

The adjournment of the Eighty-fifth Congress, referred to in subsec. (c) of this section, took place on Aug. 24, 1958.

The Migratory Bird Hunting Stamp Act, referred to in subsec. (f), subsequently renamed the Migratory Bird Hunting and Conservation Stamp Act, is act Mar. 16, 1934, ch. 71, 48 Stat. 451, as amended, which is classified generally to subchapter IV (§718 et seq.) of chapter 7 of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 718 of Title 16 and Tables.

AMENDMENTS

1998—Subsecs. (f), (g). Pub. L. 105–312 and Pub. L. 105–321 amended subsecs. (f) and (g) identically, substituting ''Klamath Marsh National Wildlife Refuge'' for ''Klamath Forest National Wildlife Refuge''.

1959—Subsec. (f). Pub. L. 86–247 changed date for Federal acquisition of Klamath Indian Marsh from April 1, 1961, to earliest date after September 30, 1959, that funds are available to pay for property from sale of stamps.

CHANGE OF NAME

Committee on Interior and Insular Affairs of the Senate abolished and replaced by Committee on Energy and Natural Resources of the Senate, effective Feb. 11, 1977. See Rule XXV of Standing Rules of the Senate, as amended by Senate Resolution No. 4, Ninety-fifth Congress (popularly cited as the ''Committee System Reorganization Amendments of 1977''), approved Feb. 4, 1977. Section 105 of Senate Resolution No. 4 established a temporary Select Committee on Indian Affairs having jurisdiction over matters relating to Indian affairs (such matters previously having been within the jurisdiction of the Committee on Interior and Insular Affairs). Senate Resolution No. 127, June 6, 1984, Ninety-eighth Congress, established the Select Committee on Indian Affairs as a permanent committee of the Senate, and section 25 of Senate Resolution No. 71, Feb. 25, 1993, One Hundred Third Congress, redesignated the Select Committee on Indian Affairs as the Committee on Indian Affairs.

Committee on Interior and Insular Affairs of the House of Representatives changed to Committee on Natural Resources of the House of Representatives on Jan. 5, 1993, by House Resolution No. 5, One Hundred Third Congress.

## §564w–2. Federal acquisition of tribal land

### (a) Condemnation authority

The Secretary of Agriculture is authorized and directed to acquire by condemnation all of the Klamath Indian forest lands which the trustee for the Klamath Indian Tribe is required to sell by the terms of its trust agreement, and the lands so acquired shall become a part of the Winema National Forest.

### (b) Initiation of action; authorization of appropriations

The condemnation action may be initiated either before or after the lands are offered for sale by the trustee, and for the purpose of carrying out the provisions of this section, there is hereby authorized to be appropriated not to exceed $70,000,000.

### (c) Applicability of homesite provisions

The homesite provisions of section 564w–1(g) of this title shall apply to the lands acquired by the Secretary pursuant to this subchapter.

(Aug. 13, 1954, ch. 732, §29, as added Pub. L. 93–102, Aug. 16, 1973, 87 Stat. 349.)

## §564x. Timber sales

Nothing in this subchapter shall affect the authority to make timber sales otherwise authorized by law prior to the termination of Federal control over such timber.

(Pub. L. 85–132, §2, Aug. 14, 1957, 71 Stat. 348.)

CODIFICATION

This section was not enacted as a part of act Aug. 13, 1954, ch. 732, 68 Stat. 718, which comprises this subchapter.

## SUBCHAPTER XIV—KLAMATH TRIBE: DISTRIBUTION OF JUDGMENT FUND

## §565. Authorization to distribute funds

The Secretary of the Interior is authorized and directed to distribute in accordance with the provisions of this subchapter the funds appropriated in satisfaction of a judgment obtained by the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians, hereinafter called the Klamath Tribe for the purposes of the administration of this subchapter, from the Indian Claims Commission against the United States in docket numbered 100, and all other funds heretofore or hereafter deposited in the United States Treasury to the credit of the Klamath Tribe or any of its constituent parts or groups, except the funds heretofore or hereafter set aside for the purpose of paying the usual and necessary expenses of prosecuting claims against the United States.

(Pub. L. 89–224, §1, Oct. 1, 1965, 79 Stat. 897.)

REFERENCES IN TEXT

The Indian Claims Commission, referred to in text, terminated Sept. 30, 1978. See Codification note set out under former section 70 et seq. of this title.

## §565a. Distribution to persons on final roll; payment of shares due living adults, deceased enrollees, adults under legal disabilities, persons in need of assistance, and minors

(a) A distribution shall be made of the funds resulting from docket numbered 100, including interest, after deducting litigation expenses and estimated costs of distribution to all persons whose names appear on the final roll of the Klamath Tribe, which roll was closed and made final as of August 13, 1954 (68 Stat. 718). Except as provided in subsections (b), (c), (d), and (e) of this section, a share or portion of a share payable to a living adult shall be paid directly to such adult; (b) a share payable to a deceased enrollee shall be paid to his heirs or legatees upon the filing of proof of death and inheritance satisfactory to the Secretary of the Interior, whose findings and determinations upon such proof shall be final and conclusive: *Provided*, That amounts payable to deceased heirs amounting to $5 or less shall not be paid, and such amounts shall remain in the United States Treasury to the credit of the Klamath Tribe; (c) a share payable to an adult under legal disability shall be paid to his legal representative; (d) a share payable to a person previously found to be in need of assistance under the provisions of section 564n of this title, may be paid directly to the individual or, if the Secretary deems it in the best in-

terest of the individual, it may be added to the trust now in force on behalf of the said individual, with concurrence of the trustee; and (e) a share or portion of a share payable to a person under age of majority as determined by the laws of the State of residence shall be paid to a parent, legal guardian, or trustee of such minor.

(Pub. L. 89–224, §2, Oct. 1, 1965, 79 Stat. 897.)

REFERENCES IN TEXT

August 13, 1954, referred to in text, is a reference to section 3 of act Aug. 13, 1954, ch. 732, 68 Stat. 718, which is classified to section 564b of this title.

### § 565b. Time of payment; claims for shares of deceased enrollees

Within sixty days of October 1, 1965, the Secretary of the Interior shall commence to pay the share due to each living person whose name appears on the final roll of August 13, 1954. As to members who have died since promulgation of the final roll of August 13, 1954, the Secretary shall mail a notice of distribution of funds and a form for presentation of a claim thereunder to all known heirs or legatees of such deceased enrollees. All such claims shall be filed with the area director of the Bureau of Indian Affairs, Portland, Oregon, within two years following October 1, 1965. From and after that date, all claims and the right to file claims for any distribution from the judgment in docket numbered 100 shall be forever barred.

(Pub. L. 89–224, §3, Oct. 1, 1965, 79 Stat. 897.)

### § 565c. Disposition of funds remaining after distribution

Funds remaining in the United States Treasury to the credit of the said Klamath Tribe, or any of its constituent parts or groups, after the distribution of funds resulting from Indian Claims Commission docket numbered 100 as provided by sections 565a and 565b of this title, together with any other funds which may be deposited in the United States Treasury, including without limitation funds accruing from other judgments against the United States (¹after payment of expenses, including attorney fees, payments for rights-of-way, trespass damages, or other revenues, together with any interest accrued thereon, shall, after deduction of the estimated cost of distribution, be distributed from time to time as determined by the Secretary to the members of the Klamath Tribe or to the members of any of its constituent parts or groups in the same manner as provided in sections 565a and 565b of this title.

(Pub. L. 89–224, §4, Oct. 1, 1965, 79 Stat. 897.)

REFERENCES IN TEXT

The Indian Claims Commission, referred to in text, terminated Sept. 30, 1978. See Codification note set out under former section 70 et seq. of this title.

### § 565d. Disposition of funds insufficient to justify further distribution

After all claims of the Klamath Tribe or any of its constituent parts or groups against the United States have been finally determined, appropriated, and distributed, as provided in sections 565a, 565b, and 565c of this title; and after all litigation expenses (including attorney fees) and costs of distributions have been paid, any funds remaining in the United States Treasury to the credit of the Klamath Tribe or any of its constituent parts or groups which, in the discretion of the Secretary of the Interior are insufficient to justify a further distribution, shall be deposited in the miscellaneous receipts of the Treasury of the United States.

(Pub. L. 89–224, §5, Oct. 1, 1965, 79 Stat. 898.)

### § 565e. Costs

The costs of distribution may be paid out of the deductions authorized by sections 565a and 565c of this title. Any unused portion of such amounts shall remain in the United States Treasury to the credit of the Klamath Tribe.

(Pub. L. 89–224, §6, Oct. 1, 1965, 79 Stat. 898.)

### § 565f. Taxes

None of the funds distributed pursuant to this subchapter shall be subject to Federal or State income tax.

(Pub. L. 89–224, §7, Oct. 1, 1965, 79 Stat. 898.)

### § 565g. Rules and regulations

The Secretary is authorized to prescribe rules and regulations to carry out the provisions of this subchapter.

(Pub. L. 89–224, §8, Oct. 1, 1965, 79 Stat. 898.)

SUBCHAPTER XIV–A—KLAMATH TRIBE: RESTORATION OF FEDERAL SUPERVISION

### § 566. Restoration of Federal recognition, rights, and privileges

#### (a) Federal recognition

Notwithstanding any provision of law, Federal recognition is hereby extended to the tribe and to members of the tribe. Except as otherwise provided in this subchapter, all laws and regulations of the United States of general application to Indians or nations, tribes, or bands of Indians which are not inconsistent with any specific provision of this subchapter shall be applicable to the tribe and its members.

#### (b) Restoration of rights and privileges

All rights and privileges of the tribe and the members of the tribe under any Federal treaty, Executive order, agreement, or statute, or any other Federal authority, which may have been diminished or lost under the Act entitled ''An Act to provide for the termination of Federal supervision over the property of the Klamath Tribe of Indians located in the State of Oregon and the individual members thereof, and for other purposes'', approved August 13, 1954 (25 U.S.C. 564 et seq.), are restored, and the provisions of such Act, to the extent that they are inconsistent with this subchapter, shall be inapplicable to the tribe and to members of the tribe after August 27, 1986.

#### (c) Federal services and benefits

Notwithstanding any other provision of law, the tribe and its members shall be eligible, on

¹ So in original. No closing parenthesis was enacted.

and after August 27, 1986, for all Federal services and benefits furnished to federally recognized Indian tribes or their members without regard to the existence of a reservation for the tribe. In the case of Federal services available to members of federally recognized Indian tribes residing on or near a reservation, members of the tribe residing in Klamath County shall be deemed to be residing in or near a reservation. Any member residing in Klamath County shall continue to be eligible to receive any such Federal service notwithstanding the establishment of a reservation for the tribe in the future. Notwithstanding any other provision of law, the tribe shall be considered an Indian tribe for the purpose of the ''Indian Tribal Government Tax Status Act'' (Sec. 7871, I.R.C. 1986).

**(d) Certain rights not altered**

Nothing in this subchapter shall alter any property right or obligation, any contractual right or obligation, or any obligation for taxes already levied.

**(e) Modoc Indian Tribe of Oklahoma**

This subchapter does not apply to the members of the Modoc Indian Tribe of Oklahoma as recognized under section 861a(a) of this title and the Klamath Tribe of Indians does not (except for the purposes set out in section 861a(a)(1) of this title) include the members of the Modoc Indian Tribe of Oklahoma.

(Pub. L. 99–398, § 2, Aug. 27, 1986, 100 Stat. 849; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095.)

REFERENCES IN TEXT

Act approved August 13, 1954, referred to in subsec. (b), is act Aug. 13, 1954, ch. 732, 68 Stat. 718, as amended, which is classified generally to subchapter XIII (§ 564 et seq.) of this chapter. For complete classification of this Act to the Code, see Tables.

The Indian Tribal Government Tax Status Act (Sec. 7871, I.R.C. 1986), referred to in subsec. (c), probably means the Indian Tribal Governmental Tax Status Act of 1982, which is title II of Pub. L. 97–473, Jan. 14, 1983, 96 Stat. 2607, as amended, and is classified principally to subchapter C (§ 7871) of chapter 80 of Title 26, Internal Revenue Code. For complete classification of this Act to the Code, see Short Title of 1983 Amendments note set out under section 1 of Title 26 and Tables.

AMENDMENTS

1986—Subsec. (c). Pub. L. 99–514 substituted ''I.R.C. 1986'' meaning Internal Revenue Code of 1986 for ''I.R.C. 1954'' meaning Internal Revenue Code of 1954.

SHORT TITLE

Section 1 of Pub. L. 99–398 provided that: ''This Act [enacting this subchapter] may be cited as the 'Klamath Indian Tribe Restoration Act.'''

**§ 566a. Tribe Constitution and Bylaws**

The tribe's Constitution and Bylaws shall remain in full force and effect and nothing in this subchapter shall affect the power of the General Council to take any action under the Constitution and Bylaws.

(Pub. L. 99–398, § 3, Aug. 27, 1986, 100 Stat. 850.)

**§ 566b. Conservation and development of lands**

**(a) In general**

Notwithstanding the tribe's previous rejection of the Act of June 18, 1934 (25 U.S.C. 461 et seq.),

upon written request of the General Council, the Secretary of the Interior shall conduct a special election pursuant to section 18 of such Act [25 U.S.C. 478] to determine if such Act should be applicable to the tribe.

**(b) Adoption of constitution**

Upon written request of the General Council, the Secretary shall conduct an election pursuant to section 16 of the Act approved on June 18, 1934 (43 Stat. 987; 25 U.S.C. 476), for the purpose of adopting a new constitution for the tribe.

(Pub. L. 99–398, § 4, Aug. 27, 1986, 100 Stat. 850.)

REFERENCES IN TEXT

Act of June 18, 1934, referred to in text, popularly known as the Indian Reorganization Act, is classified generally to subchapter V (§ 461 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 461 of this title and Tables.

**§ 566c. Hunting, fishing, trapping, and water rights**

Nothing in this subchapter shall affect in any manner any hunting, fishing, trapping, gathering, or water right of the tribe and its members.

(Pub. L. 99–398, § 5, Aug. 27, 1986, 100 Stat. 850.)

**§ 566d. Transfer of land to be held in trust**

The Secretary shall accept real property for the benefit of the tribe if conveyed or otherwise transferred to the Secretary. Such property shall be subject to all valid existing rights including liens, outstanding taxes (local and State), and mortgages. Subject to the conditions imposed by this section, the land transferred shall be taken in the name of the United States in trust for the tribe and shall be part of their reservation. The transfer of real property authorized by this section shall be exempt from all local, State, and Federal taxation as of the date of transfer.

(Pub. L. 99–398, § 6, Aug. 27, 1986, 100 Stat. 850.)

**§ 566e. Criminal and civil jurisdiction**

The State shall exercise criminal and civil jurisdiction within the boundaries of the reservation, in accordance with section 1162 of title 18 and section 1360 of title 28, respectively.

(Pub. L. 99–398, § 7, Aug. 27, 1986, 100 Stat. 850.)

**§ 566f. Economic development**

**(a) Plan for economic self-sufficiency**

The Secretary shall—

(1)(A) enter into negotiations with the Executive Committee of the General Council with respect to establishing a plan for economic development for the tribe; and

(B) in accordance with this section and not later than two years after August 27, 1986, develop such a plan.

(2) Upon the approval of such plan by the General Council (and after consultation with the State and local officials pursuant to subsection (b) of this section), the Secretary shall submit such plan to the Congress.

**(b) Consultation with State and local officials required**

To assure that legitimate State and local interests are not prejudiced by the proposed eco-

nomic self-sufficiency plan, the Secretary shall notify and consult with the appropriate officials of the State and all appropriate local governmental officials in the State. The Secretary shall provide complete information on the proposed plan to such officials, including the restrictions on such proposed plan imposed by subsection (c) of this section. During any consultation by the Secretary under this subsection, the Secretary shall provide such information as the Secretary may possess, and shall request comments and additional information on the extent of any State or local service to the tribe.

**(c) Restrictions to be contained in plan**

Any plan developed by the Secretary under subsection (a) of this section shall provide that—

(1) any real property transferred by the tribe or any member to the Secretary shall be taken and held in the name of the United States for the benefit of the tribe;

(2) any real property taken in trust by the Secretary pursuant to such plan shall be subject to—

(A) all legal rights and interests in such land existing at the time of the acquisition of such land by the Secretary, including any lien, mortgage, or previously levied and outstanding State or local tax; and

(B) foreclosure or sale in accordance with the laws of the State pursuant to the terms of any valid obligation in existence at the time of the acquisition of such land by the Secretary; and

(3) any real property transferred pursuant to such plan shall be exempt from Federal, State, and local taxation of any kind.

**(d) Appendix to plan submitted to Congress**

The Secretary shall append to the plan submitted to the Congress under subsection (a) of this section a detailed statement—

(1) naming each individual and official consulted in accordance with subsection (b) of this section;

(2) summarizing the testimony received by the Secretary pursuant to any such consultation; and

(3) including any written comments or reports submitted to the Secretary by any party named in paragraph (1).

(Pub. L. 99–398, § 8, Aug. 27, 1986, 100 Stat. 850.)

**§ 566g. Definitions**

For the purposes of this subchapter the following definitions apply:

(1) The term ''tribe'' means the Klamath Tribe consisting of the Klamath and Modoc Tribes of Oregon and the Yahooskin Band of Snake Indians.

(2) The term ''member'' means those persons eligible for enrollment under the Constitution and Bylaws of the Klamath Tribe.

(3) The term ''Secretary'' means the Secretary of the Interior or his designated representative.

(4) The term ''State'' means the State of Oregon.

(5) The term ''Constitution and Bylaws'' means the Constitution and Bylaws of the Klamath Tribe of Indians in effect on August 27, 1986.

(6) The term ''General Council'' means the governing body of the tribe under the Constitution and Bylaws.

(Pub. L. 99–398, § 9, Aug. 27, 1986, 100 Stat. 851.)

**§ 566h. Regulations**

The Secretary may make such rules and regulations as are necessary to carry out the purposes of this subchapter.

(Pub. L. 99–398, § 10, Aug. 27, 1986, 100 Stat. 852.)

SUBCHAPTER XV—SHOSHONE TRIBE: DISTRIBUTION OF JUDGMENT FUND

**§ 571. Membership roll; preparation**

The Secretary of the Interior is authorized and directed, with the advice and consent of the business council of the Shoshone Tribe of the Wind River Reservation in Wyoming, to prepare a roll showing the members of said tribe living on July 27, 1939, and such roll shall form the basis for the distribution of the judgment fund of said tribe created as the result of the passage of the Act of June 25, 1938 (52 Stat. 1114–1156), and accrued interest thereon.

(July 27, 1939, ch. 387, § 1, 53 Stat. 1128.)

REFERENCES IN TEXT

Act of June 25, 1938, referred to in text, provided for an appropriation for payment of judgments rendered by the court of claims and reported to the 75th Congress in Senate Document Numbered 191, and House Documents Numbered 661 and 686. House Document No. 661 listed a judgment in favor of the Shoshone Tribe of Indians of the Wind River Reservation in Wyoming, in the sum of $4,408,444.23, with interest on a part thereof to the date of payment, for the taking of land.

**§ 572. Payments to individuals; expenditure of payments**

There shall be credited on the books of the Office of Indian Affairs the sum of $2,450 to each member of said tribe whose name appears on the roll provided for in section 571 of this title, and out of such sum so credited the Secretary of the Interior is authorized to make available immediately to each individual member of the tribe the sum of $100; and, under such rules and regulations as he may prescribe, the sum of $1,350 to each adult and the sum of $500 to each minor for the following purposes: Purchase of land, improvement of lands to be acquired or already held by the Indian, for the erection and improvement of suitable homes, the purchase of building material, farming equipment, livestock, feed, food, seed, grain, tools, machinery, implements, household goods, bedding, clothing, and any other equipment or supplies necessary to enable the Indians to fit themselves for or to engage in farming, livestock, industry, or such other pursuits or vocations, including education, as will enable them to become self-supporting: *Provided, however,* That the funds of the aged, infirm, decrepit, and incapacitated members may be used for their proper maintenance and support in the discretion of the Secretary of the Interior. The remainder of the share of each adult individual Indian, including accrued interest, shall be made

# United States Court of Appeals
## for the Federal Circuit

KLAMATH CLAIMS COMMITTEE v. UNITED STATES, No. 2012-5130

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by FREDERICKS PEEBLES & MORGAN LLP, Attorneys for Plaintiff-Appellant to print this document.  I am an employee of Counsel Press.

On **October 15, 2012**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief of Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

> KATHERINE WADE HAZARD
> Katherine.hazard@usdoj.gov
> DEPARTMENT OF JUSTICE
> Environment and Natural Resources Division
> P.O. Box 23795
> L'Enfant Plaza Station
> Washington, DC 20026-3795
> (202) 514-2110
>
> *Attorneys for Defendants-Appellees*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

October 15, 2012                                         /s/ Robyn Cocho
                                                        Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

__x__ The brief contains __13,543__ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

__x__ The brief has been prepared in a proportionally spaced typeface using MS Word 2007_ in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using MS Word 2002_ in a ___ characters per inch_____ font.

October 15, 2012                    /s/ Thomas W. Fredericks_____
DATE                               THOMAS W. FREDERICKS